IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EXXON MOBIL CORPORATION,      )
                              )
        Plaintiff,            )
                              )
    v.                        )      Civil Action Nos.   H-10-2386 (LHR)
                              )                          H-11-1814 (LHR)
UNITED STATES OF AMERICA,     )
                              )
        Defendant.            )
                              )

**PLAINTIFF EXXON MOBIL CORPORATION'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO PHASE 1 LIABILITY AND ALLOCATION AND
<u>SUPPORTING MEMORANDUM</u>**

J. Gregory Copeland (S.D. Tex. No. 02402 and
        Texas Bar No. 04798500) - Attorney in Charge
Daniel M. Steinway (S.D. Tex. No. 1105349)
Michael McGovern (S.D. Tex. No. 1095459)
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana
Houston, TX 77002-1234
Tel.:   (713) 229-1301
Fax:    (713) 229-2701
greg.copeland@bakerbotts.com

*Counsel for Plaintiff Exxon Mobil Corporation*

September 30, 2013

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

INTRODUCTION .............................................................................................................1

NATURE AND STAGE OF THE PROCEEDING........................................................3

STATEMENT OF THE ISSUES.....................................................................................4

STANDARD OF REVIEW ..............................................................................................5

STATEMENT OF FACTS ...............................................................................................5

   I.    The War Emergency .............................................................................................6

   II.   The Governmental Regulatory Program for Avgas Production ......................7

   III.  The Government-Owned Plants at Each Facility ...........................................13

   IV.  Wartime-Related Cleanup Costs.......................................................................15

SUMMARY OF THE ARGUMENT ............................................................................16

ARGUMENT ...................................................................................................................17

   I.    The Government is Subject to CERCLA Liability .........................................17

        A. Plaintiff Is Entitled to Summary Judgment Under Section 107(a) of CERCLA ......17

            1.   Plaintiff Has Satisfied the *Prima Facie* Elements for Imposing CERCLA Liability on the United States ........................................................................17

            2.   In Addition to "Prior Owner" Liability, the United States Is Also Subject to "Prior Operator" CERCLA Liability at Both Sites......................19

            3.   ExxonMobil Is Entitled to Judgment of Joint and Several Liability Under Section 107(a) of CERCLA Against the United States ....................33

            4.   ExxonMobil Is Entitled to Summary Judgment as to the Government's Liability under Section 113(f)(3)(B) of CERCLA at the Baytown Site.......37

            5.   ExxonMobil Is Entitled to Summary Judgment as to the Government's Liability and Allocable Share of Future Costs.............................................41

   II.   In the Alternative, The Court Should Adopt an Allocation Methodology Using a Production-Oriented Surrogate Factor and Reflecting Key Equitable Factors Relating to: (1) the Government's Previously-Imposed Restrictions on the Use of Proper

Pollution Controls During the Wartime, and (2) the Government's Contractual Obligations ...................................................................................................47

A.  The United States' Allocable Share Should Be Based on Equitable Factors That the Court Deems Appropriate ........................................................47

B.  The Court Should Adopt the Allocation Methodology Offered by Plaintiff ............48

    1.  Plaintiff's Proposed Allocation Methodology Accurately Reflects Site-Specific Conditions, and is Fully Supported by the CERCLA Authorities, Regulatory Determinations and the Evidentiary Record .............................48

    2.  Plaintiff's Proposed Allocation Methodology Incorporates a Number of Critical and Relevant Equitable Factors .......................................................52

CONCLUSION ...............................................................................................................59

ATTACHMENTS

Cover Letter from Michael McGovern to the Clerk of the Court

[Proposed] Order

Plaintiff's Proposed Findings of Undisputed Material Facts

Affidavit of Michael McGovern

Exhibits 1-4

    Exhibit 1: Declaration of A.J. Gravel and Attachments

    Exhibit 2: Declaration of Jere M. Johnson and Attachment

    Exhibit 3: Defendant United States of America's Responses to Plaintiff Exxon Mobil Corporation's First Set of Requests for Admission

    Exhibit 4: Declaration of Richard Lane White and Attachments

Appendix pp. 000001-003087

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*3000 E. Imperial, LLC v. Robertshaw Controls Co.*,
  No. CV 08-3985, 2010 WL 5464296 (C.D. Cal. Dec. 29, 2010) ..............................36

*American International Specialty Lines Insurance Co. v. United States*, No. CV-09-
  01734, 2010 WL 2635768, at *28 (C.D. Cal. June 30, 2010) ...........................32, 33

*Amoco Oil Co. v. Borden, Inc.*,
  889 F.2d 664 (5th Cir. 1989) ..............................................................................18

*Ashley II of Charleston v. PCS Nitrogen*,
  791 F. Supp. 2d 431 (D.S.C. 2011) ("*Ashley II*") ..........................................56, 57

*Baranowski v. Hart*,
  486 F.3d 112 (5th Cir. 2007) .................................................................................5

*Basic Management Inc. v. United States*,
  569 F. Supp. 2d 1106 (D. Nev. 2008) ....................................................................21

*Beazer East, Inc. v. Mead Corp.*,
  412 F.3d 429 (3d Cir. 2005) ("*Beazer*") ...............................................................48

*Bibb v. Allen*, 149 U.S. 481 (1895) ...........................................................................56

*Board of County Commissioners of La Plata County, Colorado v. Brown Group Retail,
  Inc.*,
  768 F. Supp. 2d 1092 (D. Colo. 2011) ("*La Plata*") ..................................36, 45, 46

*Boeing Co. v. Cascade Corp.*,
  207 F. 3d 1177 (9th Cir. 2000) .............................................................................43

*Boeing Co. v. Cascade Corp.*,
  920 F. Supp. 1121 (D. Or. 1996) .....................................................................45, 46

*Boudreaux v. Swift Transp. Co.*,
  402 F.3d 536 (5th Cir. 2005) .................................................................................5

*Bowen v. Mass.*,
  487 U.S. 879 (1988) .............................................................................................54

*Burlington Northern and Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 612 (2009)
  ("*Burlington Northern*") ..........................................................................32, 33, 34

*Cadillac Fairview/California, Inc. v. Dow Chemical Co.,*
    299 F. 3d 1019 (9th Cir. 2002) ("*Cadillac Fairview*") ........................................ *passim*

*Cadillac Fairview/California, Inc. v. Dow Chemical Co.,*
    Nos. 83-8034 MAP (Bx), 93-7996 MRP (Bx), 1997 WL 149196 (C.D. Cal. Feb. 21,
    1997) ("*Cadillac Fairview II*") .................................................................................54

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)................................................................................................5

*City of Waukegan v. National Gypsum Co.,*
    560 F. Supp. 2d 636 (N.D. Ill. 2008) .................................................................25

*Connors v. Graves,*
    538 F.3d 373 (5th Cir. 2008) .................................................................................5

*Consol. Edison Co. of N.Y. v. UGI Util., Inc.,*
    423 F.3d 90 (2d Cir. 2005) ("*Consolidated Edison*")......................................33, 40

*Couer D'Alene Tribe v. ASARCO Inc.,*
    280 F. Supp. 2d 1094 (D. Idaho 2003) ("*Couer D'Alene*")..............................21, 22

*Differential Development - 1994, Ltd v. Harkrider Distributing Co.,*
    470 F. Supp. 2d 727 (S.D. Tex. 2007) ("*Differential*") ............................37, 38, 40

*Exxon Mobil Corp. v. United States,* 101 Fed. Cl. 576 (2011) ..................................3, 55

*Envtl. Transp. Sys., Inc. v. ENSCO,*
    969 F.2d 503 (7th Cir. 1992) ..............................................................................48

*FMC Corp v. U.S. Dept. of Commerce,*
    29 F.3d 833 (3rd Cir. 1994) ("*FMC*")......................................................24, 25, 29

*GenCorp, Inc. v. Olin Corp.,* 390 F.3d 433 (6th Cir. 2004) .......................................44

*Gussack Realty Co. v. Xerox Corp.,*
    224 F.3d 85 ...........................................................................................................46

*Halliburton Energy Services, Inc. v. NL Industries,*
    648 F. Supp. 2d 840 (S.D. Tex. 2009) ................................................................18

*In re Bell Petroleum Services., Inc.,*
    3 F.3d 889 (5th Cir. 1993) ("*Bell Petroleum*") ............................................34, 47

*Jones v. Inmont Corp.,*
    584 F. Supp. 1425 (S.D. Ohio 1984) ..................................................................42

*Jones-Hamilton Co. v. Beazer Materials & Serv.,*
    959 F.2d 126 (9th Cir. 1992) ..............................................................................54

*Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.,*
   14 F.3d 321 (7th Cir. 1994) ...................................................................................54

*Litgo New Jersey, Inc. v. Martin,*
   Civ. A. No. 06-2891(AET), 2010 WL 2400388 (D.N.J. Jun. 10, 2010) ................................25

*Little v. Liquid Air Corp.,*
   37 F.3d 1069 (5th Cir. 1994) (en banc) ..................................................................5

*Lyondell Chemical Co. v. Occidental Chemical Corp.,*
   608 F.3d 284 (5th Cir. 2010) ...............................................................................35

*Mardan Corp. v. C.G.C. Music, Ltd.,*
   600 F. Supp. 1049 (D. Ariz. 1984) ........................................................................39

*Mardan Corp. v. CGC Music, Ltd.,*
   804 F.2d 1454 (9th Cir. 1986) ..............................................................................54

*Metropolitan Water Reclamation Dist. of Greater Chicago v. North Amer. Galvanizing &*
   *Coatings, Inc.,*
   473 F.3d 824 (7th Cir. 2007) ................................................................................34

*New Jersey Turnpike Auth. v. PPG Industries, Inc.,*
   197 F.3d 96 (3rd Cir. 1999) ..................................................................................48

*New York v. Solvent Chemical Co.,*
   664 F.3d 22 (2d Cir. 2011) ("*Solvent*").........................................................42, 43, 44

*Niagara Mohawk Power Corp. v. Chevron U.S.A.,*
   596 F.3d 112 (2nd Cir. 2010).................................................................................21

*OHM Remediation Services v. Evans Cooperage Co.,*
   116 F.3d 1574 (5th Cir. 1997) ("*OHM*") ...........................................................17, 18

*Orix Credit Alliance, Inc. v. Wolfe,*
   212 F.3d 891 (5th Cir. 2000) ................................................................................46

*Pakootas v. Teck Cominco Metals, Ltd.,*
   868 F. Supp. 2d 1106 (E.D. Wash. 2012) ("*Pakootas*") ...............................................35

*PCS Nitrogen Inc. v. Ashley II of Charleston,*
   714 F.3d 161 (4th Cir. 2013) ("*PCS Nitrogen*")..................................................34, 35

*S. Fla. Water Mngt. Dist. v. Montolvo,*
   No. 88-8038, 1989 WL 260215 (S.D. Fla. Feb. 15, 1989) .....................................................52

*Sea Lion, Inc. v. Wall Chemical Corp.,* 974 F. Supp. 589, 595 (S.D. Tex. 1995) ("*Sea Lion*")........................................................................................32, 33

*Shapiro & Sons, Inc. v. Rutland Waste & Metal Co.*,
    76 F. Supp. 2d 82 (D. Mass. 1999) .................................................................42

*Shell Oil Co. v. United States,* 108 Fed. Cl. 422 (2013) ....................................3, 55

*Sossamon v. Lone Star State of Tex.*,
    560 F.3d 316 (5th Cir. 2009) ........................................................................5

*Steadfast Ins. Co. v. United States*,
    No. CV-06-4686 AHM, 2009 WL 3785565 ("*Steadfast*") .........................21

*Tex Tin Settling Defendants Steering Comm. v. Great Lakes Carbon Corp.*,
    Civ. A. Nos. G-96-0247, G-96-0272, 2008 WL 4376363 (S.D. Tex. Sept. 22, 2008)
    ("*Tex Tin*") ...................................................................................................17

*Tosco Corp. v. Koch Industries, Inc.*,
    216 F.3d 886 (10th Cir. 2000) ("*Tosco*")........................21, 44, 45, 56, 57

*Trinity Industries, Inc. v. Chicago Bridge & Iron Co.*,
    No. 12-2059 2013 WL 4418534 (3d. Cir. Aug. 20, 2013) ("*Trinity*") ...............40, 41

*Triple Tee Golf, Inc. v. Nike, Inc.*,
    485 F.3d 253 (5th Cir. 2007) ........................................................................5

*Union Carbide Corp. v. Thiokol Corp.*,
    890 F. Supp. 1035 (S.D. Ga. 1994) ("*Union Carbide*") ............................39

*United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373 (8th Cir. 1989)
    ("*Aceto*") ................................................................................................32, 33

*United States v. $92,203.00 in U.S. Currency*,
    537 F.3d 504 (5th Cir. 2008) ........................................................................5

*United States v. Alcan Aluminum Corp*,
    964 F.2d 252 (3d Cir. 1992).........................................................................35

*United States v. Alcan Aluminum Corp*,
    990 F.2d 711 (2d Cir. 1993).........................................................................35

*United States v. Atlantic Research Corp.*,
    551 U.S. 128 (2007) ("*ARC*") ................................................................18, 33

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ("*Bestfoods*")........................................20, 22, 24, 25

*United States v. Bliss*,
    667 F. Supp. 1298 (E.D. Mo. 1987)............................................................35

*United States v. Davis*, 261 F.3d 1, (1st Cir. 2001) .......................................44

*United States v. Meyer, Inc.,*
    932 F.2d 568 (6th Cir. 1991) ("*Meyer*") ...........................................................47

*United States v. Monsanto Co.,*
    858 F.2d 160 (4th Cir. 1988) ......................................................................35

*United States v. NCR Corp.,*
    Civ. No. 10–C–910, 2013 WL 1858597 (E.D. Wis. May 1, 2013) ("*NCR*") ...................34, 35

*United States v. Rohm and Haas Co.,*
    790 F. Supp. 1255 (E.D. Pa. 1992) ...............................................................39

*United States v. Shell Oil Co.,*
    13 F. Supp. 2d 1018 (C.D. Cal. 1998) ............................................................10

*United States v. Shell Oil Co.,* 294 F.3d 1045, 1051-54 (9th Cir. 2002) ("*Shell*") .................18, 19

*United States v. Shell Oil Co.,*
    1995 U.S.Dist. LEXIS 19778 (C.D. Cal. Sept. 18, 1995)..........................................10

*United States v. Shell Oil Co.,*
    841 F. Supp. 962 (C.D. Cal. 1993) .......................................................10, 11, 13, 19, 29

*United States v. Sterling Centrecorp, Inc.,*
    No. 2:08-cv-02556-MCE-JFM, 2013 WL 3214384 (E.D. Cal. Jun. 24, 2013)
    ("*Sterling*").....................................................................................21, 22

*United States v. Stringfellow,*
    661 F. Supp. 1053 (C.D. Cal. 1987) ...............................................................35

*United States v. Township of Brighton,*
    153 F.3d 307 (6th Cir. 1998) ......................................................................24

*United States v. Wade,*
    577 F. Supp. 1326 (E.D. Pa. 1983) ................................................................33

*United States v. Washington State Dept. of Transp.,*
    Civ. A. No. 3:08-cv-05722 (RJB), 2010 WL 5071277 (W.D. Wa. Dec. 7, 2010)
    ("*Washington State*") ..............................................................................25

*Vine Street, LLC v. Keeling,*
    460 F. Supp. 2d 728 (E.D. Tex. 2006) ("*Vine Street*")..................................42, 45, 46

*Yankee Gas Serv. Co. v. UGI Utilities,*
    852 F. Supp. 2d 229 (D. Conn. 2012) ("*Yankee Gas*")..................................45, 49, 52

**STATUTES**

Clean Water Act, 33 U.S.C. §§1251-1387 (1987)....................................................56

Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§9601-9675 (2006)..................................................................... *passim*

First War Powers Act of 1941, Pub. L. No. 77-354, § 201, 55 Stat. 838, 839 (1941).....................7

National Defense Act of 1916, Pub. L. No. 64-85, § 120, 39 Stat. 166, 213 (1916).......................7

Renegotiation Act of 1942, Pub. L. No. 77-528, §403, 56 Stat. 226, 245-46 (1942)...................28

Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992 (1976)..........................39, 56

Second War Powers Act of 1942, Pub. L. No. 77-507, § 633, 56 Stat. 176 (1942) .......................7

Texas Solid Waste Disposal Act, Tex. Health and Safety Code Ann. § 361.................................37

**OTHER AUTHORITIES**

Executive Order 9024 ..............................................................................................7

Executive Order 9040 ..............................................................................................7

Executive Order 9125 ..............................................................................................7

Executive Order 9276 ..............................................................................................8

*Explanation of Principles for Determination of Costs Under Government Contracts* (War Dept.;1942) ......................................................................................55, 56

Fed. R. Civ. P. 56(a) .........................................................................................1, 5

Restatement (Second) of Agency (1958)..........................................................................56

Restatement (Second) of Torts (1979)............................................................................36

Steadman, Charles W., *Legal Aspects of Renegotiation,* 42 Mich. L. Rev. 1 (1944)....................28

United States Environmental Protection Agency, *Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Petroleum Refining Point Source Category* (Washington: GPO, 1974) ("*EPA Study*")...........................50

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Exxon Mobil Corporation ("ExxonMobil") respectfully moves for partial summary judgment as to liability and allocation against Defendant United States of America ("United States" or "Government") with respect to both of the above-captioned cases. In support of this motion, ExxonMobil submits the accompanying memorandum set forth below.   A proposed order is provided for the Court.

## INTRODUCTION

These two cases involve claims for cost recovery due to wartime activities at two ExxonMobil facilities: the Baytown refinery and chemical plant ("Baytown Facility") and the Baton Rouge refinery and chemical plant ("Baton Rouge Facility").[1] The Baytown Facility, which is located adjacent to the Houston Ship Channel in Baytown, Texas, commenced operations in 1920 as a refinery originally owned and operated by ExxonMobil's predecessor, Humble Oil & Refining Company. PF ¶¶ 1-2.[2] The Baton Rouge refinery and chemical plant ("Baton Rouge Facility"), which is located adjacent to the Mississippi River in Baton Rouge, Louisiana, commenced operations in 1909 as a refinery originally owned and operated by the Standard Oil Company of Louisiana, another predecessor of ExxonMobil.[3] PF ¶¶ 4-5. While ExxonMobil also currently owns and operates both Facilities, there was a significant period of time from 1941 to 1955 when the United States owned many of the plants at both Facilities and exercised operational control over these Facilities.

---

[1]   A figure depicting the wartime-related plants and waste processing facilities for each Facility has been provided. *See* Expert Report of A.J. Gravel ("Gravel Report") at 43 (Fig. 5) & 140 (Fig. 32) (Attachment 2 to Declaration of A.J. Gravel ("Gravel Decl.") (**Exhibit No. 1**)).

[2]   "PF ¶ __" is a reference to a numbered paragraph in Plaintiff's Proposed Findings of Undisputed Material Facts" filed herewith.  Each proposed finding is supported by one or more exhibits and/or historical documents contained in an Appendix also filed herewith.

[3]   For convenience, the term "ExxonMobil" will be used to include its Humble Oil and Standard Oil of Louisiana predecessor companies.

At the onset of World War II ("WWII"), the United States exercised its war powers to transform and convert both Facilities and their refineries into major war production facilities dedicated to the production of high-octane aviation gasoline ("avgas") and other war products. The Government expanded and reconfigured these refineries to maximize the production of avgas, and arranged for the construction of various Government-owned chemical plants adjacent to or within the confines of the refineries to manufacture toluene, synthetic rubber and avgas components.   The Government specifically integrated and directed the operations of the refineries and the chemical plants at each Facility in order to create a self-contained war production facility, significantly increasing wastes generated by these operations.   Then after WWII ended, the United States continued to own and operate a number of the chemical plants at both Facilities until the mid-1950s, and when the Korean War began in 1950, the Government resumed its operational control of the refineries to once again ensure maximum avgas production for the U.S. military.  Thus, there was a 15-year period of Federal involvement in the ownership and operational control of the Facilities, and during this period the Facilities' operations generated substantial hazardous wastes that caused significant contamination at or adjacent to the Baytown Facility ("Baytown Site") and the Baton Rouge Facility ("Baton Rouge Site").

ExxonMobil has incurred approximately $80 million in response (cleanup) costs at the Sites to investigate and remediate this wartime-related contamination and will incur significant additional future response costs to fully address this matter.  Though the United States is a responsible party and clearly liable for a significant portion of these costs, the United States has not taken any responsibility for the cleanup.  ExxonMobil first submitted a demand letter to the United States for the Baytown Site in 2004, and for the Baton Rouge Site in 2010, but after years of negotiations proved futile, the company filed these pending actions.

## NATURE AND STAGE OF THE PROCEEDING

ExxonMobil has filed two civil actions for reimbursement of its response costs against the United States.  First, in March 2010 ExxonMobil filed a civil action against the United States for reimbursement of its past and future response costs to address wartime-related contamination at the Baytown Site, and then in May 2011 filed a similar action with respect to the  Baton Rouge Site.  In its complaints, ExxonMobil asserts that:  (a) the United States was subject to joint and several liability for such response costs at both Sites under section 107(a) of the federal Comprehensive Environmental Response Compensation and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9607(a); (b) the United States was liable in contribution to ExxonMobil for such response costs under section 113(f)(3)(B) of CERCLA with respect to the Baytown Site; and (c) ExxonMobil was entitled to a declaratory judgment in its favor pursuant to section 113(g)(2) of CERCLA for its future response costs at both Sites.[4]

In August 2011 the Court granted ExxonMobil's motion to consolidate the two cases "to the extent of transferring [the Baton Rouge case] to this court to permit coordination with this earlier filed related case."  In addition, the Court has bifurcated the litigation of the cases into the following two phases: (a) Phase 1 concerns the discovery, pretrial and trial of CERCLA liability

---

[4]    In 2009 ExxonMobil also filed two pending contract actions against the United States in the U.S. Court of Federal Claims regarding the Baytown and Baton Rouge Sites.  In these consolidated cases the company has alleged that the United States is contractually liable to reimburse the company for all environmental cleanup costs incurred to address contamination related to the production of avgas during WWII pursuant to a reimbursement clause in WWII avgas supply contracts between the United States and ExxonMobil's predecessor companies.  In 2011, the U.S. Court of Federal Claims granted ExxonMobil's motion for partial summary judgment on the issue of liability. *Exxon Mobil Corp. v. United States*, 101 Fed. Cl. 576 (2011).  However, earlier this year in a separate case not involving ExxonMobil but regarding similar contract claims, the Court of Federal Claims ruled that a pertinently identical reimbursement clause in other WWII avgas supply contracts did not subject the United States to liability for environmental cleanup costs arising from the production of avgas in WWII under such contracts and that case is currently on appeal before the U.S. Court of Appeals for the Federal Circuit. *See Shell Oil Co. v. United States,* 108 Fed. Cl. 422 (2013).

and allocation issues, and (b) a subsequent Phase 2 will concern discovery, pretrial and trial of costs and federal National Contingency Plan issues under CERCLA.

Pursuant to the Scheduling and Docket Control Order, as amended, the parties conducted extensive factual and expert discovery on Phase 1 issues during the past two-plus years. In addition, after the June 2013 deadline for Phase 1 discovery passed, the parties engaged in a formal mediation process but were not able to settle and resolve the cases or any Phase 1 issues. Thus, in accordance with the September 30 deadline for dispositive motions, ExxonMobil is filing a motion for partial summary judgment on Phase 1 liability and allocation issues. The docket call for the Phase 1 trial is scheduled for February 12, 2014.

## STATEMENT OF THE ISSUES

1. Is the United States liable as a prior "owner" of the Baytown Site and the Baton Rouge Site under section 107(a)(2) of CERCLA?

2. Is the United States liable as a prior "operator" of the Baytown Site and the Baton Rouge Site under section 107(a)(2) of CERCLA?

3. Is the United States liable as an "arranger" with respect to the Baytown Site under section 107(a)(3) of CERCLA?

4. Is the United States subject to joint and several liability under section 107(a) of CERCLA for reimbursement of ExxonMobil's past and future response costs to address wartime-related contamination at the Baytown and Baton Rouge Sites?

5. Is the United States liable in contribution to ExxonMobil under section 113(f)(3)(B) of CERCLA for such past and future response costs at the Baytown Site?

6. If the United States is found liable under CERCLA, what is the United States' allocated share of such past and future response costs at the Baytown and Baton Rouge Sites?

4

## STANDARD OF REVIEW

Summary judgment is appropriate if no genuine issues of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).

Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir. 2005).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.,* 560 F.3d 316, 326 (5th Cir. 2009).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart,* 486 F.3d 112, 119 (5th Cir. 2007).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## STATEMENT OF FACTS

These cases require the reconstruction of events that occurred more than sixty years ago.  Given that relevant witnesses to the wartime activities are deceased, the evidence of such activities consist of the findings and testimony of a number of experts, the deposition testimony

of a handful of WWII-era Government officials from the early 1990s *United States v. Shell Oil Co.* CERCLA case, and a large number of historic documents of the wartime era obtained from the U.S. National Archives or ExxonMobil records.  This evidence specifically describes how the U.S. Congress provided the President with wide-ranging powers to create new wartime agencies and provide them with unprecedented powers and authorities over the petroleum industry and individual oil refineries during WWII and again during the Korean War; how these Government agencies exercised pervasive control over virtually all aspects of the operations of the Baytown and Baton Rouge Facilities during the wartime period in order to maximize the production of avgas and other war products; how the Government embarked on a massive construction of Government-owned and operated chemical plants at the Baytown and Baton Rouge Facilities and fully integrated them with the refinery operations; how these wartime operations caused substantial pollution and contamination that was exacerbated by Government controls over and denials of waste processing improvements; and how ExxonMobil is incurring substantial past and future cleanup costs to remedy the contamination resulting from these wartime operations.

## I.   The War Emergency

Prior to WWII President Franklin D. Roosevelt proclaimed a limited and then eventually unlimited state of national emergency. PF ¶¶ 7 and 16. Subsequently, through a series of legislation Congress entrusted President Roosevelt with extraordinary authority to mobilize the national economy and issue various executive orders establishing new Governmental agencies with broad powers and authorities over various industries, specifically including the petroleum industry, in order to transform the Nation's free market economy into a regulated economy in support of the war effort; some of the more significant Government authorities and activities in this regard were the following. *See generally* PF ¶¶ 8-66.  First, in June 1940 Congress expanded the statutory authorities of the U.S. Reconstruction Finance Corporation ("RFC") to empower it

to create subsidiary corporations to conduct war-related programs, and the RFC created, for example, (a) the Defense Plant Corporation ("DPC") to construct numerous Government-owned war production plants - formally known as "Plancors", (b) the Defense Supplies Corporation ("DSC") to purchase and stockpile avgas and other war products, and (c) the Rubber Reserve Company ("RuR") to operate Government-owned synthetic rubber Plancors.  PF ¶¶ 11-14.  In December 1941 Congress subsequently enacted the First War Powers Act of 1941, Pub. L. No. 77-354, § 201, 55 Stat. 838, 839 (1941), that granted broad powers to the President to issue Executive Orders "for the successful prosecution of the war."  PF ¶ 17.

Pursuant to the First War Powers Act, in January 1942 President Roosevelt issued Executive Order 9024 to establish the War Production Board ("WPB") and provide it with broad, unprecedented powers and authorities regarding all aspects of war procurement and production, and a week later issued Executive Order 9040 to empower the WPB with absolute authority over the prioritization and allocation of war products.  PF ¶¶ 18-19. Through Executive Order 9040 WPB also was delegated the authority vested in the President by Section 120 of the National Defense Act of 1916, Pub. L. No. 64-85, § 120, 39 Stat. 166, 213 (1916), to seize plants that did not comply with production orders and to enforce production orders under threat of criminal penalties.  PF ¶ 19.  Several months later, President Roosevelt issued Executive Order 9125, which delegated to WPB the powers vested in the President by Title III of the Second War Powers Act of 1942, Pub. L. No.  77-507, § 633, 56 Stat. 176 (1942), thereby empowering WPB with authority to require a company to produce a good needed for the war effort.  PF ¶¶ 20-21.

## II.  The Governmental Regulatory Program for Avgas Production

*"For World War II, from beginning to end, was a war of oil."*

Those are the words that Government historians used to describe WWII a year after it ended.  PF ¶ 24.  It was a "war of oil" because the United States required substantial supplies of

7

avgas to win the war.  Avgas was an "oil weapon" because it was the "super-fuel that meant more speed, more power, quicker take-off, longer range, greater maneuverability – all the things that meant the victory margin in combat." PF ¶ 25.  The unique and critical nature of avgas to the Allied victory in WWII cannot be overstated, as British Minister of Fuel and Power – Geoffrey Lloyd – stated in regard to the Battle of Britain, "I think that without 100-octane we should not have won the Battle of Britain.  But we had 100-octane." PF ¶ 27.

Prior to Japan's attack on Pearl Harbor the Government recognized that the Nation's refineries possessed a woefully inadequate avgas production capacity to effectively wage war. At that time the Nation's refineries possessed a total production capacity of only approximately 40,000 barrels per day ("B/D"), which was a fraction of the estimated 636,000 B/D needed by the Allied Forces at the height of WWII. PF ¶ 28. Therefore, the Government set about to impose pervasive control over the petroleum industry to substantially increase and maximize the production of avgas in early 1941.

Recognizing the key role that avgas would play in helping the Nation win the war, the Roosevelt Administration established an even more stringent regulatory framework to govern and control the petroleum industry than the WPB exercised over industries in general.  First, in May 1941 the President established the Office of Petroleum Coordinator for National Defense ("OPC"), PF ¶ 30, and then in December 1942 the President issued Executive Order 9276 establishing the Petroleum Administration for War as successor to OPC (collectively, the "PAW") with sweeping authorities over the petroleum industry, including, for example, the authority to "issue necessary policy and operating directives to parties engaged in the petroleum industry."  PF ¶¶ 32-33.

Consistent with its mandate, PAW implemented a plethora of regulatory authorities to control directly all facets of general oil supply and petroleum production during WWII, from oil production in the well fields to allocation and distribution of crude oil and raw materials and their processing in the Nation's refineries, and shipment and distribution of avgas and other war products. PF ¶¶ 34 and 53-60. PAW's degree of control over specific plant-level, refinery operations was equally pervasive; for example, the PAW issued Recommendation No. 8 that directed oil refineries to "cease to use" various petroleum blending components, except for the production of avgas, PF ¶ 36, and shortly thereafter issued Recommendation No. 16 that authorized PAW's complete control over crude oil stocks, base stocks, blending agents, manufacturing processes, transportation and refining facilities "to whatever extent may be necessary to facilitate the maximum production of all grades of aviation gasoline."[5] PF ¶ 38.

In addition, PAW regularly issued directives and orders via telegrams to specific refineries to ensure that wartime needs were met. PF ¶¶ 49, 57, 71, and 77-79. For example, PAW regularly dictated to individual refineries, including the Baytown and Baton Rouge refineries, the allocations of crude oil and other raw materials, the production levels for avgas and other war products, avgas pricing and profit limitations, market controls, approval or denials of specific facility expansions or improvements ranging from the construction of a new process or waste processing unit to the installation of a light fixture, and numerous other operational requirements. PF ¶¶ 71-111.

In fact, the Government's pervasive control over the petroleum industry and individual oil refineries during WWII is well documented in prior CERCLA litigation in a series of court

---

[5]   In early 1942 OPC changed the designation of these official orders from "Recommendation" to "Directive" "as more consistent with their scope and purpose." PF ¶ 35.

decisions in the case of *United States v. Shell Oil Co.*.  In that case District Court Judge Kelleher's findings provide a detailed history of the "federal governance over the oil companies during the war," *United States v. Shell Oil Co.*, 841 F. Supp. 962, 966 (C.D. Cal. 1993), *aff'd and rev'd in part by* 294 F.3d 1045 (9th Cir. 2002), as the judge found that the Government's "extensive degree of oversight" of the industry was corroborated by thousands of pages of deposition testimony and documentary evidence.  *United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1022 (C.D. Cal. 1998).  In supporting this finding, the judge found that the Government's control over Avgas production was "pervasive and omnipotent" during WWII, further stating:

> There is no question of fact with respect to the Government's control over the production of avgas.  It is undisputed that the Government, on a regular basis, controlled the specifications, quantities, delivery, and price of avgas.  The undisputed facts reveal that the actions of the Unites States resulted in, as a practical matter, almost total control over the production of avgas.  *United States v. Shell Oil Co.*, 1995 U.S.Dist. LEXIS 19778, at \*23-24 (C.D. Cal. Sept. 18, 1995).[6]

The evidentiary record in the *United States v. Shell Oil Co.* case is replete with testimony from former (and now deceased) PAW officials regarding the substantial operational control exercised by the Government over the petroleum industry and individual refineries alike during the wartime period.  For example, Louis R. Goldsmith - a PAW Refinery Division official - testified regarding PAW's mandatory approval process for new construction as follows:

> Q.   Did PAW approve the -- have approval over industry proposals for construction.
> A.   Oh, indeed.   Absolutely.   Nobody could build anything without PAW's concurrence and approval because, for one thing, you couldn't get any raw

---

[6]   In the *Shell* litigation, the relevant waste generated by the production of avgas for the Government was not disposed of at the refineries themselves, but rather sent to a landfill owned and operated by a third-party, and therefore, there was not at issue whether the Government was subject to CERCLA "prior operator" liability.  However, in the litigation the parties engaged in extensive discovery regarding whether the Government exercised significant control over the avgas production that generated the waste sent to the landfill and the court made detailed findings with respect to this factual issue. *United States v. Shell Oil Co.*, 13 F. Supp. 2d at 1022.

materials to build anything with unless PAW certified that it was essential.  PF ¶ 61.

The PAW itself acknowledged that it took control of the Nation's refineries and treated them as "one vast national refinery," in a 1943 PAW Handbook setting forth PAW's mission as follows:

> Every refining facility was closely examined to the end that 100 octane supply be supplemented  . . .  Inter-plant movement of component parts of 100 octane was effected by a "planned blending" schedule for refiners.  Expert juggling of these components and elimination of bottlenecks in transportation insured maximum quality and quantity of the blended fuel.  <u>Under this plan the nation's refineries were all treated as units in one vast national refinery</u>.  PF ¶ 59 (emphasis added).

At the same time, PAW possessed substantial authority to employ various coercive measures, including the authority to cut off essential crude oil supplies, seize a refinery, seek criminal penalties and even imprison company officials, in order to compel an oil company's cooperation with PAW's day-to-day, plant level directives and decisions.  *See* Gravel Decl. ¶¶ 6-7 & Table 2; PF ¶¶ 62-66.  In the *Shell* case J. Howard Marshall - PAW's General Counsel during most of WWII - testified regarding how PAW used the threat of coercive measures to compel an oil company's cooperation as follows:

> Q.    Okay.  You once mentioned a company up in Ventura, California that showed some reluctance to go along with the program.
> A.    Not some, everything he could muster.
> Q.    What . . . was the problem there?
> A.    Well, we had a series of quotas for each company in the field.  And all of them, with this one exception, obeyed the quotas and lived by them.  And they said, "To heck with you.  We're going to run our business and you keep your hands off of it.  It took me a day to take his material priorities away from him.  He came, with his tail between his legs about a week later, said "All right.  I want to make peace."  PF ¶ 63.
>
> *          *          *          *          *
>
> Q.    You said before, "and they knew it."  What did you mean by that?  Who was the "they"?
> A.    Whoever wasn't going to do what we wanted them to do.
> Q.    Was that something that was spoken of from time to time in your dealings?
> A.    Oh, of course it was.  I spoke of it.  If I ran into a recalcitrant member of the business.  I remember once I said to Colonel Drake, of the Gulf Oil Company,

11

> "Colonel, have you figured out how long your refinery can operate without priority on critical supplies."

Q.     What did he say?

A.     He mumbled, but then he did what I wanted him to do.  PF ¶ 62.

In many instances, PAW actually used, rather than merely threatened, coercive measures to compel cooperation; in fact, PAW seized various oil refineries, including ExxonMobil's own refinery in Ingleside, Texas, during WWII.  Gravel Decl. ¶ 7; PF ¶ 65.

Given these circumstances, the governmental dictates required that the Baytown and Baton Rouge refineries be effectively 100% converted to maximize the production of avgas.  As noted in the record, in 1943 ExxonMobil stated that "[t]he current production of war products [at the Baytown refinery] represents essentially 100% conversion since all of the crudes and other raw materials taken into the refinery are run specifically for the production of one or more war products."  PF ¶ 70.  Jere M. Johnson - ExxonMobil's refinery operations expert - explained, stating that from an engineering and technical standpoint "[t]his expansion, reconfiguration and integration of the operations of both the Baytown Complex and the Baton Rouge Complex essentially resulted in the 100% conversion of the two Complexes to the manufacture of maximum quantities of avgas and other war-related products and materials for the Federal government."  Expert Report of Jere M. Johnson ("Johnson Report) at 3 (Attachment 1 to Declaration of Jere Johnson ("Johnson Decl.") (**Exhibit No. 2**)).

In conjunction with PAW directives to maximize avgas production, shortly after Japan's attack on Pearl Harbor DSC entered into three avgas supply contracts with ExxonMobil for the production of avgas at the Baytown and Baton Rouge refineries for the entire duration of WWII.  PF ¶¶ 72-74.  While avgas was the primary intended product, in these contracts the Government acknowledged that other war products, such as motor gasoline, would necessarily be produced during the production of avgas. PF ¶¶ 75-76. Throughout WWII PAW regularly directed

ExxonMobil to produce maximum quantities of other war products, such as residual fuel oil, kerosene, asphalt, and various fuel and lube oils, for the Government's war effort. PF ¶ 79.

During the Korean War the Government again resumed its operational control of the Baytown and Baton Rouge refineries, and the petroleum industry generally, through a new agency - the Petroleum Administration for Defense ("PAD") - modeled after PAW to ensure adequate supplies of avgas for the U.S. military during that conflict.  Gravel Decl. ¶ 23; PF ¶¶ 116-19.  Similar to its predecessor, PAD had the authority to issue orders or directives to petroleum refineries, establish programs and policies relating to the operation of petroleum refineries, and make any necessary arrangements for industrial operations or other assistance to ensure sufficient petroleum refining operations for national defense purposes.  PF ¶¶ 120-33. The record indicates that the Government provided PAD with the same amount of authorities to control the operations of petroleum refineries during the Korean War that the former PAW had possessed during WWII; in fact, by early 1951 it was reported that "PAD now stands on a footing virtually identical with that enjoyed by the last war's PAW." PF ¶ 121.

## III.  The Government-Owned Plants at Each Facility

The Government also owned a number of chemical plants at the Baytown and Baton Rouge Facilities, creating a unique situation that allowed the Government to exercise even greater control over the production of avgas than the Government exercised over the refineries in the *Shell* case.  Beginning in the early 1940s the Government purchased large parcels of land adjacent to the refineries and leased other parcels within the refineries themselves, and arranged for, approved and oversaw the design and construction of various Government-owned plants for the production of toluene, synthetic rubber, avgas blending components and other war products at both Facilities.  Gravel Decl. ¶ 4; PF ¶¶ 134-201.  All of these plants were owned by the DPC and were formally called "Plancors", except the Baytown Ordnance Works which was owned by

the War Department, and the DPC continued to own and operate a number of these plants

through the mid-1950s.  Gravel Decl ¶¶ 4-6.  Tables 1 and 2 below list these various plants,

including the type of war product manufactured, the period of Government ownership of the

plant, and the period of Government operation of the plant (*i.e.,* some plants did not operate

during the entire period of Government ownership):

### TABLE 1 - BAYTOWN FACILITY

| War Product | Plant | Period of Govt. Ownership | Period of Govt. Operation |
|---|---|---|---|
| Toluene | Baytown Ordnance Works | 1941-1946 | 1941-1946 |
| Synthetic Rubber | Plancor 485 - Butadiene Plant | 1943-1955 | 1943-1955 |
| Synthetic Rubber | Plancor 1082 - Butyl Rubber Plant | 1943-1955 | 1943-1955 |
| Synthetic Rubber | Plancor 877 - Copolymer Plant | 1942-1955 | 1943-1955 |
| Avgas Components | Plancor 1909 - Hydrocodimer Plant | 1944-1946 | 1944-1945 |

### TABLE 2 - BATON ROUGE FACILITY

| War Product | Plant | Period of Govt. Ownership | Period of Govt. Operation |
|---|---|---|---|
| Synthetic Rubber | Plancor 152 - Butadiene Plant | 1943-1955 | 1943-1947, 1950-1955 |
| Synthetic Rubber | Plancor 572 - Butyl Rubber Plant | 1942-1955 | 1942-1955 |
| Synthetic Rubber | Plancor 1526 - Catalyst Plant | 1943-1950 | 1943-1944 |
| Synthetic Rubber | Plancor 1355 - Butadiene Conversion Plant | 1943-1949 | 1943-1948 |
| Avgas Components | Plancor 1065 - Avgas Components Plant | 1944-1950 | 1944-1945 |
| Avgas Components | Plancor 1868 - Hydrogenation Plant | 1943-1949 | 1943-1945 |

*See* Gravel Decl. ¶¶ 4-5 & Table 1; PF ¶¶ 134-201.[7]

The Government purposely sited these plants at or adjacent to the Baytown and Baton

Rouge refineries in order to integrate them into overall operations.  Gravel Decl. ¶ 17.  For

example, many of the plants relied upon the refinery for one or more raw materials needed for

their production operations, PF ¶¶ 202-04; a number of the plants used the refinery waste

processing facilities for the treatment and disposal of specific wastes that the Government had

---

[7]    ExxonMobil had no involvement in the operation of Plancor 877.  General Tire & Rubber
Company was the "agent" company that contracted with the Government regarding the operation
of the plant.  When the Government sold Plancor 877 in 1955, United Carbon Company
purchased the plant.  PF ¶¶ 159-66.

not designed the Plancor to manage, PF ¶¶ 205-06; and the plants relied upon some of the refinery's existing infrastructure, such as sewers, drainage ditches, piping, and tanks. PF at ¶¶ 207-08.  In essence, the Government expanded the refinery at each Site into a self-contained, war production complex, imposing significant new waste management challenges.  Johnson Decl. ¶¶ 6-8, 12.

The Government exercised pervasive control over virtually all aspects of these plants. This control was exercised through numerous means, such as, for example, an "operating contract" under which the Government retained full authority over the design and construction of the plant, including the design and adequacy of the waste processing facilities, the type of product and production levels.  PF ¶¶ 210, 212 and 226.  To achieve its goals, the Government designated the company as its "agent" in regard to various operational activities at these plants and required the company to obtain the Government's approval for virtually any purchase, improvement, or construction at these plants.  PF ¶¶ 226 and 234-39; Gravel Report at 51-69, 79-81, 147-64, 168-71.

## IV.  Wartime-Related Cleanup Costs

ExxonMobil has undertaken extensive response actions over the course of a number of years to address the contamination at the Sites, and much of this contamination was caused or contributed to by the wartime operations.  These response actions have been conducted pursuant to state administrative orders and/or otherwise under the approval and oversight of the relevant state environmental agency.  PF ¶¶ 289-95.  To date, the company has incurred substantial past costs of approximately $80 million and will incur additional future costs to fully address the wartime-related contamination at both Sites.  PF ¶¶ 293 and 295.

## SUMMARY OF THE ARGUMENT

ExxonMobil is entitled to summary judgment under section 107(a) of CERCLA because the United States is subject to both "prior owner" and "prior operator" liability under section 107(a)(2) at both Sites.  The United States is subject to CERCLA "prior owner" liability with respect to the BOW and Plancors at both Sites and the Government has admitted as much.  In addition, the United States is subject to "prior operator" liability with respect to the refineries - as well as the BOW and Plancors - at both Sites because the Government's pervasive control over the operations of the Baytown and Baton Rouge refineries during the wartime periods fully satisfies the "operator" criteria under well-established CERCLA authorities.

ExxonMobil also is entitled to a judgment of joint and several liability under section 107(a) of CERCLA against the United States.  Cost recovery actions under section 107(a) typically result in the imposition of joint and several liability as the "default" standard of liability and this is particularly appropriate where, as here in this cases, hazardous substances have been so "commingled" such that responsibility for the pollution to be remediated is incapable of being apportioned among the responsible parties.  In essence, the commingled waste contamination resulting from integrated, Government-controlled historic operations has resulted in indivisible environmental pollution at the Sites for which the United States is joint and severally liable.

While ExxonMobil is seeking a joint and several liability ruling, it is pleading in the alternative a contribution claim under section 113(f)(3)(B) of CERCLA, and in fact, is entitled to summary judgment on this claim as well for response costs incurred at the Baytown Site.  The record in this case demonstrates that all of the *prima facie* elements are satisfied for this claim.

Furthermore, ExxonMobil is entitled to summary judgment as to the United States' liability and allocable share of future costs under CERCLA.  Given that the United States is a liable party under section 107(a) and the company will incur future response costs for which the

Government is liable at both Sites, the Court should issue a declaratory judgment that the United States is joint and severally liable for, or alternatively liable for a specific allocable share of, such future costs at both Sites.

Finally, in the event the Court imposes several liability, but not joint and several liability, under CERCLA on the United States, ExxonMobil is entitled to contribution for reimbursement of the Government's equitable share of its response costs at both Sites, and has provided the Court with a proposed allocation methodology for this purpose. This methodology should be adopted by the Court because it uses a well-established "production-oriented" approach that accurately reflects the actual operations and other relevant conditions at the Sites and incorporates a number of equitable factors that are critical and relevant to the allocation decision.

## ARGUMENT

## I.  The Government is Subject to CERCLA Liability

### A.  Plaintiff Is Entitled to Summary Judgment Under Section 107(a) of CERCLA

#### 1.  Plaintiff Has Satisfied the *Prima Facie* Elements for Imposing CERCLA Liability on the United States

CERCLA's broad remedial purpose is to facilitate the cleanup of contaminated sites and to shift the cost of environmental response onto the parties that benefitted from the wastes that caused the harm. *OHM Remediation Services v. Evans Cooperage Co.,* 116 F.3d 1574, 1578 (5th Cir. 1997) ("*OHM*"). To effectuate this purpose, section 107(a) of CERCLA sets forth a liability scheme that imposes strict, joint and several liability upon "covered persons" for response costs incurred by, *inter alia*, "any other person," and therefore, a plaintiff is not required to prove causation, but rather to prove merely that the defendant is a "covered person." 42 U.S.C. § 9607(a); *OHM*, 116 F.3d at 1578-79; *Tex Tin Settling Defendants Steering Comm. v. Great Lakes Carbon Corp.,* Civ. A. Nos. G-96-0247, G-96-0272, 2008 WL 4376363, at *5 (S.D.

17

Tex. Sept. 22, 2008) ("*Tex Tin*").  In addition, section 107(a)(4)(B) of CERCLA authorizes cost recovery actions by any private party, including potentially responsible parties ("PRPs"), against "any other person," including the United States,[8] to recover response costs incurred by the private party.  42 U.S.C. § 9607(a)(4)(B); *United States v. Atlantic Research Corp.*, 551 U.S. 128, 136 (2007) ("*ARC*"); *Halliburton Energy Services, Inc. v. NL Industries*, 648 F. Supp. 2d 840, 859-60 (S.D. Tex. 2009).

To establish a *prima facie* case of liability in a CERCLA cost recovery action under section 107(a)(4)(B), the plaintiff must show the following:  (1) the defendant falls within at least one of the four categories of responsible, covered persons; (2) hazardous substances are disposed at a "facility"; (3) there has been a "release" or "threatened release" of hazardous substances from the facility into the environment; and (4) the plaintiff incurred response costs responding to the "release" or "threatened release."  *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989).  The four categories of responsible, covered persons are the following:  (1) owners and operators of facilities at which hazardous substances are located; (2) prior owners and operators of such facilities at the time disposal of hazardous substances occurred; (3) persons who arranged for disposal or treatment of hazardous substances; and (4) certain transporters of hazardous substances.  42 U.S.C. § 9607(a)(1)-(4); *OHM*, 116 F.3d at 1578.

ExxonMobil has fully satisfied the *prima facie* elements for establishing that the United States is liable under section 107(a) of CERCLA at both Sites.[9]  In fact, the United States has admitted in its responses to requests for admissions that (1) each Site is a "facility" within the

---

[8]    CERCLA defines the term "person" to include the "United States Government."  42 U.S.C. § 9601(21).

[9]    It is well established that section 120(a)(1) of CERCLA provides an express waiver of the United States' sovereign immunity to suit under CERCLA and to the imposition of liability under section 107(a) of CERCLA.  *See, e.g., United States v. Shell Oil Co.,* 294 F.3d 1045, 1051-54 (9th Cir. 2002) ("*Shell*").

meaning of section 101(9) of CERCLA; (2) there have been releases and/or threatened releases of hazardous substances into the environment at each Site; (3) ExxonMobil has incurred response costs in response to such releases and/or threatened releases of hazardous substances at each Site; and (4) the United States was an "owner", as that term is defined in section 101(2)(A) of CERCLA, of multiple facilities at both Sites during a time when hazardous substances were released or disposed of at such facilities. *See* Def.'s Responses to Pl.'s First Set of Requests for Admissions, Response Nos. 2-9 (**Exhibit No. 3**).  The Government does not dispute that it is subject to CERCLA "prior owner" liability at both Sites because the record shows that beginning in the early 1940s, the Government was the owner of the BOW and four Plancors at the Baytown Site, and the owner of six Plancors at the Baton Rouge Site, and continued to own a number of these Plancors through the mid-1950s.  The Government also fully integrated the operations of these new chemical plants with the operations of the refinery complex in order to exercise even greater control over the types and production levels of avgas and other types of war products that each Facility would produce, ultimately generating substantial hazardous process wastes and contributing to contamination for which the company is incurring significant response costs to address.  Johnson Decl. ¶¶ 7, 11-12; Gravel Decl. ¶¶ 17-19; PF ¶¶ 134-239.

### 2.     In Addition to "Prior Owner" Liability, the United States Is Also Subject to "Prior Operator" CERCLA Liability at Both Sites

#### a.     U.S. was a "prior operator" at the refineries at both Sites

From an "operator" perspective, two seminal cases - *Shell*, 294 F. 3d 1045 and *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 299 F. 3d 1019, 1025-27 (9th Cir. 2002) ("*Cadillac Fairview*") - have already addressed CERCLA-related factors that apply to this case; for example, as the *Shell* case notes, the record here amply shows that PAW fully directed and controlled refinery operations both at individual plants and across the country, and had pervasive

control over these refineries during the wartime period, with the goal of forcing and maximizing

the production of avgas and other war products to meet our Nation's wartime needs. *See* Gravel

Decl. ¶¶ 6, 12-14.   According to a 1946 Government report, PAW was "the virtual czar of 100-

octane in the United States," that "called upon the industry to devise plans for using all facilities

and raw materials as though they all belonged to one company . . . [i]n a word, 'forget economic

considerations--forget everything except getting out more and more 100-octane as quickly as you

can.'" PF ¶ 56.   This Government report further stated:

> Insofar as products for war and for essential civil use were concerned, PAW told
> the refiners what to make, how much of it to make, and what quality.   Nobody
> wanted it to be that way - neither PAW nor the refiners.   It just happened to be the
> only way to do it in wartime.   PF ¶ 58.

In addition to these wartime regulatory controls themselves, recent jurisprudence further

confirms that the Government's actions during these wartime periods fully satisfies the

"operator" criteria under well-established CERCLA authorities.   In *United States v. Bestfoods*,

524 U.S. 51 (1998) ("*Bestfoods*"), the U.S. Supreme Court held the following:

> So, under CERCLA, an operator is simply someone who directs the workings of,
> manages, or conducts the affairs of a facility.   To sharpen the definition for
> purposes of CERCLA's concern with environmental contamination, an operator
> must manage, direct, or conduct operations specifically related to pollution, that
> is, operations having to do with the leakage or disposal of hazardous waste, or
> decisions about compliance with environmental regulations. *Id.* at 66-67.

The Court further held that in order to prove that a party is liable as an "operator" under

CERCLA, it is only necessary to show that the party directed the operations of the facility from

just the "organizational sense" of plant operations.   *Id.* at 66   Amplifying on this point, the Court

stated that the term "operator" of a facility under section 107(a) of CERCLA means "[i]n the

organizational sense  . . . .  simply someone who directs the workings of, manages, or conducts

the affairs of a facility," and that the term "operator" should not be narrowly construed to mean

only "in a mechanical sense" someone who just runs the machinery or equipment on the plant level. *Id.* The Court further clarified its intended broader definition of the term "operator," stating that the term "to operate" under CERCLA "obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71. Thus, it is not necessary to show that the Government actually turned valves or pumps, or directed employees to do so, at the plant level, in order for the Government to be subject to CERCLA "prior operator" liability at the Sites.[10]

In applying this standard, the courts in CERCLA cases have looked at the "totality of the circumstances" in determining whether a party is subject to CERCLA "prior operator" liability. *See, e.g., Niagara Mohawk Power Corp. v. Chevron U.S.A.*, 596 F.3d 112, 136 (2nd Cir. 2010) ("CERCLA liability may be inferred from a totality of the circumstances"); *Tosco Corp. v. Koch Industries, Inc.*, 216 F.3d 886, 892 (10th Cir. 2000) ("*Tosco*") (same); *United States v. Sterling Centrecorp, Inc.,* No. 2:08-cv-02556-MCE-JFM, 2013 WL 3214384, at *17 (E.D. Cal. Jun. 24, 2013) ("*Sterling*") (same); *Steadfast Ins. Co. v. United States*, No. CV-06-4686 AHM, 2009 WL 3785565, at *4 ("*Steadfast*") ("'Test for control uses a totality of the circumstances standard'"); *Basic Management Inc. v. United States,,* 569 F. Supp. 2d 1106, 1116 (D. Nev. 2008) (finding that all of the parent's activities at the facility at issue resulted in CERCLA "operator" liability). In *Couer D'Alene Tribe v. ASARCO Inc.,* 280 F. Supp. 2d 1094 (D. Idaho 2003) ("*Couer D'Alene*"), the court, for example, examined the activities that caused, created or generated the

---

[10]    Several parties may be subject to "operator" liability at a particular Site under CERCLA jurisprudence.  In *Bestfoods* the Supreme Court emphasized that a facility may be concurrently operated by two parties in "some sort of a joint venture" and in such instances both parties are liable. 524 U.S. at 71.

wastes that led to the contamination, stating that the court "must examine the degree of control the alleged owner/operator is able to exert over the activity causing the pollution," *id.* at 1127, and in *Sterling*, in addressing similar factors, albeit in the corporate parent/subsidiary context, the court noted that "*Bestfoods* does not limit a court's scrutiny of parent activity to the parent's activity with respect to environmental decisions . . . . [a]ccordingly, the Court concludes that the evidence that Sterling controlled many other aspects of Keystone's actions is relevant to the analysis of Sterling's operator liability under *Bestfoods*." *Sterling*, at *17.

Here, in this case the demands of war imposed by the Government drastically altered the entire operational framework of both Facilities from almost every perspective. In effect, the Government got involved in virtually all aspects of operations and managerial control of the refinery - from construction to operation and product output. Shortly before the conclusion of WWII PAW eventually acknowledged this point, noting that:

> Up to the present time the Refining Industry has been essentially restricted to new construction work which represented the barest minimum which would achieve the end of supplying the most critical war products. This policy has been necessitated by the extreme demands for construction materials and construction labor which the war had placed upon the entire country's economy. PF ¶ 92.

From a waste perspective, the amount of wastes generated during the wartime period increased substantially because of the Government's requirements for war. Johnson Decl. ¶¶ 10-11; Declaration of Richard Lane White ("White Decl.") ¶¶ 12-13 (**Exhibit No. 4**); PF ¶ 104. Wartime requirements greatly over-taxed the refineries' existing capabilities to handle and process crude oil, and overwhelmed their abilities to manage wastes in a routine manner. Johnson Decl. ¶ 12. For the Government-owned facilities themselves, expert testimony indicated that the Government's integration of the BOW and the various Plancors with the refineries' operations at Baytown resulted in the generation of additional, substantial amounts of waste, and

much of this waste was treated and disposed of in the refinery's wastewater processing facilities. Gravel Decl. ¶¶ 17-19; PF ¶¶ 205-06. Even the Government's own U.S. Engineer Office acknowledged the problems caused by wartime demands, noting that "[w]ar activity has caused rapid expansion in plant facilities for production with no increase in waste disposal facilities. This has caused, as stated before, daily pollution of the Mississippi River." PF ¶ 104. To address this issue, the Government was involved in virtually all aspects of waste operations - in fact, according to Government historical expert Dr. Jay L. Brigham, the Government made decisions regarding the construction and maintenance of the waste units and facilities, decisions regarding the adequacy or inadequacy of the waste units or facilities, and decisions regarding improvements to the waste units or facilities. PF ¶ 99. WPB and PAW's specific regulatory controls over the allocation and use of construction materials directly affected the construction or expansion of waste treatment facilities at both refineries that were needed to handle the wastes generated by the war production operations. PF ¶¶ 92-108.

One noteworthy example of this was the Government's denial of ExxonMobil's request to construct a Master Separator at the Baton Rouge refinery. During WWII the U.S. Engineer Office had determined that "[t]he enormous operations and rapid expansion of the plant have overloaded the waste disposal system to the extent that pollution of the Mississippi is a daily occurrence." PF ¶ 104. To solve this problem, the U.S. Engineer Office strongly recommended the construction of a master separator,[11] noting that:

> The project, including the separator, appears adequate to end pollution of the Mississippi River. It is believed that the urgency of construction is sufficiently necessary for the war effort that endorsement for approval by the P.A.W. and

---

[11]   The purpose of the Master Separator was to separate and remove oil and oily silt from the process wastewaters before their discharge into Callaghan's Bayou and ultimately the Mississippi River. PF ¶ 102.

W.P.B. for the use of materials and labor for construction of the separator be given as requested. *Id.*

However, in spite of the pressing need for this critical waste treatment unit, PAW nevertheless denied its approval for the construction of the proposed Master Separator on the grounds that "this project is not of sufficient essentiality to the war program to warrant its installation at the present time and should be considered as a post-war project." PF ¶ 105.

Just as at Baton Rouge, it was recognized at all of the refineries across the U.S. - including Baytown as well - that scarce resources had to be devoted to the production of essential war goods at the expense of other necessities, such as environmental controls; in fact, in *Cadillac Fairview* the Ninth Circuit specifically found that "the government made a policy decision not to divert resources from the war effort to stop the pollution." 299 F.3d at 1023. And so, at Baytown the plant engineers operated under the premise that:

> During the war it was not possible to devote much technical manpower to the problem of effluent improvement since it was obvious that saving surface waters was secondary to saving men. PF ¶ 100.

Consequently, there were key instances at Baytown were necessary pollution controls were not approved by PAW during the war as well. For example, when ExxonMobil requested PAW's approval to construct additional facilities for burning acid sludge - a waste generated by the production of avgas, PAW denied the request, even though ExxonMobil intended to use its own funds and materials for the project. PF ¶ 107.

Subsequent to *Bestfoods*, numerous courts have continued to embrace the "operator" criteria established by the Third Circuit in *FMC Corp v. U.S. Dept. of Commerce*, 29 F.3d 833 (3rd Cir. 1994) ("*FMC*") for CERCLA liability. *See, e.g., United States v. Township of Brighton*, 153 F.3d 307, 315 (6th Cir. 1998) (Sixth Circuit found the *FMC* decision "instructive"); *City of Waukegan v. National Gypsum Co.*, 560 F. Supp. 2d 636, 641 (N.D. Ill.

2008) (finding the *FMC* decision "to be consistent with *Bestfoods* and thus still viable as legal authority"); *United States v. Washington State Dept. of Transp.*, Civ. A. No. 3:08-cv-05722 (RJB), 2010 WL 5071277, at *5 (W.D. Wa. Dec. 7, 2010) ("*Washington State*") (finding the *FMC* decision "illuminating" and that the *FMC* criteria "provide[s] an example of the type of 'control' that an entity must exert before operator liability may attach"); *Litgo New Jersey, Inc. v. Martin*, Civ. A. No. 06-2891(AET), 2010 WL 2400388, at *25 (D.N.J. Jun. 10, 2010) (the court stated that the test set forth in "traditional operator liability cases" are still relied upon and specifically applied the "operator" criteria in *FMC*), *aff'd and rev'd in part by* 725 F.3d 369 (3d. Cir. 2013).  In finding that the Government exercised "substantial control" over the WWII facility at issue in *FMC*, the Third Circuit ruled that "the leading indicia of control were [that] the government determined what product the facility would produce, the level of production, the price of the product, and to whom the product would be sold." *FMC*, 29 F.3d at 843.[12]

Again, these criteria for CERCLA liability have been satisfied in this case.  First, PAW employed broad measures to ensure maximum production levels of avgas through a specific seven-step program for refineries that required the following:

1.      Change the specifications for the product in such a way as to augment production;

---

[12]     Just recently, the court in the *Steadfast* decision succinctly summarized the key *FMC* "operator" control criteria for wartime cases that it considered particularly relevant to its CERCLA liability determination, stating as follows:

(1) FMC's predecessor during the war years would not have been manufacturing high tenacity rayon but for the Government's direction, and the Government also pressured the company to increase production, thereby increasing the amount of resulting toxic waste; (2) the company was subject to Government regulations, on-site inspections, and the possibility of seizure; (3) the Government built plants supplying raw materials to American Viscose; (4) the Government supplied machinery and equipment for use during the manufacturing process; and (5) the Government controlled product marketing and price.  2009 WL 3785565, at *4.

2.      Regulate the operation of refining units in such a way as to conserve all raw materials that may be used in the product, i.e., to prevent the diversion of valuable components to other uses;

3.      Blend (mix) all of the components (ingredients) available in the United States in such a way as to assure maximum production;

4.      Force each refining operating unit to its maximum output;

5.      Remove "bottlenecks" in operating units by the judicious use of small amounts of construction materials . . . ;

6.      Adapt existing refining facilities to 100 octane production  . . .; and

7.      Build new 100 octane units.  PF ¶ 60 (emphasis added).

As part of this effort, PAW established the "Planned Blending Program" under which it issued monthly refinery schedules - "Planned Blending Schedules" - that allocated to each refinery - including specifically the Baytown and Baton Rouge refineries - a defined amount of crude oil and directed the types and amounts of avgas and other war products that each refinery was to produce.  PF ¶¶ 51-52.  If ExxonMobil did not comply, the Government could "cut off" its crude supply and put the company out of business in a "heartbeat" - this effectively prevented ExxonMobil from using its own purchased crude oil in its own refinery to make whatever products the company wanted to make.  To ensure that wartime needs were met as necessary, PAW then further dictated specified production levels by either issuing:  (1) numerous nationwide directives, such as, for example, a directive restricting the use of blending components to the manufacture of avgas, PF ¶¶ 34-39, and/or (2) routine instructions directly to ExxonMobil facilities via telegrams that set forth specific orders regarding production levels, specifications and other operational requirements.  PF ¶¶ 49, 57, 71, and 77-79.

Second, the Baytown and Baton Rouge refinery operations were constantly subject to on-site inspections and the threat of seizure.  PAW conducted extensive on-site inspections of the Baytown and Baton Rouge refineries to evaluate and improve the refineries' operations.  PF ¶ 109-111.  Moreover, as noted above in order to ensure that ExxonMobil "cooperated" with PAW's various regulatory controls, PAW possessed the authority to seize any refinery and to

employ other coercive measures.  White Decl. ¶ 13; Gravel Decl. ¶¶ 12-14; PF ¶¶ 62-66.  This was no idle threat, given that the Government seized nearly 1,000 industrial facilities and in fact PAW seized the company's Ingleside, Texas refinery during WWII.  Gravel Decl. ¶ 7; PF ¶ 65.

Third, the Government's construction plans significantly interfered with the general operations of the refineries themselves.  Government-owned plants were always carefully sited so as to ensure that they were integrated into overall Facility operations as effectively as possible.  For example, the Government arranged for the construction of a Government-owned hydrocodimer plant directly in the middle of the Baytown refinery so that additional hydrocodimer, which was a key avgas blending components, could be manufactured from certain byproducts obtained from the processing of crude oil at the refinery.  Gravel Report at 57.  ExxonMobil was not receptive to PAW's proposal to construct a hydrocodimer plant at the refinery for various reasons; however, PAW pressured the company until it acquiesced to PAW's demands, as Mr. Gravel noted in his deposition as follows:

> Well, I think - - I think the chain of correspondence reflects that Humble did not want this particular plant to be built within its facility for a number of reasons. . . And the way I read the correspondence is that Humble basically said in the correspondence, we want to make it clear that we're not for this project.  But if the government feels like this is a project that really needs to be done for the war effort, then will basically acquiesce and do it.  PF ¶ 97.

Similarly, the Ordnance Department sited the BOW adjacent to the Baytown refinery so that the BOW could rely upon the refinery as the source of most of its primary raw material - naphtha.  PF ¶ 203.

Fourth, PAW even went so far as to dictate the allocation and use of equipment, supplies and construction materials - even for materials owned by ExxonMobil itself - at the two refineries, and often denied ExxonMobil the permission to construct at the company's own expense much-needed improvements, including (as noted above) key waste processing

27

improvements.  According to the WWII directives, PAW required individual oil refineries to obtain its approval to construct or install virtually anything - ranging from a process unit, building, tank, machine or piece of equipment - if it would require the use of any "controlled material," such as steel, copper or iron, and PAW often denied approval if deemed not sufficiently essential to the war program. Gravel Decl. ¶ 20.  For example, ExxonMobil had to obtain PAW's approval to, at the company's own cost, install a steam line for the propane deasphalting and dewaxing units, construct an employee training facility, install a small vertical drum in the reactor charge line for the isomerization unit, install a storage tank to store muriatic acid, install a lighting fixture in an instrument repair shop, and install repair and maintenance equipment for repairing diesel engine equipment.  PF ¶ 94.

Fifth, at the same time, PAW also controlled both the price and the marketplace for the avgas.  Due to the DSC's pricing power, the Government was able to establish a price for the avgas during WWII that was below pre-WWII fair market prices in order to minimize the refineries' profits. PF ¶¶ 81-84.  The Government expressly limited the profits that ExxonMobil could realize from the production and sale of the avgas to only a modest 6% profit, PF ¶ 82, an amount that PAW eventually determined was reasonable and acceptable under the Renegotiation Act of 1942, Pub. L.  No. 77-528, § 403, 56 Stat. 226, 245-46 (1942).[13]  PF ¶¶ 85-86.  Lastly, through the "Four Party Purchase Agreement" the Government established the DSC as the sole purchaser of avgas nationwide, and thereby effectively created a monopsony, as the Government historical expert himself acknowledged during his deposition.  PF ¶¶ 45-46 and 88.

---

[13]   The Renegotiation Act of 1942 was passed expressly in order to ensure that companies did not receive excess profits under their contracts.   Charles W. Steadman, *Legal Aspects of Renegotiation*, 42 Mich. L. Rev. 1 (1944) (writing that renegotiation is a method of profit limitation); PF ¶ 85.

In sum, the Court should impose CERCLA "prior operator" liability upon the United States with respect to both Sites. Such a ruling would be consistent with a number of other seminal cases in which the courts have recognized that wartime conditions presented a unique set of factors when considering CERCLA liabilities. *See, e.g., Cadillac Fairview*, 299 F.3d at 1029; *Shell*, 294 F.3d at 1060; *FMC*, 29 F.3d at 846. In doing so, the courts have recognized that environmental cleanup costs were a cost to society that the Government should rightfully pay as a result of wartime conditions. For example, in *FMC* the Third Circuit stated that placing "a cost of war on the United States, and thus on society as a whole [constitutes] a result which is neither untoward nor inconsistent with the policy underlying CERCLA." 29 F.3d at 846. Similarly, in *Shell*, the Ninth Circuit stated that "the cleanup costs are properly seen as part of the war effort for which the American public as a whole should pay." 294 F.3d at 1060. Lastly, in *Cadillac Fairview* the Ninth Circuit emphasized the fair and equitable underpinnings of this policy, stating as follows:

> This is a shocking case. The government is trying to take money from firms it conscripted for a critical part of a great war effort. . . . The government decided at the time that polluting the land and water this way was preferable to diverting resources from the war effort to do anything about it. Now the government wants its servants to pay for what it told them to do and promised them they could do with no fear of liability. 299 F.3d at 1029.

### b. U.S. was a "prior operator" as well as "prior owner" of the BOW and Plancors at both Sites

In addition to owning the BOW and the Plancors at both the Baytown and Baton Rouge Facilities, the Government also exercised direct and substantial control over these plants as well, subjecting them to CERCLA "prior operator" liability. This case is identical to the situation in both *FMC* and prior instances where the Government controlled the operations of other Government-owned synthetic rubber plants. *See e.g., Cadillac Fairview*, 299 F.3d at 1023-25 (finding that the Government reviewed and approved the designs for and construction of these

Government-owned plants to ensure that they were properly configured, and required manufacture of a specific war products at production levels dictated by the Government).  For the BOW, the U.S. Ordnance Department specifically ordered the maximum production of toluene, with the result that the Ordnance Works ultimately produced over 40% of the total amount of toluene produced in the Nation during WWII.  PF ¶¶ 139 and 209.

In addition, the Government stationed permanent Government personnel at many of these Government-owned plants to direct and oversee plant operations and conducted plant inspections.  PF ¶¶ 227-33.  For the BOW, the Ordnance Department even stationed a permanent Commanding Officer, military staff and detachment at the Ordnance Works to command and supervise the plant's operation, and an infantry company (replaced later in the war by a military police unit) to secure and protect the plant.  PF ¶¶ 227-29.  The Ordnance Department micro-managed the day-to-day operations of the BOW, as an ExxonMobil official described it in an internal company memorandum as follows:

> We are subjected to a steady stream of orders from this [Ordnance Department] office stating how various phases of the business should be conducted and specifying numerous reports to be submitted daily, weekly, and monthly to St. Louis . . . .  The latest order, for example, states that no equipment of any kind or cost other than regular warehouse items may be acquired by the BOW without prior approval of that office. . . . Hence, we are subjected to inspections by representatives from this office who have had negligible knowledge of refining operations but who recommend numerous changes in our safety, fire fighting, and plant protection procedures and equipment.  Likewise, inspectors from the Eighth Service Command regularly check our sanitary facilities and require a monthly report from us as to the adequacy of our water supply and sewage facilities.  PF ¶ 231.

Similarly, the DPC maintained a permanent office and staff at Baytown in order to manage and oversee the operations of the other Government-owned plants.  PF ¶ 232.  For example, a resident DPC official threatened action from "Washington" when he observed from his DPC

office at the Baytown Facility a number of ExxonMobil employees leaving work at a Plancor early, stating as follows in a memorandum:

> On numerous occasions I sit in my office looking out of the window along about a quarter to five and can see the men gathering up through the aisles of the boiler house section and lining up to make a rush for the time clocks at five o'clock. Since this matter has not just occasionally happened, but has been constant for weeks, it is running into a considerable loss of time. . . . Please take steps with the general contractor to see that the condition is eliminated or the matter will have to be taken up with Washington, where I am sure we can get results.  PF ¶ 233.

At the same time, the Government exercised stringent controls over the supply of raw materials and the allocation and use of equipment, supplies and construction materials at these Government-owned plants.  For example, Government approval was again always required for any significant construction projects or for the acquisition of most machinery, equipment and suppliers at these plants.  Gravel Decl. ¶¶ 12-13, 20.

Just as with products from the refineries themselves, the Government also controlled the pricing and the marketplace for the war products specifically manufactured at the Government-owned plants themselves.  These prices were set under Government directives, and products were only allowed to be sold and transported to military agencies.  Gravel Decl. ¶ 12.

Finally, the Government was directly involved in waste control decisions at its own plants - namely, the Plancors and the BOW - and its decisions to subordinate waste control to wartime production greatly contributed to the environmental problems noted during the wartime period. PF ¶¶ 217-25.  It was widely acknowledged that many of the Government-owned synthetic rubber plants were constructed with inadequate waste treatment facilities *at the Government's direction*, and that the Government was unwilling to expend funds or materials to improve these facilities during WWII because of the need to address other pressing priorities. PF ¶ 217.  In fact, a Government-commissioned report admitted as much, stating as follows:

During this period, it was recognized that some raw and partially processed materials were lost into waste waters leaving the plants, and that some of these substances were causing a stream pollution problem. However, personnel could not be diverted from more pressing objectives to study the complex problems related to waste prevention or treatment - nor could construction materials be secured for such purposes. PF ¶ 219.

Given the inadequate nature of the waste treatment facilities, a number of specific waste streams generated by these plants were either discharged into nearby surface water bodies after minimal treatment or had to be sent to the Baytown refinery's waste processing system for treatment where they contributed to the refinery-related contamination. PF ¶¶ 141, 150, 157, 165, 172, 179, 187 and 205-06. While the Government arranged for an industrial waste treatment expert to evaluate and recommend improvements to the waste processing facilities at the synthetic rubber plants shortly after WWII, PF ¶¶ 219-20, the Government did not implement many of these improvements until the early to mid-1950s, necessitating at Baytown the continued use of the refinery waste processing system for the treatment and disposal of some of the wastes generated by the Government-owned plants.[14]

---

[14]     The Government also is liable as an "arranger" for the disposal of waste specifically at the Hydrocodimer Plancor facility at the Baytown Site. CERCLA holds liable "any person who by contract, agreement, or otherwise arranged for the disposal or treatment . . . of hazardous substances owned or possessed by such person[.]" 42 U.S.C. § 9607 (a)(3). At a minimum, the entity must take some "intentional steps to dispose of a hazardous substance" to qualify as an arranger. *Burlington Northern and Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 612 (2009) ("*Burlington Northern*").

The courts, including this one, have consistently found that a party is subject to "arranger" liability under section 107(a)(3) of CERCLA when it supplies raw materials, specifically contracts for production or processes that result in hazardous waste disposal, and retains title to the raw materials and the resulting product. *See, e.g.*, *U.S. v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1379-83 (8th Cir. 1989) ("*Aceto*"); *Sea Lion, Inc. v. Wall Chemical Corp.*, 974 F. Supp. 589, 595 (S.D. Tex. 1995) ("*Sea Lion*"); *American International Specialty Lines Insurance Co. v. United States*, No. CV-09-01734, 2010 WL 2635768, at *28 (C.D. Cal. June 30, 2010). In *Sea Lion*, for instance, the defendant supplied the raw materials to the manufacturer to produce a dinitrobenzene mixture to be sold back to the defendant. 974 F. Supp. at 596. This process generated waste, but the defendant made no arrangement for its

3.     **ExxonMobil Is Entitled to Judgment of Joint and Several Liability Under Section 107(a) of CERCLA Against the United States**

Given the above, ExxonMobil requests that the court enter judgment imposing joint and several liability against the United States for all costs incurred and to be incurred by ExxonMobil in connection with its oil refineries and chemical plants located in Baytown, Texas and Baton Rouge, Louisiana (the "Sites"). The U.S. Supreme Court has recognized that section 107(a) of CERCLA authorizes the imposition of joint and several liability against responsible parties. *See, e.g., Burlington Northern*, 556 U.S. at 613; *ARC*, 551 U.S. at 136 n. 7. As the Supreme Court noted in *Burlington Northern*, CERCLA "was designed to promote the 'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." 556 U.S. at 602 (quoting *Consol. Edison Co. of N.Y. v. UGI Util., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005) ("*Consolidated Edison*")). The routine imposition of joint and several liability has admirably served these purposes, and helps effectuate "the general congressional intent of placing liability for toxic waste clean-up as nearly as possible on those responsible for creating the hazard." *United States v. Wade*, 577 F. Supp. 1326, 1339 (E.D. Pa. 1983).

Numerous courts, including the U.S. Court of Appeals for the Fifth Circuit, have similarly concluded that section 107(a) of CERCLA actions typically result in the imposition of joint *and* several liability as the "default" standard of liability. In its key 1993 decision, the Fifth

---

proper disposal. The Court therefore concluded that it intended for the disposal of waste and was liable as an arranger. *Id.* at 598.

Similar to the scenarios under which "arranger" liability was found in *Sea Lion* and *Aceto*, here, the Government in these cases arranged for and paid ExxonMobil to process various hazardous raw materials, including light, catalytically cracked naphtha and hot acid copolymer, into hydrocodimer. The Government also retained title to these raw materials throughout the production process. Expert Report of Richard Lane White ("White Report") at 39 (Attachment 2 to White Decl. (**Exhibit No. 4**)). This process generated waste containing hazardous substances. PF ¶¶ 90-91 and 172.

Circuit acknowledged that joint and several liability, although not mandated by CERCLA, nonetheless is the usual standard of liability imposed in Section 107(a) actions absent adequate proof of divisibility. *In re Bell Petroleum Services., Inc.*, 3 F.3d 889, 895 (5th Cir. 1993) ("*Bell Petroleum*"). *See also United States v. NCR Corp.*, Civ. No. 10–C–910, 2013 WL 1858597, at *1 (E.D. Wis. May 1, 2013) ("*NCR*") ("Federal courts have consistently interpreted section 107(a) to impose joint and several liability on responsible parties unless they can show that a reasonable basis for apportionment of the harm exists").  Similarly, the U.S. Court of Appeals for the Fourth Circuit recently declared that liability under section 107(a) "is, by default, joint and several," (*PCS Nitrogen Inc. v. Ashley II of Charleston*, 714 F.3d 161, 168 (4th Cir. 2013) ("*PCS Nitrogen*")) while the U.S. Court of Appeals for the Seventh Circuit has opined that exceptions to joint and several liability are "rare."  *Metropolitan Water Reclamation Dist. of Greater Chicago v. North Amer. Galvanizing & Coatings, Inc.*, 473 F.3d 824, 827 n. 3 (7th Cir. 2007).

Here, in this case various types of hazardous substances, wastes and other pollutants were commingled *over* multiple time periods due to the United States' wartime operation at the Baytown and Baton Rouge Sites, resulting in a "chemical soup" of mixed wastes at both Sites.  These wastes included not only wastes generated by refineries controlled by the U.S., but also wastes from the Plancor operations as well. Johnson Decl. ¶¶ 11-12.  *See further* Johnson Report at 10, 44-45, 64-66, 76-78.  Wastes resulting from the Government's wartime operations also became commingled with other wastes during the subsequent post-wartime period.  *Id.*

Application of joint and several liability is particularly appropriate at sites where, as here, hazardous substances have so "commingled" such that responsibility for the pollution to be *remediated* is incapable of being apportioned among the responsible parties.  As courts have acknowledged both before and since the Supreme Court's *Burlington Northern* decision, the

presence of commingled waste is good evidence that harm is indivisible. *See, e.g., Pakootas v. Teck Cominco Metals, Ltd.,* 868 F. Supp. 2d 1106, 1117-24 (E.D. Wash. 2012) ("*Pakootas*"); *United States v. Stringfellow*, 661 F. Supp. 1053, 1060 (C.D. Cal. 1987). "[T]he co-mingling and migration of wastes at a disposal site makes identification of sources scientifically difficult and economically infeasible." *United States v. Bliss*, 667 F. Supp. 1298, 1309 (E.D. Mo. 1987).

Although harm from commingled wastes is not automatically considered indivisible (*Pakootas*, 868 F. *Supp.* 2d at 1122; *United States v. Alcan Aluminum Corp,* 990 F.2d 711, 722 (2d Cir. 1993); *United States v. Alcan Aluminum Corp*, 964 F.2d 252, 270 n. 29 (3d Cir. 1992)), evidence disclosing the relative toxicity, migratory potential, and synergistic capacity of the hazardous substances at the site typically is needed to establish divisibility of harm. *United States v. Monsanto Co.*, 858 F.2d 160, 172 (4th Cir. 1988); *Lyondell Chemical Co. v. Occidental Chemical Corp.,* 608 F.3d 284, 289 (5th Cir. 2010) ("Joint and several liability may be imposed, unless a party can prove that the harm it caused is divisible from the harm others caused"). Moreover, since the *Burlington Northern* decision in 2009, joint and several liability has been uniformly imposed in cases involving section 107(a) of CERCLA claims given the difficulty of substantiating a divisibility defense. *See, e.g., PCS Nitrogen*, 714 F.3d at 183-85 (affirming lower court decision imposing joint and several liability); *Pakootas*, 868 F. Supp. 2d at 1116-24 (imposing joint and several liability in the absence of requisite evidence proving divisibility); *NCR*, 2013 WL 1858597, at *30, 41 (same). Here, the Government has failed to even assert an affirmative defense based on divisibility or apportionment in either its initial Answer or the Amended Answer.

Not only are the wastes "commingled" in this case, but also plant operations were conducted in an integrated manner, further showing that each Site represents a single, indivisible

harm for which joint and several liability should be imposed on the United States. Both historical and technical evidence has been proffered indicating that the petrochemical production and refinery operations at both Sites were integrated in order to maximize production of avgas and other war-related products and materials for Government use. *See* discussion *supra* pp. 12-15; Johnson Decl. ¶¶ 6-8.[15] The complete integration of these operations resulted in a substantial increase in waste generation – in both the type and volume of wastes – which were disposed of at numerous locations throughout each Site. *See, e.g.*, Johnson Report at 4, 64-74.

In essence, the commingled waste contamination resulting from integrated, Government-controlled historic operations, has resulted in indivisible environmental pollution at the Sites for which the United States should be held jointly and severally liable under section 107(a) of CERCLA. This conclusion is supported by recent CERCLA decisions in which the courts have found that when the harm at a particular site is indivisible (and/or the defendants in question failed to prove a reasonable basis for divisibility), joint and several liability should be imposed. *See, e.g., Board of County Commissioners of La Plata County, Colorado v. Brown Group Retail, Inc.*, 768 F. Supp. 2d 1092, 1117 (D. Colo. 2011) ("*La Plata*") (commingled contamination "precludes apportionment based on distinct harms"); *3000 E. Imperial, LLC v. Robertshaw Controls Co.*, No. CV 08-3985, 2010 WL 5464296, at \*8-11 (C.D. Cal. Dec. 29, 2010). *See also* Restatement (Second) of Torts § 875 (1979) (where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm).

---

[15] Mr. Gravel opined that "[t]hroughout the period of Federal involvement, Baytown, including the Federally-owned and operated production units, shared an integrated waste processing and disposal system consisting of oil/water separators, open ditches, covered drains, and sewer lines." Gravel Report at 91. He also indicated that Government operations caused a similar degree of integrated operations at the Baton Rouge Site during the wartime periods, opining that "refinery and chemical plant waste processing and disposal systems served all of the Federally-owned and/or operated production units at Baton Rouge during the period of Federal involvement." *Id.* at 206.

4.   **ExxonMobil Is Entitled to Summary Judgment as to the Government's Liability under Section 113(f)(3)(B) of CERCLA at the Baytown Site**

While ExxonMobil is seeking a joint and several liability ruling, it is pleading in the alternative a contribution claim under section 113(f)(3)(b); in fact, ExxonMobil is entitled to summary judgment that the United States is liable under section 113(f)(3)(B) of CERCLA for response costs incurred at the Baytown Site. The undisputed record in this case demonstrates that all of the *prima facie* elements are satisfied for this claim, because ExxonMobil has (1) entered into settlement with the State of Texas, which (2) resolves its liability for some or all of a response action or the costs of such an action at the Baytown Site, and (3) the Government is liable as an "owner," "operator," and "arranger" at the Baytown Site - but has not contributed toward any response costs incurred by ExxonMobil for the cleanup of the Baytown Site. *See* 42 U.S.C. § 9613(f)(3)(B) (a plaintiff can maintain a section 113(f)(3)(B) of CERCLA claim when it has "resolved its liability to . . . a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement[.]" ). *See also, supra,* pp. 17-32.

a.   **ExxonMobil has entered into "administratively or judicially approved" settlements with the State of Texas**

In 1995 ExxonMobil reached two separate settlements with the former Texas Natural Resource Conservation Commission (known now as the Texas Commission on Environmental Quality) (collectively, the "TCEQ") that were memorialized in separate Agreed Orders to settle alleged violations of the Texas Solid Waste Disposal Act, Tex. Health and Safety Code Ann. § 361, PF ¶ 289, and therefore, qualify as "administratively or judicially approved" settlements under section 113(f)(3)(B) of CERCLA for several reasons. While ExxonMobil is aware that the Court ruled in *Differential Development - 1994, Ltd v. Harkrider Distributing Co.,* 470 F. Supp.

2d 727, 742-43 (S.D. Tex. 2007) ("*Differential*") that the "Voluntary Cleanup Program Agreement" ("VCP Agreement") between TCEQ and the plaintiff at issue in that case did not qualify as an "administratively or judicially approved settlement" under section 113(f)(3)(B) of CERCLA, there are critical factual differences between this VCP Agreement and ExxonMobil's Agreed Orders.  First, the Agreed Orders in this case acknowledge that the parties had settled disputed claims and matters in controversy, whereas the Court found in *Differential* that the VCP Agreement "does not resolve claims, but merely agrees to work toward resolution."   470 F. Supp. 2d at 743.  For example, one of the Agreed Orders expressly acknowledges that the parties "had settled all matters in controversy . . . . [and] [t]his Agreed Order is entered solely for the purpose of *resolving* disputed claims between the Commission and Exxon relating to remediation . . . ." at the Baytown Site.  PF ¶ 290.  As part of these Orders, ExxonMobil agreed to make a monetary payment and comply with numerous "ordering provisions" set forth in the Agreed Order that obligated the company to perform various response actions at the Baytown Site, and for this consideration TCEQ agreed to "dispense[] with all claims and allegations set forth in the Executive Director's original petition against Exxon."  PF ¶ 290.  Secondly, contrary to the VCP Agreement at issue in *Differential,* ExxonMobil may not withdraw from an Order because otherwise TCEQ may "refer this enforcement matter to the Office of the Attorney General of the State of Texas for further enforcement proceedings as provided by law if the Executive Director determines that Exxon is noncompliant with or in violation of any of the terms or conditions set forth in this Agreed Order."  PF ¶ 290.

        **b.**        **ExxonMobil has resolved a portion of its liability for a response action and incurred response costs within the meaning of CERCLA**

As for the second prima facie element of a 113(f)(3)(B) contribution claim, ExxonMobil has conducted investigatory, monitoring and remediation activities for contaminated drainage

38

canals, solid waste management units ("SWMUs"), and other areas of contamination at the Baytown Site under the Agreed Orders issued pursuant to the Texas RCRA[16]-delegated program. PF ¶ 291-92; Gravel Report at 109-111.   These cleanup activities fall squarely within the definition of "response" and "removal" actions stated in CERCLA and as applied by the courts.[17]

CERCLA defines the term "response action" to cover a broad range of removal and remedial efforts, and is not strictly limited to actions specifically taken pursuant to CERCLA. *See* 42 U.S.C. § 9601(25).  Based on this language, numerous federal courts have concluded that "RCRA compliance costs may also be considered 'response costs' under CERCLA."  *See, e.g., Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F. Supp. 1049, 1053 (D. Ariz. 1984) (holding that the "costs of complying with RCRA" qualified as response costs under CERCLA); *Union Carbide Corp. v. Thiokol Corp.*, 890 F. Supp. 1035, 1044 (S.D. Ga. 1994) ("*Union Carbide*") ("Costs arising from RCRA compliance can be recovered in a CERCLA action.") (citing *United States v. Rohm and Haas Co.*, 790 F. Supp. 1255, 1262 (E.D. Pa. 1992) ("The overwhelming evidence is that Congress intended CERCLA to be cumulative and not merely an alternative to RCRA or to be limited in its application to formally designated Superfund sites."), *rev'd on other grounds by* 2 F.3d 1265 (3d. Cir. 1993)).  In *Union Carbide*, for instance, the court found that "monitoring and assessment . . . undertaken in accordance with a RCRA compliance scheme" were "necessary response costs under CERCLA."  890 F. Supp. at 1044.

Finally, ExxonMobil has incurred substantial costs funding these actions.  *See* Gravel Report at 136 & Appendix C (providing preliminary cost information); PF ¶ 298.  ExxonMobil

---

[16]   "RCRA" refers to the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901-6992.

[17]   ExxonMobil also has agreed under one of the "ordering provisions" to conduct a RCRA Facility Investigation ("RFI") to characterize the nature and extent of the waste and other contamination at each SWMU in order to determine whether any of the SWMUs should be subject to corrective action, and the RFI work remains ongoing. PF ¶¶ 290-91.

has thus "resolved its liability to . . . a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement[.]"   42 U.S.C. § 9613(f)(3)(B).

> **c.** **CERCLA Section 113(f)(3)(B) is triggered by state settlements requiring response actions even where those settlements do not explicitly reference CERCLA liability**

Since the Court's decision in *Differential,* there has been a significant development regarding the scope of section 113(f)(3)(B); specifically, in *Trinity Industries, Inc. v. Chicago Bridge & Iron Co.,* No. 12-2059 2013 WL 4418534 (3d. Cir. Aug. 20, 2013) ("*Trinity*") the Third Circuit recently ruled, at the urging of the U.S. Environmental Protection Agency ("EPA") which filed an *amicus* brief, that a contribution action under section 113(f)(3)(B) may be brought by a party who has settled some of its liability to the state for response costs, even where the settlement does not explicitly provide that it resolves any CERCLA liability *per se*. *Trinity*, at *4. *See also* Brief of the United States as Amicus Curiae Supporting Appellant, *Trinity*, 2013 WL 4418534 (3d. Cir. 2013) (No. 12-2059).

In *Trinity,* the Third Circuit found that the plain reading of section 113(f)(3)(B) does not limit this provision to response actions specifically taken under CERCLA. *Trinity,* at *4.  In that case Trinity Industries had settled its liability with Pennsylvania under two state statutes. *Id.*, at *1.  The district court, relying primarily on *Consolidated Edison*, 423 F.3d at 94-97, initially held that the Consent Order did not resolve any CERCLA liability and therefore could not trigger its section 113(f)(3)(B) rights.  However, the Third Circuit reversed, noting that:

> § 113(f)(3)(B) does not require resolution of CERCLA liability in particular.  The statutory language of § 113(f)(3)(B) requires only the existence of a settlement resolving liability to the United States or a state "for some or all of a response action." Section 113(f)(3)(B) does not state that the 'response action' in question must have been initiated pursuant to CERCLA—a requirement that might have easily been written into the provision. *Id.*, at *4.

40

Both of ExxonMobil's administrative settlements with TCEQ that are memorialized in the Agreed Orders fall within the scope of section 113(f)(3)(B) as construed by the Third Circuit in *Trinity*. Therefore, given that ExxonMobil has resolved its liability for some or all of a response action in these administrative actions, it is entitled to seek contribution from the United States under CERCLA section 113(f)(3)(B).

> **5.** **ExxonMobil Is Entitled to Summary Judgment as to the Government's Liability and Allocable Share of Future Costs**

ExxonMobil further seeks summary judgment on its claim for a declaration that the United States is liable for future environmental response costs incurred at the Baytown and Baton Rouge Sites. ExxonMobil has incurred—and will continue to incur—response costs for which the Government is liable at both Sites, creating an actual controversy between ExxonMobil and the Government and rendering ExxonMobil's request for declaratory judgment ripe. As there is an actual controversy and the Government is a liable party under section 107(a) of CERCLA, the plain text of CERCLA and the relevant case law mandate a declaratory judgment of the Government's future liability—regardless of whether this Court concludes ExxonMobil's claims are for cost recovery under section 107, contribution under section 113, or both. Finally, cleanup at both Sites remains ongoing, and liability for future response costs will necessarily mean that the Government will continue to share in the responsibility for those costs. Consistent with the relevant case law, ExxonMobil is also entitled to a declaration of the Government's specific allocable share of future response costs as determined equitable in accordance with the allocation methodology adopted by this Court.

> **a.** **This declaratory judgment action is ripe**

A declaratory judgment action that the Government is liable for future response costs is ripe so long as ExxonMobil has actually spent money on response costs at the respective Sites.

*Shapiro & Sons, Inc. v. Rutland Waste & Metal Co.*, 76 F. Supp. 2d 82, 87 (D. Mass. 1999).

Once a party has incurred any such costs, "the controversy is sufficiently real to permit the court

to issue a declaratory judgment on defendant's liability." *Jones v. Inmont Corp.*, 584 F. Supp.

1425, 1430 (S.D. Ohio 1984).   As the record indicates, ExxonMobil has indeed incurred

substantial response costs pursuant to its agreements with Texas and Louisiana.  PF ¶¶ 293 and

295; Gravel Report, Appendix C.  Further, it has paid more than its equitable share, and the

Government, which shares in responsibility for the contamination, has not.  These costs remain

ongoing and, absent court intervention, ExxonMobil will continue to incur more than its

equitable share of future costs at the Sites.  A real controversy thus exists between the parties and

this action is ripe for adjudication. *See id.*

> **b.**     **ExxonMobil is entitled to a declaratory judgment that the Government is liable for future costs under section 107 and section 113 of CERCLA**

So long as it is ripe, a declaratory judgment that the Government is liable for future costs

is mandatory even where future costs or response efforts are entirely unknown.  42 U.S.C. §

9613(g)(2); *New York v. Solvent Chemical Co.*, 664 F.3d 22 (2d Cir. 2011) ("*Solvent*").  With

respect to claims under section 107(a) of CERCLA, section 113(g) of the statute is explicit:

> [I]n an initial action for the recovery of costs referred to in section 9607 . . . the court <u>shall</u> enter a declaratory judgment on liability for response costs or damages which will be binding on any subsequent action or actions to recover further costs or damages[.]  42 U.S.C. § 9613(g)(2) (emphasis added).

Courts also have consistently held that declaratory judgment is appropriate in CERCLA

contribution claims under section 113 as well. *See, e.g. Solvent*, 664 F.3d at 26; *Vine Street, LLC

v. Keeling*, 460 F. Supp. 2d 728, 766-67 (E.D. Tex. 2006) ("*Vine Street*") (holding that section

113(g)(2) requires a declaratory judgment as to "any such action described in this subsection,"

including claims under Section 113 for contribution).  In the *Solvent* litigation, the Second

Circuit applied factors outlined in the federal Declaratory Judgment Act[18] and concluded that the following three facts—each of which are relatively universal to CERCLA claims—mandated a declaratory judgment as to liability.  664 F.3d at 26.  First, the court established that there was no reason to distinguish between liability for past costs and future costs and any attempt to do so merely set an arbitrary cutoff date.  Second, the court reasoned that the short three-year statute of limitations for a CERCLA contribution claim means that "declaratory judgments will often be necessary to ensure an equitable apportionment of cleanup costs that (as is common) are incurred over many years."  *Id.* at 27.  As the court pointed out, the litigation had been going on for nearly that long; denying the plaintiff declaratory judgment could have resulted in prejudice to the plaintiff's right to contribution with respect to costs incurred while the litigation remained pending.  *Id.*  Finally, the court provided a third rationale for the appropriateness of issuing a declaratory judgment in CERCLA cases, reasoning that:

> [T]he 'costs and time involved in relitigating issues as complex as these where new costs are incurred would be massive and wasteful.'  As is typical, the CERCLA claims and defenses below were complex, and entailed years of litigation, weeks of trial, and thousands of pages of briefing.  A declaratory judgment with respect to liability saves litigants and the courts substantial time and money[.]  *Id.* at 27, (quoting *Boeing Co. v. Cascade Corp.*, 207 F. 3d 1177,

---

[18]    These factors consist of:

> [1] whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; ... [2] whether a judgment would finalize the controversy and offer relief from uncertainty[;] ... [3] whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; [4] whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and [5] whether there is a better or more effective remedy.  *Solvent*, 664 F. 3d at 26 (citation omitted).

1191 (9th Cir. 2000)).[19]

As in *Solvent*, the parties here have been litigating over these costs for several years. The issues involved in this case are technically complex and complicated further by the fact that the contamination at the Baytown and Baton Rouge Sites began over seventy years ago. Environmental cleanup costs are plant-wide and involve the adjacent water bodies. PF ¶¶ 291-95. Correspondingly, the role of the Government in causing the contamination is historic in the sense that it is actually documented in history books and its liability as a responsible party is unlikely to disappear. ExxonMobil is therefore entitled to a determination that the Government, as a responsible party under CERCLA section 107, is liable for future costs.

> **c.      ExxonMobil is entitled to a declaratory judgment that the Government is liable for a specific percentage share of those future response costs at Baytown and Baton Rouge that are consistent with the National Contingency Plan**

Once liability for future costs is established, courts consistently issue declaratory judgments assigning responsible parties the equitable percentage shares of future costs. Here, ExxonMobil has shown (1) that it will continue to incur response costs for current and future investigations at both Sites, and (2) that the Government's equitable share of the total response costs incurred in remediating the sites should be determined in accordance with the allocation methodology set forth in Section II, *infra*. ExxonMobil thus requests that the court issue a declaratory judgment that the Government must contribute this set equitable share of future

---

[19]   Other circuit courts have consistently reached the same result. *See, e.g., GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 450-51 (6th Cir. 2004) (holding that "declaratory judgments concerning future costs in § 107 and § 113(f) suits must be treated alike" so long as a case or controversy exists); *United States v. Davis*, 261 F.3d 1, 46 (1st Cir. 2001) ("[T]he Ninth and Tenth Circuits have taken the position, as we do here, that § 9613(g)(2), the declaratory judgment provision of CERCLA, applies to § 9613(f) contribution actions for both past and future response costs."); *Tosco*, 216 F.3d at 897 (upholding an allocation of "liability for past and future response costs proportionally among the parties" under Section 113).

response costs that ExxonMobil incurs consistent with the NCP and otherwise proper under CERCLA that are associated with wartime activities.

Numerous courts, including the Eastern District of Texas, have entered declaratory judgment allocating specified amounts of future costs. *See, e.g., Vine Street,* 460 F. Supp. 2d at 768; *Tosco,* 216 F.3d at 897; *Boeing Co. v. Cascade Corp.*, 920 F. Supp. 1121 (D. Or. 1996), *aff'd,* 207 F.3d 1177 (9th Cir. 2000); *Yankee Gas Serv. Co. v. UGI Utilities*, 852 F. Supp. 2d 229 (D. Conn. 2012) ("*Yankee Gas*"); *La Plata*, 768 F. Supp. 2d at 1119. For example, in *La Plata*, the county brought a CERCLA action against a prior owner. Based on the record in this case, the court allocated 75% of past and future costs to the prior owner. *Id.* at 1122. Some of the future costs were determinable, and the court allocated specified dollar shares to each party with respect to such costs. With respect to other future costs not yet known at the time of its decision, the court issued a declaratory judgment that the defendant would be liable for 75% of those costs so long as they were reasonable, necessary, and consistent with the NCP. *Id.*

ExxonMobil is likewise engaged in ongoing cleanup actions at both Sites that will continue in the future. At the Baytown Site ExxonMobil is performing, pursuant to the Agreed Orders or otherwise required by the TCEQ, groundwater remediation and monitoring, a RCRA Facility Investigation and possible remediation of various SWMUs.   PF ¶¶ 291-92; Gravel Report at 109-135. ExxonMobil is also applying for a Facility Operating Area permit that covers remediation, assessment, monitoring, and other response actions across the entire Facility. *Id.* at 133-35. At the Baton Rouge Site, ExxonMobil is performing response actions pursuant to a Corrective Action Order or otherwise required by the Louisiana Department on Environmental Quality; these activities include groundwater remediation and monitoring of the Shallow Fill Zone, a RCRA Facility Investigation and possible remediation of various SWMUs, post-closure

activities at the Old Silt Pond and Rice Paddy Landfarm, and other response activities.  Gravel Report at 207-225; PF ¶ 294.

The ongoing and future response costs for the Baton Rouge and Baytown Sites, as in *La Plata*, are part of the overall effort to remediate the contamination at these Sites.  Similar to that case, the Government's share of the future response costs can now be factually determined, and a declaratory judgment is therefore appropriate at this time: "A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required." *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000) (citation omitted).   Although the total cost of the response actions—and therefore the government's liability in actual dollars—may remain uncertain, ExxonMobil "does not ask the court to determine now what those costs will be or to award the costs in a present lump-sum payment." *Vine Street*, 460 F. Supp. 2d at 767.   Instead, ExxonMobil merely requests "the proper remedy for future response costs," which is "a declaratory award dividing future response costs among responsible parties." *Id.* (quoting *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85. 92 (2d Cir. 2000)).  Such a judgment will save both parties substantial resources relitigating the same issues "each time new response costs are incurred[.]" *Boeing Co.*, 920 F. Supp. at 1140.

II. **In the Alternative, The Court Should Adopt an Allocation Methodology Using a Production-Oriented Surrogate Factor and Reflecting Key Equitable Factors Relating to: (1) the Government's Previously-Imposed Restrictions on the Use of Proper Pollution Controls During the Wartime, and (2) the Government's Contractual Obligations[20]**

   A. **The United States' Allocable Share Should Be Based on Equitable Factors That the Court Deems Appropriate**

   Both CERCLA and the related case law authorities specify that the Court should apply the federal law of equity in deciding an appropriate allocation among CERCLA liable parties. Section 113(f)(1) of CERCLA specifically sets forth the following in regard to the allocation of response costs among liable parties in contribution:

   > Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law.  In resolving contribution claims, the court may allocate response costs among liable parties <u>using such equitable factors as the court determines are appropriate</u>.   42 U.S.C. § 9613(f)(1) (emphasis added).

   In *United States v. Meyer, Inc.,* 932 F.2d 568 (6th Cir. 1991) ("*Meyer*"), the Sixth Circuit clarified the broad discretion afforded a district court in determining the appropriate equitable factors to apply in CERCLA allocations, stating as follows:

   > Congress reemphasized that the trial court should invoke its moral as well as its legal sense by providing that the court use not just "equitable factors," which phrase already implies a large degree of discretion, but "such equitable factors as the court determines are appropriate."  This language broadens the trial court's scope of discretion even further. *Id.* at 572.

---

[20]    In the event the Court imposes several liability, but not joint and several liability, under CERCLA on the United States, ExxonMobil remains entitled to contribution from the United States for reimbursement of the Government's equitable share of such costs at both Sites.

While CERCLA is silent regarding the specific equitable factors that a court may consider, the courts have frequently turned as a starting point to the six "Gore factors"[21] taken from an unsuccessful amendment to CERCLA. *Bell Petroleum*, 3 F.3d at 899.  Other equitable factors commonly employed by the courts include contractual arrangements between the parties, the state of the mind of the parties, and economic and other benefits to the parties.  *See, e.g., Meyer*, 932 F.2d at 572-73; *Cadillac Fairview*, 299 F.3d at 1028; *Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429, 446 (3d Cir. 2005) ("*Beazer*").  The courts are not bound to consider any particular factor; rather, "'a court may consider several factors or a few, depending on the totality of the circumstances.'"  *Beazer* at 446 (quoting *New Jersey Turnpike Auth. v. PPG Industries, Inc.*, 197 F.3d 96, 104 (3rd Cir. 1999)); *see Envtl. Transp. Sys., Inc. v. ENSCO*, 969 F.2d 503, 508 (7th Cir. 1992).  In essence, the site-specific evidence in each case provides guidance as to which equitable factors may be most relevant, and ExxonMobil submits that is the case here as well.

**B.   The Court Should Adopt the Allocation Methodology Offered by Plaintiff**

   **1.   Plaintiff's Proposed Allocation Methodology Accurately Reflects Site-Specific Conditions, and is Fully Supported by the CERCLA Authorities, Regulatory Determinations and the Evidentiary Record**

ExxonMobil retained an experienced and well-respected allocation expert - Richard L. White - who developed a comprehensive allocation methodology that properly reflects the actual, Site-specific manufacturing operations that occurred during the wartime period and takes

---

[21]  The "Gore factors" are the following:  (1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment.  *Bell Petroleum*, 3 F.3d at 899-900.

into account the relevant panoply of equitable factors that should be considered in this unique wartime CERCLA case. *See generally* White Decl. Given the evidentiary record in these cases, Plaintiff's proposed allocation methodology is reasonable and equitable and should be adopted by the Court for a number of reasons.

First, Plaintiff's allocation methodology employs a "production-oriented" approach that most accurately reflects the actual operations and other relevant conditions at the Sites over the relevant periods of operation, especially taking into account, for example, the numerous significant changes in the Facilities' operations that occurred during the wartime period in order to achieve the goals established by the PAW to maximize the production of avgas. This "production-oriented" approach employs – as a surrogate for waste generation – the actual plant capacity to process crude oil on an annual basis at each Facility, since this information was available for each Facility throughout its respective period of operation. This "crude oil throughput capacity factor" is a typical surrogate for reflecting the actual production of crude oil products and would commensurably act to reflect the amount of waste products generated on an annual basis. However, in order to fully characterize actual plant conditions, this "production-oriented" approach incorporates an additional set of factors that recognize the substantial waste process reduction and/or process efficiency improvements that were implemented at each Site over the years to improve production efficiency and environmental performance at each Site. As such, both of these factors have in tandem acted as a proxy or surrogate for evaluating the relative production of waste at each Site on an annual per barrel basis over the relevant periods of refinery operations at each Facility. White Decl. ¶¶ 7-10.

This "production-oriented" approach is fully supported by the CERCLA case law. *See e.g., Yankee Gas*, 852 F. Supp. 2d at 252-54. For example, in *Yankee Gas*, the court allocated

between prior operators of a former manufactured gas plant the costs to clean up contamination at several discrete contaminated areas of the plant. In rendering its determination, the court allocated the cleanup costs for one of the areas of contamination based upon each party's total gas production during its period of operation, rather than simply based on each party's total years of operation, because the court found the production-based approach corresponded more closely to the cause of the contamination,[22] stating as follows:

> The gas production ratios are tied more closely to operations than any of the other proposed allocation methods. As such, they have the virtue of corresponding, at least roughly, to the cause of the pollution . . . . *Id.* at 253.

Similarly, Plaintiff's allocation methodology reflects the common sense conclusion that refinery operations - in terms of the amount of crude oil processed and waste generated - were not the same year-after-year, and therefore, the crude oil surrogate approach, as opposed to a simple "time of use" approach, more closely resembles how waste was generated and processed at the Facilities in different years.

In fact, according to refinery operations expert Jere Johnson, EPA has itself recognized the relationship between waste quantities generated and crude capacity. Johnson Decl. ¶ 15. EPA determined that there is a direct correlation between a refinery's crude oil throughput capacity and the amount of wastes generated by the refinery's operations. *See* EPA, *Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Petroleum Refining Point Source Category* (Washington: GPO, 1974) ("*EPA Study*") at 55-61; PF ¶ 288. Simply put, the *EPA Study* concluded that the greater the crude oil

---

[22] The *Yankee Gas* court did not use the production-based approach to allocate the cleanup costs at one discrete area of contamination only because the court found that the source of some of the contamination occurred after the gas plant's period of operation. 852 F. Supp. 2d at 250. However, this part of the allocation ruling in the *Yankee Gas* decision is inapposite because none of the contamination at issue in ExxonMobil's pending cases arose from sources occurring outside the periods of operations at the two Sites.

throughput capacity at a particular refinery, the greater the amount of waste that would be generated at that refinery; this exact approach is adopted here.

The allocation methodology's use of crude oil throughput capacity as a surrogate for waste generation – coupled with the waste reduction and/or improvement factors – is also fully supported by the evidentiary record in this case for two key reasons. First, as the crude oil production throughput capacity increased at ExxonMobil's refineries, absent any production efficiency improvements the amount of waste generated increased as well. For example, the evidence shows that during WWII the crude oil throughput capacity increased by 36% at the Baytown refinery, PF ¶ 67, and, as noted above, at that time the U.S. Engineers Office determined that the increased crude oil processing for the production of war products for the Government had substantially increased waste generation from pre-war levels that was overwhelming the existing waste processing facilities.   PF ¶ 104.   On the other hand, the evidence shows that once ExxonMobil was able to implement various production efficiency improvements and upgrade the waste processing facilities after Government wartime controls were lifted, these improvements led to substantial reductions in separator sludge, and reductions in oil and other contaminants in the wastewater effluent; in fact, A. J. Gravel provided a chronology of the various key production and waste processing improvements and the historical data showing the waste reduction effects of these improvements, Gravel Decl. ¶ 21 & Attachment 4, and Jere Johnson confirmed that this historical data was technically valid and scientifically reliable.  Johnson Decl. ¶¶ 13-14. *See also* PF ¶¶ 248-69 and 281-87.  Consistent with this expert discovery, Plaintiff's allocation methodology uses this data to incorporate appropriate waste reduction and/or improvement factors - termed "process efficiency factors" -

to directly take into account how the environmental performance (*i.e.,* waste and contaminant reduction) of the refineries at the Sites improved over time.   White Decl. ¶¶ 13-14.

Secondly, Plaintiff's use of crude oil throughput capacity as the production surrogate -- rather than, for example, merely the "end-products" sold to the Government – reflects the fact that both refineries were directly and essentially one hundred percent committed during the wartime period to the production of avgas and other war products.  As the record notes the PAW dictated that all of the allocated crude oil to these facilities be processed solely for the goal of maximizing avgas production; otherwise, the PAW would have effectively shut down the refineries' operations by cutting off crude oil supplies under its regulatory authorities or alternatively seizing the plant.

**2.    Plaintiff's Proposed Allocation Methodology Incorporates a Number of Critical and Relevant Equitable Factors**

While ExxonMobil acknowledges that it is the province of the Court to determine which equitable factors to consider for the purposes of allocation, Plaintiff's proposed allocation methodology incorporates a number of equitable factors that are both critical and relevant to the allocation decision.

**a.    The degree of involvement in the generation, treatment and disposal of wastes**

Consistent with the "Gore factors," the Plaintiff's proposed allocation methodology properly addresses the "degree of involvement" factor in several key respects.  First, as part of determining the fair and reasonable allocation between different types of parties, *i.e.*, owners and operators, which is generally termed an "inter-class allocation," the Plaintiff's allocation initially sets the overall "owner" share of a particular plant at 20% and the "operator" share at 80% of the total responsibility for cleanup costs at a specified plant (or facility).  This allocation follows the

general principle in CERCLA allocations that an operator typically has more direct control than the owner over facility operations that generate the relevant waste, and the courts have generally allocated comparable "owner" shares and "operator" shares with respect to specific sites. *See, e.g., Yankee Gas,* 852 F. Supp. 2d at 249 (court allocated a 25% share to the owner and the remaining share to the prior operators of the facility); *S. Fla. Water Mngt. Dist. v. Montolvo*, No. 88-8038, 1989 WL 260215, at *4 (S.D. Fla. Feb. 15, 1989) (allocating a 75% share to the operator whose activities caused the contamination and 25% share to the owner who acquiesced to the operator's activities). For the owner share, this allocation methodology ascribed the 20% share to the specific party that owned the plant at issue - ExxonMobil for the refinery and the Government for the Plancors and the BOW - during the relevant parts of the wartime period.

Once this initial "inter-class allocation" has been made under the Plaintiff's methodology, the specific operator share of 80% is then fairly apportioned among the two parties solely on the basis of the level of operator control actually assumed by each party at that particular plant. For example, in this case since it assumed the full control over the operations of the refineries at both Facilities during World War II, the Government would therefore be fairly allocated the full share of "operator" liability for these plants during that wartime period.

Second, the Plaintiff's allocation also properly takes into account the Government's involvement in preventing and delaying the implementation of recommended waste processing improvements until well after WWII that would have significantly reduced waste generation and the resulting contamination at the Sites if they had instead been implemented in a timely manner as originally recommended by ExxonMobil or the U.S. Government. In essence, PAW exercised its authority on numerous occasions to deny ExxonMobil the ability to manage properly the wastes resulting from the production of avgas and other war products at the Facilities during

WWII.  For example, the Government's denial of ExxonMobil's request to build a Master Separator at the Baton Rouge Facility or to build acid waste burning facilities at the Baytown Facility were not the exception but the rule as emphasized in *Cadillac Fairview*, 299 F. 3d at 1023.  By all accounts, CERCLA is an equitable statute, and the Government's informed and concerted decision to favor war production over environmental protection is a decision for which the Government should bear the burden of the consequences, not ExxonMobil, in fashioning any appropriate allocation in this case.

      **b.**     **Contractual arrangements between the parties**

The courts in wartime cases have recognized that contractual obligations also should be viewed as an equitable factor to be taken into account in allocation determinations.  For example, in the *Cadillac Fairview* war claims litigation, the district court ruled that "the Court may consider as an equitable factor in making a section 113 of CERCLA allocation determination evidence that one of the parties had contractually agreed to indemnify another of the parties with respect to the conduct at issue." *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, Nos. 83-8034 MAP (Bx), 93-7996 MRP (Bx), 1997 WL 149196, at *17  (C.D. Cal. Feb. 21, 1997) ("*Cadillac Fairview II*") (citing *Jones-Hamilton Co. v. Beazer Materials & Serv.*, 959 F.2d 126, 129 (9th Cir. 1992)); *Mardan Corp. v. CGC Music, Ltd.*, 804 F.2d 1454, 1459 (9th Cir. 1986); *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir. 1994) ("*Kerr-McGee*").  The *Cadillac Fairview II* court further stated as follows:

> In making the allocation determination under CERCLA, this Court has jurisdiction to consider contractual arrangements between the parties, despite the fact that the contract is with the United States and involves claims over $10,000. Jurisdiction under the Tucker Act is not exclusive where other statutes independently confer jurisdiction and waive sovereign immunity. 1997 WL 149196, at *16 (citing *Bowen v. Mass.*, 487 U.S. 879, 901-08 (1988)) (other citations omitted).

In so ruling, the Ninth Circuit further emphasized the likelihood that the contract would have likely contained an indemnity for potential CERCLA liability had the statute existed at the time, stating as follows:

> Obviously, the parties could not have contemplated, when they entered into the [contract], that decades later Congress would pass a law like CERCLA. Equally obviously, had CERCLA already been in effect, lawyers for such sophisticated corporations as those the government recruited for this war work would have recommended that their clients obtain language protecting them from CERCLA liability. *Cadillac Fairview*, 299 F. 3d at 1028.

Consistent with the Court's opinion in *Cadillac Fairview*, Plaintiff's allocation methodology here properly reflects the fact that there were prior wartime contractual arrangements between the DSC and Exxon covering the production and sale of avgas at both the Baytown and Baton Rouge Facilities. PF ¶¶ 72-74.   Under these contractual arrangements, the United States expressly assumed full responsibility for the reimbursement of all "new or additional . . . charges" incurred by the company in connection with the "production, manufacture, sale or delivery" of the avgas at these Facilities. PF ¶ 297.   This methodology reflects the conclusion that these avgas supply contracts imposed an obligation on the United States to reimburse ExxonMobil for cleanup costs that it has subsequently incurred in connection with the production and manufacture of avgas and its associated war products.  This position was upheld in *ExxonMobil vs. United States*, and subsequently confirmed by extrinsic evidence produced during the course of discovery in this case.  101 Fed. Cl. at 579-81.[23]   This extrinsic evidence shows that the term "charges" as used elsewhere in the DSC contracts and in accompanying correspondence was intended to be used interchangeably with the term "costs" and that "charges" were intended to cover a wide range of costs including remediation expenses.

---

[23]   However, as noted in n. 4 above, another court has just recently ruled otherwise in a case involving similar contract claims. *See Shell Oil Co. v. United States*, 108 Fed. Cl. at 430-34.

PF ¶¶ 298-304.   It also shows that these contracts contemplated the reimbursement of all costs related to the production of avgas and the associated war products during WWII, including the full costs associated with the operation of the crude oil distillation and cat cracker units, PF ¶¶ 296-302, irrespective of the fact that the processing of the crude oil to produce avgas simultaneously produced other products; in fact, in the avgas contracts the Government expressly acknowledged that in regard to the "normal operation of said refinery . . . substantial quantities of motor fuel and other products must necessarily be produced and sold in connection with the production of 100 octane aviation gasoline." PF ¶ 76.  This position is consistent with the Government's very liberal WWII standard regarding the allowance of costs incurred by a war contractor in a supply contract, *see Explanation of Principles for Determination of Costs Under Government Contracts* at 2 (War Dept.;1942) (PF ¶¶ 305-06); most importantly, during WWII the War Department's formal policy for contractual reimbursement explicitly provided that "[t]he total costs under a contract is the sum of all costs incurred by the contractor incident to and necessary for the performance of the contract and properly chargeable thereto."[24]   *Id.*

---

[24]     Although not specifically taken into account in the Plaintiff's allocation methodology *per se*, there are various other contractual obligations that should be considered in undertaking an equitable allocation in this case.  For example, the Government required that ExxonMobil act as its "agent" with respect to the operation of the various Plancors in numerous respects. PF ¶¶ 234-39.  Under these circumstances the Government is obligated to indemnify the company for any response costs related to the operation of the Plancors under well-established agency law principles.  The Restatement (Second) of Agency (1958) defines an agent as a party who by mutual assent acts on behalf of another and is subject to the other's control.   An agency relationship requires:
   (1)     an objective manifestation of assent by both parties to the relationship;
   (2)     one party being subject to the other's control; and
   (3)     that party acting on behalf of the other.  *Id.* § 1.

c.     **Compliance with governmental environmental requirements**

Again consistent with other CERCLA jurisprudence, *see Tosco*, 216 F.3d at 894-95; *Ashley II of Charleston v. PCS Nitrogen*, 791 F. Supp. 2d 431, 487 (D.S.C. 2011) ("*Ashley II*"), Plaintiff's allocation methodology reflects the fact that ExxonMobil would have acted to meet any newly-applicable federal environmental regulatory requirements that would have come into effect during the course of operations over the years at both Baytown and Baton Rouge Facilities.  These requirements would have included more stringent practices imposed under the Federal Water Pollution Control Act of 1972 (commonly known as the Clean Water Act ("CWA"), 33 U.S.C. §§1251-1387), regulating the discharge of pollutants from industrial formations into navigable waters, and RCRA, 42 U.S.C. §§ 6901-6992, regulating the treatment, storage and disposal of hazardous wastes.  In developing applications, CERCLA jurisprudence has historically recognized and given credit to the imposition of new management practices in response to new regulatory requirements. *See, e.g.*, *Tosco*, 216 F. 3d at 894 (upholding the lower court's determination that one factor was "that waste disposal practices improved in the years subsequent to Koch's ownership and operation[.]"); *see also Ashley II*, 791 F. Supp. 2d at 487 (rejecting a years-on approach to apportionment because the parties "did not uniformly disposed of contaminants on the Site" over time).

d.     **Other Equitable Factors**

Other equitable factors within the province of this Court are not expressly included in the Plaintiff's allocation.  For example, the courts have held that the benefits received by the United

---

It is well established that the principal must indemnify its agent where the agent suffers a loss resulting from activities authorized by the principal. *Id.* §§ 438, 439; *Bibb v. Allen*, 149 U.S. 481, 498 (1895) ("It is a well established principle, which pervades the whole law of principal and agent, that the principal is bound to indemnify the agent against the consequences of all acts done by him in the execution of his agency, or in pursuance of the authority conferred upon him, when the actions or transactions are not illegal").  This rule reflects the unfairness of holding an agent liable for an act which he performed on behalf of the principal.

States from the operations of industrial facilities for the war effort is an equitable factor that should be considered a cost to society for which the United States should therefore pay. *See, e.g., Cadillac Fairview*, 299 F. 3d at 1029. It is quite evident that the United States received a benefit from the wartime operations of the Baytown and Baton Rouge Facilities that is almost impossible to quantify in terms of money. The United States had a war to fight and win, and avgas was critical to winning the war. As one high-ranking Government official stated after the war, "100-octane is to motor gasoline what the Lincoln is to the Ford. If birds ran on gasoline it would give a hawk the performance of an eagle. . . On all counts, 100-octane was the lifeblood of the United Nations in the air." PF ¶ 26. However, the Government's avgas program required ExxonMobil to construct facilities for a product that had little pre-war demand and was not expected to have much post-war demand or value as well - a belief that came to fruition. *See* Gravel Decl. ¶ 16. Avgas production nationwide went from 40,000 barrels per day in 1941, to 514,000 barrels per day in 1945, and subsequently back down to an estimated 72,000 barrels per day in 1946. PF ¶¶ 28 and 112. And the Baytown and Baton Rouge refineries played a critical and essential role in that wartime avgas production, as they were two of only three refineries in the U.S. to produce more than one billion gallons of avgas during WWII; in fact, ExxonMobil-affiliated companies produced approximately 20 percent of the avgas consumed by the Allied Forces during WWII. PF ¶ 68. Thus, the United States' war effort was benefitted greatly by the avgas production of the Baytown and Baton Rouge Facilities and their significant contribution to the Allied victory in WWII cannot be understated.

*       *       *

In sum, Plaintiff's proposed allocation methodology should be adopted by the Court because it employs a well-established "production-oriented" approach that accurately reflects the actual operations and other relevant conditions at the Sites, and incorporates a number of

equitable factors that are both critical and relevant to the allocation decision.  In addition, while not expressly reflected in the proposed allocation methodology, although it is the province of the Court, ExxonMobil thinks that other equitable factors, such as the benefits received by the United States from the wartime operations at the Facilities, and ExxonMobil's cooperation with state environmental agencies in remediating the contamination, should be considered by the Court in developing the allocation methodology.

## CONCLUSION

For the foregoing reasons, Plaintiff ExxonMobil Corporation requests that the Court enter partial summary judgment in favor of Plaintiff with respect to both cases and find as follows:  (1) Defendant United States is liable under section 107(a)(2) of CERCLA as both a prior owner and prior operator of the Baytown Site and the Baton Rouge Site; (2) Defendant United States is liable under section 107(a)(3) of CERCLA as a person who arranged for the treatment or disposal of hazardous substances at the Baytown Site; (3) Defendant United States is subject to joint and several liability under section 107(a) of CERCLA for reimbursement of ExxonMobil's past and future response costs at the Baytown Site and the Baton Rouge Site; (4) Defendant United States is liable in contribution to ExxonMobil under section 113(f)(3)(B) of CERCLA for such past and future response costs at the Baytown Site; and (5) Defendant United States is subject to an allocated share of both the past and future costs at the Baytown Site and the Baton Rouge Site in accordance with the allocation methodology offered by Plaintiff.

Dated:  September 30, 2013                    Respectfully submitted,


                                             /s/ J. Gregory Copeland
                                             J. Gregory Copeland (S.D. Tex. No. 02402 and
                                                     Texas Bar No. 04798500) - Attorney in Charge
                                             Daniel M. Steinway (S.D. Tex. No. 1105349)
                                             Michael McGovern (S.D. Tex. No. 1095459)
                                             BAKER BOTTS L.L.P.

One Shell Plaza
910 Louisiana
Houston, TX 77002-1234
Tel.:    (713) 229-1301
Fax:    (713) 229-2701
greg.copeland@bakerbotts.com

*Counsel for Plaintiff Exxon Mobil Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of September 2013 I served the foregoing on the

following counsel by filing the same via the Court's ECF system and/or Federal Express:

Michael D. Rowe, Esq.
United States Department of Justice
Environment Division
Environmental Defense Section
601 D Street, N.W., Room 8110
Washington, D.C. 20004
michael.rowe@usdoj.gov

T. Monique Peoples, Esq.
United States Department of Justice
Environment Division
Environmental Defense Section
601 D Street, N.W., Room 8110
Washington, D.C. 20004
monique.peoples@usdoj.gov

Stephanie J. Talbert
United States Department of Justice
Environment Division
Environmental Defense Section
601 D Street, N.W., Room 8110
Washington, D.C. 20004
stephanie.talbert@usdoj.gov

Brian H. Lynk
United States Department of Justice
Environment Division
Environmental Defense Section
601 D Street, N.W., Room 8110
Washington, D.C. 20004
brian.lynk@usdoj.gov

Erica Zilioli
United States Department of Justice
Environment Division
Environmental Defense Section
601 D Street, N.W., Room 8110
Washington, D.C. 20004
erica.zilioli@usdoj.gov

61

/s/ Michael McGovern
J, Gregory Copeland (S.D. Tex. No. 02402 and
Texas Bar No. 04798500) - Attorney in Charge
Daniel M. Steinway (S.D. Tex. No. 1105349)
Michael McGovern (S.D. Tex. No. 1095459)
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400
Tel.:   (202) 639-7700
Fax:    (202) 639-7980
michael.mcgovern@bakerbotts.com

*Counsel for Exxon Mobil Corporation*