**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-10-2386 |
| | § | CIVIL ACTION NO. H-11-1814 |
| | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

The nation's need for wartime supplies made during World War II and the Korean War left lasting environmental effects.  More recent statutes require those involved to clean the pollution left in the refineries and plants where aviation fuel and other supplies our nation's military needed were produced.  This case requires the court to decide who pays, and how much.  The issue is whether the federal government or a private oil company it contracted with to produce fuel needed in the wars must pay for the environmental harm the production generated, under a statute enacted years later.

During World War II and the Korean War, the United States enlisted oil companies across the country to swiftly increase the nation's production of high-octane aviation gas ("avgas"), synthetic rubber, and toluene required for military operations in Europe and the Pacific.  The companies contracted with the federal government to increase avgas production at their existing refineries and to construct and operate new plants to produce synthetic rubber, avgas components, and other necessary war materials.   The swift increase in production capabilities also generated more hazardous waste.

This case involves two sites—one in Baytown, Texas and one in Baton Rouge, Louisiana—where ExxonMobil Corporation's predecessors[1] produced avgas and other materials under government contracts.  The Baytown and Baton Rouge refineries and plants disposed of the resulting hazardous waste in nearby bodies of water, including the Houston Shipping Channel and the Mississippi River.  Both feed into the Gulf of Mexico.  Under these contracts, the government encouraged Exxon and other oil companies to produce as much as possible to meet the war effort's demands.  Exxon, like other oil companies that entered similar contracts, retained day-to-day control, including over waste management.

Decades later, Exxon reached administrative agreements with the State of Texas to clean up the Baytown site and with the State of Louisiana for the Baton Rouge site.  Exxon estimates that it has incurred roughly $41 million to clean up Baytown and $30 million for Baton Rouge.  The United States refused to pay Exxon for any of these costs.  Exxon sued the United States under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, seeking to hold the government accountable as a "covered person" responsible for cleanup costs at both sites.

After several years of litigation and discovery, both Exxon and the United States moved for partial summary judgment as to certain issues important to deciding who was liable for the past and future clean up costs.  (Docket Entry Nos. 102, 103, in 4:10-cv-02386; Docket Entry Nos. 51, 52 in 4:11-cv-01814).[2]  Based on the pleadings; the motions, responses, replies, and supplemental

---

[1] Exxon's predecessor at the Baytown site was Humble Oil and its predecessor at the Baton Rouge site was Standard Oil.  For simplicity, the court refers to these predecessors as "Exxon" unless otherwise noted.

[2] Unless otherwise noted, citations are to the record in the lead case, *Exxon Mobil Corp. v. United States*, No. 4:10-cv-2386 (S.D. Tex. filed Mar. 29, 2010).

briefing; the parties' arguments; the record; and the applicable law, the court grants the parties' motions in part and denies them in part.  The following findings and conclusions are entered:

- Exxon operated the refineries at both sites.

- The United States government did not operate the refineries at either site.

- Both Exxon and the government operated the chemical plants at the sites.

- Joint and several liability does not apply.

- It is too early to decide whether to adopt Exxon's proposed method for apportioning fault or to grant declaratory relief awarding future costs under the proposed method. Exxon may request the court to adopt its proposed method to apportion liability for the costs in Phase II of this litigation.

The reasons for these rulings are explained in detail below.

## I.    Background

Because the number of government agencies, programs, and statutory and regulatory terms involved makes acronyms unavoidable, a glossary is attached to the end of this opinion.

### A.    CERCLA

Congress enacted CERCLA in 1980 "in response to the serious environmental and health risks posed by industrial pollution."  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009); *see also CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2180 (2014); *United States v. Bestfoods*, 524 U.S. 51, 55 (1998).  "The Act was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination."  *Burlington N.*, 556 U.S. at 602 (quotations omitted).  As amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub. L. No. 99- 499, 100 Stat. 1613, CERCLA provides several alternative means for cleaning up contaminated property.  Sections 104 and 106 provide for federal abatement and enforcement actions to compel

cleanup of contaminated sites. *See* 42 U.S.C. §§ 9604, 9606(a). Section 107(a)(4) states that "covered persons" (also known as "potentially responsible parties" or "PRPs") may be liable for costs the federal or state government incur in responding to the contamination and for response costs incurred by "any other person." *See* 42 U.S.C. § 9607(a)(4)(A)–(B). Section 107(a)(4) is part of the original statute enacted in 1980. Two contribution provisions, §§ 113(f)(1) and 113(f)(3)(B), were added later as part of SARA.

Section 107(a) identifies four categories of PRPs who may be liable for costs to clean up hazardous substances. *See* 42 U.S.C. § 9607(a). The categories are: (1) owners and operators of facilities at which hazardous substances are located; (2) past owners and operators of these facilities when the disposal of hazardous substances occurred; (3) persons who arranged to dispose of or treat hazardous substances; and (4) certain transporters of hazardous substances. *See* 42 U.S.C. § 9607(a)(1)–(4). Unless a statutory defense or exclusion applies, covered persons are liable for "all costs of removal or remedial action incurred by the United States government or a State . . . not inconsistent with the national contingency plan," and "any other necessary costs of response incurred by any other person consistent with the national contingency plan," 42 U.S.C. § 9607(a).[3] The statute defines "person," "facility," "disposal," "release," and "environment."[4]

---

[3] The national contingency plan consists of federal regulations that prescribe the procedure for conducting hazardous substance cleanups under CERCLA and other federal laws. *See* CERCLA § 105, 42 U.S.C. § 9605; 40 C.F.R. Pt. 300.

[4] The term "person" includes an "individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body. . . . " 42 U.S.C. § 9601(21).

The term "facility" means

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor

4

vehicle, rolling stock, or aircraft; or
(B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

*Id.* at § 9601(9).

The term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes

(A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons;
(B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine;
(C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954 [42 U.S.C. 2011 *et seq.*], if such release is subject to requirements with respect to financial protection established by the Nuclear Regulatory Commission under section 170 of such Act [42 U.S.C. § 2210], or, for the purposes of section 9604 of this title or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 7912 (a)(1) or 7942 (a) of this title; and
(D) the normal application of fertilizer.

*Id.* at § 9601(22).

(8) The term "environment" means

(A) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson-Stevens Fishery Conservation and Management Act [16 U.S.C. 1801 *et seq.*]; and
(B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.

*Id.* at § 9601(8).

"Disposal" is defined as:

The discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the

5

CERCLA also provides a narrow set of defenses to liability that may arise under § 107(a), none of which applies here.

Section 113, added in 1986 as part of SARA, contains a subsection entitled "Contribution." This subsection states:

> Any person may seek contribution from any other person who is liable or potentially liable under [§ 107(a)], during or following any civil action under [§§ 106 or 107(a)]. . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under [§§ 106 or 107].

42 U.S.C. § 9613(f)(1).

Under § 113, a PRP that "has resolved its liability to the United States or a State in an administrative or judicially approved settlement" is immune from contribution claims made by other PRPs "regarding matters addressed in the settlement." *Id.* at § 9613(f)(2).  A settling PRP may seek contribution under § 113(f)(3) from other, nonsettling PRPs. *Id.* at § 9613(f)(3)(B).  Section 107(a) allows a plaintiff to recover 100% of its response costs from all liable parties, including those who have settled their CERCLA liability with the government. *Id.* at §§ 9613(g)(2), 9607(a).  Section 113's right to contribution is more restricted than that afforded by § 107.  Section 107 has a six-year statute of limitations; § 113 has a three-year statute of limitations in certain scenarios.  Under § 107, plaintiffs may recover only costs in excess of their equitable share and may not recover from previously settling parties. *Id.* at § 9613(f)(1), (f)(2), (g)(3).  Federal and state governments may

---

> environment or be emitted into the air or discharged into any waters, including ground waters.

*Id.* at § 9601(29) (citing 42 U.S.C. § 6903(3)).

sue PRPs for response costs and may also be liable as PRPs for response costs others incur.  *See* 42

U.S.C. § 9607(a)(4)(A) and (B).[5]

**B.      Factual Background**[6]

     **1.      Avgas and Synthetic-Rubber Production in World War II and the Korean War**

"In the early 1930s, petroleum refiners in the United States developed new technologies for

producing high-octane gasoline fuel." *Shell Oil Co.*, 294 F.3d at 1049.  "Until that time, the highest

octane gasoline available had octane ratings in the 70s, but by 1935 refiners possessed the ability

to produce mass quantities of 100-octane fuel." *Id.*  "The primary consumer of this fuel was the

United States military, which used it in airplane engines, leading to its colloquial name 'avgas.'  The

high octane and low volatility of avgas allowed the design and use of high-compression internal

combustion engines for military airplanes." *Id.* For the Allied forces, avgas was the "super-fuel that

meant more speed, more power, quicker take-off, longer range, [and] greater maneuverability—all

of the things that meant the victory margin in combat."  (Docket Entry No. 118-1 ¶ 25).  According

to Geoffrey Lloyd, the British Minister of Fuel and Power during the War, "without 100-octane we

should not have won the Battle of Britain.  But we had 100-octane."  (Docket Entry No. 118-1 ¶ 27).

---

    [5]   Section 120(a)(1) of CERCLA, 42 U.S.C. § 9620(a)(1), enacted as part of the 1986 SARA amendments, broadly waives the federal government's sovereign immunity, providing that "[e]ach department, agency, and instrumentality of the United States" is subject to CERCLA's provisions "in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 [CERCLA section 107] of this title." 42 U.S.C. § 9620(a)(1); *see also United States v. Shell Oil Co.*, 294 F.3d 1045, 1053 (9th Cir. 2002) (holding that "CERCLA's waiver of sovereign immunity is coextensive with the scope of liability imposed by 42 U.S.C. § 9607").

    [6]   Much of the background summary is from *Shell Oil Co.*, 294 F.3d at 1049-50.  Exxon and the government agree that it is largely accurate.  (*See* Docket Entry No. 143, at 23, 102-03).

The *Shell* opinion described the avgas production process:

> Avgas was a blend of petroleum distillates and chemical additives. Its base component was ordinary gasoline, to which the refineries added varying amounts of several additives. Oil producers made avgas using one of two types of additives. The most prevalent additive was a compound called "alkylate," which comprised 25-40% of the weight of avgas. The production of alkylate, as well as other additives, required the use of sulfuric acid. In the production of alkylate, through a process called "alkylation," the refineries used 98% purity sulfuric acid as a catalyst. Approximately 90% of the sulfuric acid used by the refineries during the war was devoted to this purpose. As a consequence of its use in alkylation, the purity of the acid was greatly reduced. "Spent" alkylation acid could be reprocessed, at some expense, so that its purity was once again high enough for use as an alkylation catalyst. Alternatively, spent acid either could be used in other refinery processes, or could be dumped without being reused.

*Shell Oil Co.*, 294 F.3d at 1049. Another, less desirable method, to produce avgas used codimer, a blending component from polymers, instead of akylate. Codimer production also led to various spent wastes that either had to be disposed of or used.

"When the war began, the alkylation process and the production of avgas were new technological developments. During the war, production of avgas increased more than twelve-fold, from roughly 40,000 barrels per day in December 1941 to 636,000 barrels per day in 1944." *Id.*; (*see also* Docket Entry No. 118-1 ¶ 28). "Sulfuric acid consumption increased five-fold, from 24 million pounds per year in 1941 to 120 million pounds per year in 1944. The use of sulfuric acid in the alkylation process produced quantities of spent alkylation acid far greater than had ever been produced before." *Shell Oil Co.*, 294 F.3d at 1049.

"Because high-octane avgas was critical to the war effort, the United States government had a considerable stake in ensuring its consistent production during World War II." *Id.* "In 1942, President Roosevelt established several agencies to oversee war-time production of avgas. Among

those with authority over petroleum production were the War Production Board ("WPB") and the

Petroleum Administration for War ("PAW")." *Id.* The WPB, which was created to "assur[e] the

most effective prosecution of war procurement and production," established a nationwide priority

ranking system to identify scarce goods, prioritize their use, and facilitate their production; it also

limited the production of nonessential goods. Exec. Order No. 9024 ¶ 2, 7 Fed. Reg. 329, 329-30

(Jan. 17, 1942). The president delegated broad authority to the WPB, including the power to issue

directives about "purchasing, contracting, specifications, and construction." *Id.* "The PAW

centralized the government's petroleum-related activities. It made policy determinations regarding

the construction of new facilities, allocation of raw materials, avgas pricing and profit limitations,

and had the authority to issue production orders to refineries." *Shell Oil Co.*, 294 F.3d at 1049; *see

also* Testimony of Louis R. Goldsmith, (Docket Entry No. 118-1 PF ¶ 61) (testifying that although

it was "completely a cooperative effort in which everybody said: 'We've got a war to fight and let's

get on with it, providing what's needed, . . . [n]obody could build anything without PAW's

concurrence and approval because, for one thing, you couldn't get any raw materials to build

anything with unless PAW certified that it was essential.").

The WPB, PAW, and other federal government agencies had the authority to require oil

companies to produce certain goods at the refineries they owned, and to seize the refineries if the

companies refused. During the war, the "President, through the head of the War or Navy

Departments of the Government . . . [was] . . . authorized to take immediate possession of any such

plant" that "refuse[d] to manufacture the kind, quantity, or quality of arms or ammunition, or the

parts thereof, or any necessary supplies or equipment . . . ." Selective Training and Service Act of

1940, 54 Stat. 885, 892 (1940). The PAW seized Exxon's refinery in Ingleside, Texas, but "the

company continued to operate the Refinery for its own account . . . ." (Docket Entry No. 66-4 ¶ 32

9

(4:11-cv-01814); Docket Entry No. 118-1 ¶ 65, Gravel Decl. ¶ 7).  These seizures were unusual.

The federal agencies relied almost exclusively on contracts with oil companies to ensure avgas

production, including long-term contracts to purchase avgas with low-cost loans to companies to

help them build avgas-producing plants.

The federal government implemented the Planned Blending Program to optimize avgas

production.  "Under this program, the government assisted the refineries operated by the oil

companies in exchanging and blending various avgas components in order to maximize production

of avgas.  The government could, and sometimes did, direct that specific exchanges be made, but

it usually accepted what was proposed by the refineries."  *Shell Oil Co.*, 294 F.3d at 1050.  The

Planned Blending Program set "aside" and alleviated concerns about "antitrust restrictions that had

always governed the industry," so "there could be total cooperation in avgas production" (Docket

Entry No. 117-3 ¶ 30).  Under the Program, the government issued instructions that "were at times

quite detailed.  Sometimes they directed refiners to blend avgas in a way that would allow increased

overall production even if that method would reduce an individual refinery's yield."  *Shell Oil Co.*,

294 F.3d at 1050.  "Expert juggling of [the] components and elimination of bottlenecks in

transportation insured maximum quality and quantity of the blended fuel.  Under this plan, the

nation's refineries were all treated as units in one vast national refinery."  (Docket Entry No. 118-1

¶ 59 (PAW handbook)).  The Program did not, however, exercise direct control over the production

of avgas components or waste disposal.  Instead, the Planned Blending Program controlled only their

exchange and blending after production.

In addition, "[t]he government reduced the financial risk to producers of avgas and its

components through the Aviation Gas Reimbursement Plan ('AGRP')."  *Shell Oil Co.*, 294 F.3d at

1060.  "This program allowed oil companies that entered into long-term avgas supply contracts to

recoup costs they could not have anticipated at the time of the execution of the contracts." *Id.* "The AGRP directly reimbursed the refineries for any extraordinary expenditures they undertook— including those incurred under the Planned Blending Program to maintain maximum avgas production during the war." *Id.*

Throughout World War II, the oil companies designed and built production facilities, maintaining private ownership and managing their own refinery operations. *See id.* The oil companies entered into contracts to sell the avgas they produced to the federal government. The contracts were profitable. (Docket Entry No. 52-2, ¶ 86 (4:11-cv-01814)). The companies nonetheless filed grievances with the government about contract terms. One grievance concerned contractual limits on profits. Another concerned "statutory renegotiation clauses" allowing the government to renegotiate certain contract terms. The oil companies wanted to preserve their ability to challenge the constitutionality of the statute authorizing these renegotiation clauses. The Supreme Court described some of the contract challenges facing the federal government and private industry during the War as follows:

> The problem was to find a fair means of compensation for the services rendered and the goods purchased. Contracts were awarded by negotiation wherever competitive bidding no longer was practicable. Contracts were let at cost-plus-a-fixed fee. Escalator clauses were inserted. Price ceilings were established. A flat percentage limit on the profits in certain lines of production was tried. Excess profits taxes were imposed. Appeals were made for voluntary refunds of excessive profits. However, experience with these alternatives convinced the Government that contracts at fixed initial prices still provided the best incentive to production.

*Lichter v. United States*, 334 U.S. 742, 768 (1948). A general complaint about the contracts is illustrated by the following statement from George L. Parkhurst, then Standard's Director of Refining:

11

> [I]n the case of the 100 octane contracts in which Standard was dealing, Defense Supplies Company is the sole purchaser and P.A.W. insists that each company utilize all of its facilities to make 100 octane aviation gasoline to the extent of its ability to do so, and there is not in fact any freedom to make a choice between contracting and not contracting.

(Docket Entry No. 159 at 2).   According to Parkhurst, the lack of freedom stemmed from the government's power to seize refineries and cut off the supply of crude oil if the oil companies refused to cooperate.

Synthetic rubber was also critical to the war effort.  After Pearl Harbor, the United States was cut off from 90 percent of the world's natural rubber supplies.  The government designated rubber as a critical and strategic material,  (Docket Entry No. 118-1 ¶ 15),  creating the U.S. Rubber Reserve Company ("RuR") to draw on industry expertise to develop synthetic rubber production. (Docket Entry No. 123-1 ¶ 56; Docket Entry No. 118-1 ¶¶ 11-14).  Through the U.S. Defense Plant Corporation ("DPC"), the government arranged for the construction of synthetic rubber and avgas-component plants, known as "Plancors," during the War.  (Docket Entry Nos. 118-1 ¶ 12; 123-1 ¶ 57; Docket Entry No. 118-1 ¶¶ 11-14).  The DPC negotiated lease agreements and supply contracts valued at $7.2 billion, involving 2300 plants and projects, during World War II.  (Docket Entry No. 66-4 ¶ 45 (4:11-cv-01814)).   Unlike most avgas refineries, however, the government—not the contracting companies—owned the Plancors.

Shortly after World War II ended, the Supreme Court described the wartime relationship between the government and private industry:

> Laying aside as undesirable the complete governmental ownership and operation of the production of war goods of all kinds, many alternative solutions were attempted.  Often these called for capital expenditures by the Government in building new plant facilities. Adhering, however, to the policy of private operation of these facilities Congress and the Administration sought to promote a policy

12

> of wide distribution of prime contracts and subcontracts, even to comparatively high cost marginal producers of unfamiliar products. Congress sought to do everything possible to retain and encourage individual initiative in the world-wide race for the largest and quickest production of the best equipment and supplies. It clung to its faith in private enterprise.

*Lichter*, 334 U.S. at 767-68.

When the Korean War began in 1950, Congress enacted the Defense Production Act ("DPA"). Modeled after the Second War Powers Act of 1942, the DPA gave President Truman "robust legal authority . . . to force industry to give priority to national security production" and to seize or requisition facilities and equipment. (Docket Entry No. 123-1 ¶ 35). On September 9, 1950, President Truman issued Executive Order 10161, creating the National Production Authority ("NPA") and the Petroleum Administration for Defense ("PAD"). (Docket Entry No. 123-1 ¶¶ 37–38). Modeled after the PAW, the PAD had authority to issue orders to private companies to establish programs and policies to operate refineries to ensure sufficient oil production for the war effort. (Docket Entry No. 118-1 ¶¶ 120-33; *see also* Docket Entry No. 118-1 ¶ 121) (observing that "PAD now stands on a footing virtually identical with that enjoyed by the last war's PAW")). Although plant seizures were possible, PAD did "not wish to see [this] happen" and did not exercise this authority during the Korean War. (Docket Entry No. 123-1 ¶ 46).

### 2.     The Baytown and Baton Rouge Sites

Although refineries and plants throughout the country produced avgas and synthetic rubber during the wars, only the Baytown, Texas and the Baton Rouge, Louisiana sites are relevant here. Exxon's predecessor, Humble Oil & Refining Company ("Humble"), owned and began operating the Baytown refinery in the 1920s. (Docket Entry No. 118-1 ¶¶ 1-2). The Baton Rouge refinery, located next to the Mississippi River in Baton Rouge, began operating in 1909 under the ownership

13

and control of the Standard Oil Company of Louisiana ("Standard LA"), another Exxon predecessor. (Docket Entry No. 118-1 ¶ 4).

### a.    Avgas Production at the Baytown and Baton Rouge Sites

In the 1930s, Humble and Standard LA began developing and installing new technologies at Baytown and Baton Rouge to produce high-octane gas and synthetic rubber.  (Docket Entry No. 118-1 ¶ 3).  By the start of World War II, the sites had either already produced or could produce many of the products they made during the War.  (*Id.*).

After Pearl Harbor, the Defense Supplies Corporation ("DSC") and Exxon's predecessors signed three avgas supply contracts for 100-octane avgas production at the Baytown and Baton Rouge refineries.  (Docket Entry No. 118-1 ¶¶ 72-74).  On January 13, 1942, the DSC and Standard Oil Company of New Jersey ("Standard NJ") signed a four-year avgas supply contract.  Under this contract, Humble and Standard LA would supply 100-octane avgas to Standard NJ, which would supply the federal government.  (Docket Entry No. 118-1 ¶ 72).  On February 4, 1942, the DSC and Humble also signed a four-year avgas supply contract to sell 100-octane avgas directly to the federal government including from the Baytown refinery.  (Docket Entry No. 118-1 ¶ 73).  On February 16, 1943, the DSC and Standard NJ signed a third contract incorporating by reference the provisions in the other contracts and applying them to the Baton Rouge refinery.  (Docket Entry No. 118-1 ¶ 74). Standard's contract provided that "[t]he prices, specifications and quantities of [100-octane avgas of specifications other than those originally attached to the contract] shall be determined by negotiation between the parties, and [Standard] shall not be required to deliver such products unless and until an agreement has been reached."  (Docket Entry No. 52-2, ¶ 61 & MIS-00022189-90 (4:11-cv-01814)).  Humble's avgas contracts with the federal government had almost  identical provisions. (*See* Docket Entry No. 52-2, ¶¶ 67-71 & BAYHIS-00010204 (4:11-cv-01814)).

14

Even though these contracts limited profits to 6% to prevent war profiteering, both Standard LA and Humble consistently profited from them. (Docket Entry No. 117-4 ¶ 86). During World War II and the Korean War, both companies applied for and received tax-amortization certificates worth a total of more than $120 million (without adjusting for present-day inflation). (Docket Entry No. 117-4 ¶¶ 82-85). The companies paid their investors dividends during the wars. (*Id.* ¶ 86).

The avgas contracts did not provide the United States government authority to make personnel decisions at the Baytown or Baton Rouge refineries. (*Id.* ¶ 170). The contracts required the companies to provide certificates of inspections from licensed inspectors about product quality and quantity, unless the government waived this requirement and instead inspected the avgas on delivery. (*Id.* ¶ 172). The government did not operate the equipment at the two refineries, supervise Humble or Standard LA employees in their day-to-day refinery operations, or make personnel or labor decisions. (*Id.* ¶ 174).

Under the Planned Blending Program, however, the federal government did control the type and amount of crude oil and other raw materials sent to the two refineries. This was part of the approach that treated all the nation's refineries "as units in one vast national refinery." (Docket Entry No. 118-1 ¶¶ 59, 89).

Exxon asserts that the United States government "directed" and "controlled" production levels, the production process, and other day-to-day aspects of avgas production at these two refineries through a series of "recommendations" or "directives." Recommendation 8 is illustrative. It stated that the two refineries should "cease to use" various blending components derived from petroleum, "except for the production and manufacture of 100 octane aviation gasoline or such other aviation gasolines as may hereafter be recommended. . . ." (Docket Entry No. 118-1 ¶ 36). Recommendation 16 called for "plans for the use of all sources of the components of" avgas and

stated that such plans "may provide for . . . allocation, exchange, license, pooling, loan, sale or lease of crude oil, base stocks, blending agents, processes, and patents, and production, transportation and refining facilities . . . whenever and to whatever extent may be necessary to facilitate the maximum production of all grades of aviation gasoline . . . ."  (Docket Entry No. 118-1 ¶ 38).  Louis Goldsmith, a high-ranking PAW official during most of World War II, testified that "the government came in and said:  Thou shalt produce.  If you're going to produce at all, you've got to produce these kinds of products."  (Docket Entry No. 123-1 ¶ 12).  A 1943 PAW report laid out seven steps for meeting avgas requirements, including "[f]orc[ing] each refining operating unit to its maximum output."  (Docket Entry No. 118-1 ¶ 60).

Exxon also points to a stream of telegrams PAW sent the Baytown and Baton Rouge refineries communicating the government's desired production levels for avgas and other war products under these contracts.  (Docket Entry No. 118-1 ¶ 77).  In 1946, a government-prepared report acknowledged the industry's frustrations:

> One of the wartime conditions which served to harass the refiners as much, perhaps, as anything else was the frequent need to change yields so as to produce, at all times, the maximum quantities of most-needed products.  One day, refiners would have instructions from PAW to increase their yields of gasoline and cut down their yields of fuel oil.  On another occasion, the ever-shifting requirements of war might call for exactly the opposite.  And, adding to the difficulty, the orders often had to be dispatched in the form of telegrams, calling for the changes to be made virtually overnight.

(Docket Entry No. 118-1 ¶ 55).

The government contends that the "Avgas Contracts did not confer on the United States any decision-making authority over or role in production" and "[t]he United States simply agreed to buy 100-octane Avgas."  (Docket Entry No. 118-1 ¶ 78).  The government's expert witness, Dr. Jay Brigham, a research historian specializing in twentieth century American political, western, and

environmental history, testified that the telegrams were a means of "encouraging greater production, in a sense of rallying the troops," but were not directives aimed at "engaging in a production or management decision" akin to "saying do it this way or do it that way." (Docket Entry No. 72-2, Brigham Decl. (4:11-cv-1814); Docket Entry No. 118, Ex. 10, Brigham Depo., Vol. 2 at 367-68 (4:10-cv-2386)).

### b. The Synthetic-Rubber, Avgas-Component, and Toluene-Production Plants at Baytown and Baton Rouge

Beginning in the early 1940s, the government purchased land adjacent to the refineries and leased land within the refineries to build plants to produce synthetic rubber, avgas blending components, toluene (a key component of TNT), and other war materials. (Docket Entry No. 118-1 ¶¶ 134-201). The federal government owned many of these plants, or "Plancors" through the mid-1950s. (Docket Entry No. 102, Ex. 1, Gravel Decl., ¶¶ 4-6). Exxon's predecessors designed, built, and operated the Plancors under contracts with the federal government. The government regularly inspected the plants and supplied Exxon's predecessors with the raw materials necessary to maintain production in accordance with the contract requirements.

### i. The Baytown Plants

There were four Plancors at the Baytown site. Three produced synthetic rubber and the other avgas components. (Docket Entry No. 118-1 ¶¶ 134-201). The government bought the land for these Plancors from Humble in 1942 and 1943. (Docket Entry No. 67-1 ¶¶ 145, 152, 159, 167 (4:11-cv-01814)). One, the Hydrocodimer Plancor, was located within the Baytown refinery and produced an avgas blending stock for the refinery. The Hydrocodimer Plancor used the refinery's waste

processing facilities and its waste-drainage ditch.  (Docket Entry No. 67-1 ¶¶ 167-73 (4:11-cv-01814)).  The other three Plancors were located outside the refinery's boundary.

Under the contracts with the federal government,  Humble agreed to build the plants and arranged for subcontractors to develop the designs and specifications.  (*Id.* ¶ 146).[7]  The government and Humble agreed to the  specifications, production levels, and prices of the  synthetic-rubber material and avgas components to be produced.  If the government unilaterally changed the  prices, Humble had the right to withhold future performance until the government either reinstated the agreed price or took other action.  (*Id.* ¶ 148).  The parties could also submit their disputes to arbitration.  (*Id.*).  The DPC had at least one official stationed in the Baytown plants.  (Docket Entry No. 67-1 ¶ 232 (4:11-cv-01814)).

The Baytown Plancors generated byproducts and waste, including oil slop, tertiary butyl alcohol, caustic soda, sulphuric acid, copper ammonium acetate aluminum chloride, rubber polymer, naphtha, zinc stearate, lubricating oils, boiler blow-down waste and sludge, sludge from brine purification,  spent-caustic acids containing TB.C from butadiene purification, wastewater from carbon black paint, and various other liquid wastes.  (Docket Entry No. 67-1 ¶¶ 149, 156, 164 (4:11-cv-01814)).  Some of the Baytown Plancors sent their byproducts to the Baytown refinery, which would use them to produce avgas.  (Docket Entry No. 118-1 ¶¶ 205-06).  The Baytown Plancors disposed of other byproducts in Scott's Bay, upstream from where the Baytown refinery discharged its avgas-related waste.  (Docket Entry No. 67-1 ¶¶ 150, 165, 246 (4:11-cv-01814)).  In 1946, the

---

[7] Humble played no role in the management of one government-owned Plancor, the Copolymer Plancor (No. 877), which was operated by the General Tire & Rubber Company from 1943 to 1955 when it was sold to the United Carbon Company.  (Docket Entry No. 67-1 ¶¶ 162-66 (4:11-cv-01814)).

government sold the Hydrocodimer Plancor to Humble.  The government did not sell the other Plancors to Humble until after the Korean War.  (Docket Entry No. 67-1 ¶ 173 (4:11-cv-01814)).

In addition to the Plancors and avgas refineries, the government relied on another chemical plant adjacent to the Baytown refinery, the Baytown Ordnance Works, to produce toluene.  The Ordnance Works accounted for over 40 percent of the nation's toluene production.  (Docket Entry No. 118-1, ¶ 139).  The government bought the land for the Ordnance Works from Humble in February 1941 and leased the land back to Humble until August 1945.  (Docket Entry No. 67-1 ¶ 134 (4:11-cv-01814)).  Humble and the government entered into a contract under which Humble agreed to construct the Ordnance Works and to furnish "all architectural and engineering services covering the design, preparation of the drawings, plans, specifications and field engineering and supervision necessary for the efficient execution and coordination of the work" there.  (Docket Entry No. 67-1 ¶ 135 (4:11-cv-01814)).  The Ordnance Works included toluene-producing facilities, above-ground tanks, military barracks, a mess hall, air raid shelters, perimeter fencing, and four guard watchtowers.  (Docket Entry No. 67-1 ¶ 136 (4:11-cv-01814)).  The Ordnance Works generated waste in the form of spent-acid sludge, spent-alumina catalyst, and acidic wastewater effluent.  (Docket Entry No. 67-1 ¶ 140 (4:11-cv-01814)).  Some of the spent-alumina catalyst went to three nearby dumps.  (Docket Entry No. 61-1 ¶ 142 (4:11-cv-01814)).  Although most of the Ordnance Works infrastructure was outside the Baytown refinery's boundary, the Works exchanged byproducts with the refinery, used the refinery's waste-processing facilities for its wastewaters, and shared a waste-drainage ditch that fed into the Houston Ship Channel.  (*Id.* ¶ 141).

19

In August 1945, the government conveyed the property associated with the Ordnance Works to Humble, and in February 1946, sold the land back to Humble.  (*Id.* ¶ 144).  The Ordnance Works was not used after World War II.

### ii.       The Baton Rouge Plancors

The government owned six Plancors at the Baton Rouge site.  Four produced synthetic rubber and the other two avgas components.  (Docket Entry No. 118-1 ¶¶ 134-201).  The government bought the land for the Plancors from Standard LA in 1941, 1942, and 1943, and leased the land back to Standard.  (Docket Entry No. 67-1 ¶¶ 174, 183, 189, 196, 199 (4:11-cv-01814)).[8] The contracts between Standard LA and the government were similar to the contracts for the Baytown Plancors.  Standard LA agreed to construct the plants and to arrange for subcontractors to develop the designs and specifications.  (*Id.* ¶ 175, 177, 184).[9]  The parties agreed to specifications, production levels, and prices of the synthetic rubber material and avgas components.  If the government unilaterally changed those prices, Standard LA retained the right to withhold future performance until either reinstatement or other action.  (*Id.* ¶ 148).  The government agreed to pay for certain costs, including the "cost of disposing of all waste solids, byproducts, liquids, and gases resulting from manufacturing operations" at the plants.  (Docket Entry No. 117-4 ¶¶ 93, 97, 138, 144, 161, 165).

---

[8] In 1950, the lease for the Butadiene Plancor was transferred from Standard LA to the Copolymer Corporation.  (Docket Entry No. 67-1 ¶ 176 (4:11-cv-01814)).

[9] Standard LA had already begun building the Butyl Rubber Plancor and the Hydrogenation Plancor before the United States purchased the land.  (Docket Entry No. 67-1 ¶¶ 182, 199 (4:11-cv-01814)).

The byproducts and waste from these Plancors included oil emulsions, sulphuric acid esters, acetone and isoprene wastes, rubber polymer crumbs, aluminum chloride, copper ammonium acetate, ammonium hydroxide, oily water, and various wastewaters. (Docket Entry No. 67-1 ¶¶ 178, 186 (4:11-cv-01814)). Some of the Plancors sent their byproducts to the Baton Rouge refinery for use in producing avgas. Some of the Plancors disposed of solid waste in landfills, burn pits, and other land-based disposal units in the western part of the Baton Rouge refinery. (Docket Entry No. 67-1 ¶ 187 (4:11-cv-01814)). One plant, the Butadiene Plancor, used the refinery's waste-processing facilities to treat wastewater before discharging it into Callaghan's Bayou. (Docket Entry No. 67-1 ¶ 179 (4:11-cv-01814)). Another plant, the Butadiene Conversion Plancor, used the refinery's waste- processing system to treat and dispose of Plancor wastes as well. (*Id.* ¶ 194). This Plancor had been converted from existing facilities in the Baton Rouge refinery and was located within the refinery boundary. (Docket Entry No. 67-1 ¶ 192).[10] The other Plancors disposed of their wastewater into the Monte Sano Bayou, upstream from where the Baton Rouge refinery discharged its avgas-related wastewater. (Docket Entry No. 67-1 ¶¶ 179, 165 (4:11-cv-01814)).

After World War II ended, the government sold some of the Baton Rouge Plancors to Exxon's predecessors. (Docket Entry No. 67-1 ¶ 195, 198, 201 (4:11-cv-01814)). The government retained ownership of the other Plancors until the Korean War ended and then sold the plants and the land to Exxon's predecessors. (Docket Entry No. 67-1 ¶¶ 151, 154, 188 (4:11-cv-01814)).

---

[10] Standard LA owned this Plancor's land and buildings, while the government owned part of the machinery and equipment. (Docket Entry No. 67-1 ¶ 192 (4:11-cv-01814)).

### c.    The Government's Involvement in Waste Disposal

The increased avgas, rubber, and toluene production at the Baytown and Baton Rouge sites led to more hazardous waste, which Exxon's predecessors routed into nearby bodies of water, including the Houston Shipping Channel and the Mississippi River.  According to one Humble engineer, Sidney O. Brady, "[d]uring the war it was not possible to devote much technical manpower to the problem of effluent improvement since it was obvious that saving surface waters was secondary to saving men." (Docket Entry No. 118-1 ¶ 100).  The government agreed that "personnel could not be diverted from more pressing objectives to study complex problems related to waste prevention and treatment—nor could construction materials be secured for such purposes." (Docket Entry No. 118-1 ¶ 219).  But the government did not play a direct role in waste disposal.  Neither the avgas-production, Ordnance Works, nor Plancors contracts specified how to dispose of production waste.  (Docket Entry No. 66-4 ¶ 126 (4:11-cv-01814)).

The government did not direct or order either Humble or Standard LA to dispose of the production waste in any particular way.  The Plancors contracts between the federal government and the Exxon predecessors did provide that the government would be responsible for the plants' waste-disposal costs.  (Docket Entry No. 117-4 ¶¶ 93-96, 138).  The government also controlled the allocation of scarce materials that could be used for more environmentally conscious waste disposal.  As Louis Goldsmith, a PAW Refinery Division official during the War, testified in a June 1992 deposition in different case,[11] "[n]obody could build anything without PAW's concurrence and

---

[11] *United States v. Shell Oil Co.*, Civ. Action No. CV 91-0589-RJK (C.D. Cal.).  (Docket Entry No. 118-1, ¶ 61).

approval because, for one thing, you couldn't get any raw materials to build anything unless PAW certified that it was essential."  (Docket Entry No. 118-1 ¶ 61).  In April 1943, the WPB instituted the Controlled Materials Plan, which set allocations for materials like steel, aluminum, iron, and copper that were important to the war effort.  *See* J.S. Frey & H.C. Ide, *A History of the Petroleum Administration for War, 1941-1945* (1946).  During most of the War, the PAW required Humble and Standard LA to apply for and obtain approval before constructing new facilities or structures at the Baytown or Baton Rouge refineries that would require steel, copper, or other "controlled materials." (Docket Entry No. 118-1 ¶ 93).

On August 4, 1944, the U.S. Engineer Office informed its Chief of Engineers that the Baton Rouge refinery was in violation of the River and Harbor Act, because the refinery's "enormous operations and rapid expansion" had "overloaded the waste disposal system," causing daily "disposal of [] vast wastes from the refinery [] into the Mississippi River."  A842; US-BR006087; *see also* 33 U.S.C. § 407 (forbidding the "[d]eposit of refuse in navigable waters").  The U.S. Engineer  Office recommended that the PAW and WPB approve a Master Separator, a "key unit" to "end pollution of the Mississippi River."  A843; (*see also* Docket Entry No. 123-1 ¶ 31). Standard LA had first considered a Master Separator several years before the War began, but had not built it.  When Standard LA proposed during the War that the Master Separator and a silt remover should be built at Baton Rouge, the government responded that it could allow only one of the two.  Standard LA chose the silt remover because it offered more benefit and required less critical material than the Separator.  The government approved Standard LA's request to construct the silt remover.  Although the government lifted the restrictions on steel, copper, and similar

materials in 1945, Standard LA waited until the 1950s to build a Master Separator at the Baton Rouge refinery.  (Docket Entry No. 123-1 ¶ 34).

In 1953, the U.S. Public Health Service put a team of government engineers and analysts in a mobile laboratory at the Baton Rouge site for eight weeks to investigate and evaluate refinery operations and the waste they caused.  The investigation resulted in a report entitled "A Study of Liquid Wastes From a Gulf Coast Petroleum Refinery."  (Docket Entry No. 117-3 ¶ 52).   That report described the refinery's waste-disposal process, identified the types of contaminants found in the refinery's effluent discharge and the particular refinery operation responsible for those contaminants, and provided "possible methods . . . for control of the wastes."  RA 165; BRC-0027353.

### d.      Postwar Disposal and Cleanup at Baytown and Baton Rouge

After World War II and the Korean War, Exxon's predecessors continued to own and manage the refineries and many of the Plancors they had purchased from the government.  Exxon currently owns both the Baytown and Baton Rouge sites.  In 1995, Exxon reached an administrative settlement with the State of Texas to cleanup hazardous waste at the Baytown site.  (Docket Entry No. 67-1 ¶ 289 (4:11-cv-01814)).  Exxon alleges that it spent $41.7 million dollars remediating the Baytown site under this settlement agreement, is currently performing "groundwater remediation and monitoring," and expects to incur future costs at the site and its nearby waters.  (Docket Entry No. 102 at 59 (4:10-cv-2386); Docket Entry No. 67-1 ¶ 293 (4:11-cv-01814)).  Exxon is applying for a Facility Operations Area permit that covers remediation, assessment, monitoring, and other response actions across the Baytown site.

Exxon alleges that it has spent over $30.5 million voluntarily cleaning up waste at the Baton Rouge site. Exxon is currently "performing response actions pursuant to a Corrective Action Order or otherwise required by the Louisiana Department on Environmental Quality," including remediating groundwater and monitoring several areas across the site. (Docket Entry No. 102, at 54). Exxon contends that it will incur future costs at the Baton Rouge site and nearby waters.

### C.    Procedural Background

In March 2010, Exxon sued the United States in the Eastern District of Virginia, alleging CERCLA liability for past and future cleanup costs associated with the Baytown site. The United States successfully moved to transfer the case to the Southern District of Texas. After the transfer, Exxon filed another suit against the United States in the Southern District of Texas, raising the same legal and similar factual issues for the Baton Rouge site. The United States counterclaimed under CERCLA's contribution provision, § 113(f)(3)(B), as to both sites. The two cases have proceeded on a coordinated basis. (Docket Entry No. 102 at 12).

At the parties' joint suggestion, the court bifurcated the pretrial proceedings into two phases. Phase 1 addresses liability and fault allocation; Phase 2 will address other cost issues and issues under the National Contingency Plan. (Docket Entry No. 102 at 13). The parties completed Phase 1 discovery on June 14, 2013 and both parties moved for partial summary judgment. (Docket Entry Nos. 51, 52 (4:11-cv-01814); Docket Entry Nos. 102, 103 (4:10-cv-2386)). Extensive briefs and oral argument have narrowed the issues presented in the motions and responses.

Exxon seeks summary judgment on its claim that the United States is jointly and severally liable for Exxon's past and future cleanup costs under CERCLA § 107(a)(2) as a prior operator of

25

both the Baytown and Baton Rouge refineries and as a prior owner and prior operator of the rubber and chemical plants at both sites.  In the alternative, Exxon seeks a summary judgment on its claim that the United States is liable in contribution under § 113(f)(3)(B) for Exxon's past and future response costs at Baytown and under § 107(a) for Exxon's past and future response costs at Baton Rouge, based on the government's role as a former owner and operator.  Exxon seeks an equitable allocation of responsibility based on a proposed "production-based approach" that applies both to costs already incurred and to future cleanup costs.  (Docket Entry No. 102).

The United States seeks summary judgment on its claim that during the two wartime periods, it did not operate either refinery within the meaning of § 107(a)(2), that Exxon's predecessors operated both refineries, and that Exxon's predecessors operated each of the nearby plants and the Ordnance Works.  (Docket Entry No. 52-1 (4:11-cv-01814)).  The United States also asks this court to deny Exxon's motion for summary judgment that the United States operated the plants and decline Exxon's request to allocate responsibility for future costs because they are too speculative.  The United States opposes Exxon's proposed method of allocation.  (Docket Entry No. 52 at 1 (4:11-cv-01814); Docket Entry No. 103-1, at 1-2 (4:10-cv-2386)).

Each issue and the parties' arguments are examined against record evidence and the summary judgment standard.

## II.    The Rule 56 Standard and the Summary Judgment Issues

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the

absence of a genuine [dispute] of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine dispute as to any material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  A dispute "is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on its pleading allegations.  "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted).  "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a "scintilla" of evidence.'" *Little*, 37 F.3d at 1075 (citations omitted).  In deciding a summary judgment motion,

the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

When the parties cross-move for summary judgment, the court must review "each motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010) (internal quotation marks and alteration omitted). Nevertheless, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2).

The parties' cross-motions present many liability and fault issues. But they can be organized into the following three categories:

1.   Whether CERCLA's contribution provision, 42 U.S.C. § 9613(f)(3)(B), is the exclusive mechanism for Exxon to recoup cleanup costs for the Baytown site, and if so, whether its claim under that provision is timely.

2.   Whether the United States is liable as a prior operator of the refineries and the chemical plants.

3.   Whether Exxon is entitled to joint and several liability or to an equitable allocation of present and future costs.

## III.   Exxon's § 113(f)(3)(B) Claim to Recover Its Costs to Cleanup the Baytown Site

The parties dispute whether Exxon must bring its CERCLA claim for the Baytown site as a contribution action under § 113(f)(3)(B). The answer may determine whether Exxon timely asserted its CERCLA claim for the Baytown site cleanup costs.

In 1995, Exxon signed two administrative consent orders with the State of Texas for the Baytown site. The United States argues that these agreements are administrative settlements under § 113(f)(3)(B) and that Exxon cannot seek to recover the costs incurred under those settlements under § 107. Instead, according to the government, § 113(f) provides the exclusive remedy for Exxon to recover money it has already spent cleaning up the Baytown site. Exxon disagrees, arguing that the settlement with the State of Texas had nothing to do with CERCLA, but rather only with state-law regulatory violations. As a result, according to Exxon, the agreement is not an administrative settlement under § 113(f)(3)(B). Exxon also argues that even if the administrative settlement did limit its remedy under CERCLA, recovery under § 107 is still available for any costs Exxon voluntarily incurred from 1986 to 1995, before entering into the agreement with the State of Texas, or for costs incurred after the agreement that are outside its scope.

As explained below, the court concludes that: (1) § 113(f) is the exclusive remedy for a PRP that has incurred cleanup costs in response to an administrative settlement; (2) Exxon's agreements with the State of Texas qualify as administrative settlements under § 113(f); (3) Exxon may not use § 107(a) to recoup the costs it voluntarily paid that predated its agreement with Texas or fell outside its scope; and (4) Exxon's § 113(f)(3)(B) contribution claim is timely, at least for purposes of summary judgment.

### A.    Whether § 113(f)(3)(B)'s Contribution Provision is the Exclusive Remedy for Exxon to Seek the Cleanup Costs It Incurred in Response to the Administrative Settlements

In 1986, Congress amended CERCLA to provide an express contribution right for PRPs that have been found liable under CERCLA or that have entered into certain administratively or

judicially approved settlements.[12]  Under § 113(f)(3)(B), a PRP that "has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in [Section 113(f)(2)]."  42 U.S.C. § 9613(f)(2)(B).  Under § 113(f)(3), a settling PRP may seek contribution from other, nonsettling PRPs.  *Id*. at § 9613(f)(3)(B).

Until 2007, many courts held that PRPs could not sue under § 107(a) and that § 113(f) was their only remedy for contribution.  In 2007, the Supreme Court made clear that PRPs may bring an action for cost recovery under § 107 if they have "incurred cleanup costs."  *United States v. Atlantic Research Corp.*, 551 U.S. 128, 138 (2007).  At the same time, the Court emphasized the "complementary yet distinct nature of the rights established in §§ 107(a) and 113(f)."  *Id.*  "The remedies available in §§ 107(a) and 113(f) complement each other by providing causes of action to persons in different procedural circumstances."  *Id.* at 139 (quotations omitted).  When a PRP "pays to satisfy a settlement agreement or a court judgment," that PRP "may pursue § 113(f) contribution."  *Id.*  But "by reimbursing response costs paid by other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a)."  *Id.*  Even though this PRP is "eligible to seek contribution" under § 113(f), in that procedural circumstance the PRP "cannot simultaneously seek to recover the same expenses under § 107(a)."  *Id.*

---

[12]  The Supreme Court has interpreted CERCLA's use of the term "contribution" in accordance with the common-law definition that "the 'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.'"  *United States v. Atlantic Research Corp.*, 551 U.S. 128, 138 (2007) (quoting BLACK'S LAW DICTIONARY 353 (8th ed. 2004)).

30

The Supreme Court did not address every "different procedural circumstance[]" that might trigger different remedial options under § 107(a) or § 113(f).   The Court did recognize another situation in which the distinction between §§ 107 and 113 might blur.  If a PRP "sustain[s] expenses pursuant to a consent decree," "the PRP does not incur costs voluntarily but does not reimburse the costs of another party."  The Court declined to resolve

> whether these compelled costs of response are recoverable under §
> 113(f), § 107(a), or both. For our purposes, it suffices to demonstrate
> that costs incurred voluntarily are recoverable only by way of §
> 107(a)(4)(B), and costs of reimbursement to another person pursuant
> to a legal judgment or settlement are recoverable only under § 113(f).

*Id.*

The government argues that § 113(f)(3)(B) provides the exclusive remedy for Exxon, a PRP that has incurred expense costs under administrative settlements.  CERCLA's text, structure, history, and the position of every circuit court to address this issue since *Atlantic Research* lead this court to agree.[13]

"Statutes must 'be read as a whole.'"  *Atlantic Research*, 551 U.S. at 135 (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991)).  The 1986 CERCLA amendment adding an express contribution remedy laid out how PRPs could seek contribution.  Section 113(f) allows courts to use equitable factors to allocate response costs among liable parties.  *See* 42 U.S.C. § 9613(f)(1).  Second, § 113(f) protects parties that have previously settled with the government from future contribution actions, *Id.* § 9613(f)(2).  In some circumstances, the statute of limitations under § 113

---

[13] The Fifth Circuit does not appear to have addressed this question.  *See Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 291 n.19 (5th Cir. 2010) (declining to address question).

is shorter than under § 107(a) actions.  Cost-recovery actions under § 107(a) may be brought within six years, but certain contribution actions under § 113 must be brought within three years.  *See id.* § 9613(g)(2) & (g)(3).  If PRPs could simply pick either § 107(a) or § 113(f) to recover cleanup costs incurred in responding to an administrative settlement, these limits on § 113(f) actions (and the 1986 amendment) would be superfluous.  *See Cooper Indus., Inv. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004) (recognizing, in the context of CERCLA, "the settled rule that [courts] must, if possible, construe a statute to give every word some operative effect"); *Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect."); *Bernstein v. Bankert*, 733 F.3d 190, 205-06 (7th Cir. 2012) ("'[T]o allow [a qualifying contribution plaintiff] to proceed under § 9607(a) would in effect nullify the SARA amendment and abrogate the requirements Congress placed on contribution claims under § 9613.'" (quoting *Niagara Mohawk*, 596 F.3d at 128)).  The statute's text, structure, and history support the conclusion that § 113(f) is the exclusive remedy for PRPs that incur cleanup costs in responding to administrative settlements.[14]

Every court of appeals considering the question the Supreme Court left open in *Atlantic Research* has reached the same conclusion.  *See NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 691 (7th Cir. 2014) ("[A]lthough a strict reading of the phrase 'necessary costs of

---

[14] Exxon contends that § 107(a) allows "any person" to bring a cost-recovery action and therefore does not forbid an action by a PRP that has incurred costs in response to an administrative settlement. (Docket Entry No. 121, at 11).  But under well-established principles of statutory construction, the general language of § 107(a) must give way to the later-enacted, more specific provisions of § 113(f).  *See Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (quotation omitted)); *Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect.").

response' in section 107(a) might suggest that parties who pay pursuant to an enforcement action might be able to sue under section 107(a), this court—like our sister circuits—restricts plaintiffs to section 113 contribution actions when they are available."); *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 767 (6th Cir. 2014) (concluding that "PRPs must proceed under § 113(f) if they meet one of that section's statutory triggers," including incurring costs in response to an administrative settlement); *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1235-37 (11th Cir. 2012) (per curiam) (upholding the dismissal of the PRPs' § 107 claims when the PRPs had entered into a consent decree imposing cleanup obligations); *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 602-04 (8th Cir. 2011) (finding that a PRP that had agreed to administrative settlements imposing cleanup obligations and that had been sued by EPA under §§ 106 and 107 was barred from bringing § 107(a) claims against other PRPs); *Agere Sys. Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 227-29 (3d Cir. 2010) (PRPs that entered consent decrees with EPA are limited to seeking contribution under § 113(f)); *Niagara Mohawk Power Corp.*, 596 F.3d 112, 127-28 (2d Cir. 2010) (a PRP that entered into a consent order with a state is limited to a § 113(f)(3)(B) contribution claim).

The cases Exxon cites—*Bernstein v. Bankert*, 733 F.3d 190, 207-15 (7th Cir. 2013), and *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 92-93 (2d Cir. 2009)—do not support a different result. Both cases allowed PRPs that had entered into agreements with state regulators to maintain cost-recovery actions under § 107(a), but on a wholly different basis than Exxon contends. Exxon's reliance on these cases conflates two questions. The first question is whether a party with a § 113(f)(3)(B) claim may bring a separate claim under § 107(a). The second question is whether a party *without* a § 113(f)(3)(B) claim may maintain a § 107(a) action. In both *Bernstein* and *W.R.*

*Grace*, the court concluded that the agreements did not qualify as "administrative settlements" under § 113(f)(3)(B), a question addressed in the next part of this opinion. Because there was no administrative settlement, the plaintiffs in these cases could not bring § 113(f)(3)(B) contribution actions. *Bernstein* addressed two separate agreements, only one of which qualified as an administrative settlement under § 113(f)(3)(B). The Seventh Circuit concluded that if § 113(f)(3)(B) was available, it was the exclusive remedy for seeking costs incurred in responding to the qualifying administrative settlement agreement. *See Bernstein*, 733 F.3d at 206 ("[W]e agree with our sister circuits that a plaintiff is limited to a contribution remedy when one is available."); *see also NCR Corp.*, 768 F.3d at 691 (describing *Bernstein* and observing that "[t]he earlier order [in that case] dealt with a project on which the PRP had completed work. The PRP was therefore limited to a contribution action under section 113(f) to recover its costs.").

In *W.R. Grace*, the Second Circuit concluded that the consent order did not resolve liability under CERCLA and was not an administrative settlement under § 113(f)(3)(B). *See W.R. Grace*, 559 F.3d at 91 ("The Consent Order at issue here did not resolve CERCLA claims that could be brought by the federal government."). The court stated that "[t]he relevant inquiry with respect to section 107(a) is whether the party undertook the remedial actions without the need for the type of administrative or judicial action that would give rise to a contribution claim under section 113(f)." Because the plaintiff-PRP "chose to enter into a[] [non-qualifying] agreement with the state to investigate and remediate a contaminated site," it could seek its cleanup costs under § 107(a). *Id.* at 94.

If the orders Exxon and the State of Texas signed requiring Exxon to pay to clean up the Baytown site qualify as administrative settlements under § 113(f)(3)(B), Exxon may not bring a § 107(a) claim for the cleanup costs it incurred in complying with those orders.

**B.      Exxon's Agreed Orders with the State of Texas are "Administrative Settlements" under § 113(f)(3)(B)**

      **1.      The Agreed Orders**

In March and July of 1995, Exxon entered into two Agreed Orders[15] with the Texas Natural Resource Conservation Commission (now known as the Texas Commission on Environmental Quality, or "TCEQ")[16] to settle alleged violations of the Texas Solid Waste Disposal Act, TEX. HEALTH & SAFETY CODE ANN. § 361, at the Baytown site.  The March Order ("Agreed Order 1") stated that Exxon and the State of Texas "had settled all matters in controversy . . . . [and] [t]his Agreed Order is entered solely for the purpose of resolving disputed claims between the Commission and Exxon relating to remediations" at the Baytown site.  A2754; *see also* A2796 ("This Agreed Order constitutes full and final adjudication by [TCEQ] of the violations . . . giving rise to this Agreed Order.").

Agreed Order 1 required Exxon to do the following at Baytown: (1) "[i]dentification, delineation, containment and remediation of known hydrocarbon plumes" as well as of "hydrocarbon plumes discovered after the effective date" of the Agreed Order; (2) submission and implementation of a "groundwater quality assessment plan," to include a report of  past remedial

---

[15] *See* Agreed Order, *In the Matter of Exxon Co. U.S.A., SWR No. 30040*, No. 95-0282-IHW-E (March 15, 1995) ("Agreed Order 1"); Agreed Order, *In the Matter of Exxon Chems. Americas, SWR No. 33880*, No. 95-1078-IHW-E (July 31, 1995) ("Agreed Order 2").

[16] TNCC is referred to in the briefs and this opinion as the TCEQ.

activities and a plan to study hydrocarbon sources; (3) implementation of a semiannual groundwater-monitoring program (after the report of the groundwater-quality assessment plan); (4) a soil-investigation work plan to identify and study potential hydrocarbon sources; and (5) corrective-measures studies and reports for saturated and unsaturated zones, followed by implementation of a corrective-measures work plan to "verify cleanup of contaminated soils . . . and groundwater," including post-remediation sampling.  A2766-91.  If Exxon withdraws from the Order, the TCEQ may refer the matter to the Texas Attorney General "for further enforcement proceedings as provided by law if the Executive Director determines that Exxon is noncompliant with or in violation of any of the terms or conditions set forth in this Agreed Order."  (Docket Entry No. 118-1 ¶ 290).  The Agreed Order provided that if Exxon withdrew, it could still be held criminally liable for noncompliance.

Exxon asserts that under Agreed Order 1, it "conducted investigatory, monitoring, and remediation activities . . . across the entire Facility" at Baytown.  (Docket Entry No. 118-1 ¶ 291).  Exxon also asserts that under Agreed Order 2, it has conducted investigatory, monitoring, and remediation activities relating to a groundwater contamination plume in an area now known as Tankfarm 3000.  (Docket Entry No. 118-1 ¶ 292).  Exxon alleges that through December 31, 2011, it incurred over $41.7 million in response costs and will continue to incur costs.  (Docket Entry No. 1 ¶ 41); (Docket Entry No. 118-1 ¶ 293).

### 2.   Analysis

In its opening memorandum in support of its motion for partial summary judgment, Exxon argued that its two Agreed Orders with the State of Texas are within § 113(f)(3)'s contribution provision.  (Docket Entry No. 102, at 46-47).  Faced now with the prospect that this remedy is

exclusive and may be time-barred, Exxon now argues that the Orders are not administrative settlements under § 113(f)(2).  The court agrees with Exxon's original position.

Section 113(f)(3)(B) applies if Exxon "resolved its liability to . . . a State for some or all of a response action or for some or all of the costs of such action in an administrative . . . settlement." 42 U.S.C. § 9613(f)(3)(B).  Unlike the separate contribution provision of § 113(f)(1)—which applies only "during or following any civil action under section 9606 of this title or under section 9607(a) of this title"—§ 113(f)(3)(B) does not specify the type of "liability" that needs to be resolved to qualify as an administrative settlement.  Congress did not limit § 113(f)(3)(B) to administrative settlements specifically resolving CERCLA liability.  CERCLA itself defines a "response action" to include a broad range of remedial activities, and broadly defines those activities to cover remediation beyond CERCLA.  *See id.* §§ 9601(23) (defining "remove" or "removal"); 9601(24) (defining "remedy" or "remedial action"); 9601(25) (defining "respond" or "response").  For example, courts have concluded that costs incurred to comply with the Resource Conservation and Recovery Act ("RCRA"), *see* 42 U.S.C. §§ 6901-92k, may also be response costs under CERCLA's administrative-settlement provision.  *See Mardan Corp. v. C.G.C. Music Ltd.*, 600 F. Supp. 1049, 1053 (D. Ariz. 1984) (holding that the "costs of complying with RCRA" qualified as response costs under CERCLA); *Union Carbide Corp. v. Thiokol Corp.*, 890 F. Supp. 1035, 1044 (S.D. Ga. 1994) ("Costs arising from RCRA compliance can be recovered in a CERCLA action."); *United States v. Rohm & Haas Co.*, 790 F. Supp. 1255, 1262 (E.D. Pa. 1992) ("The overwhelming evidence is that Congress intended CERCLA to be cumulative and not merely an alternative to RCRA or to be limited in its application to formally designated Superfund sites."), *rev'd on other grounds*, 2 F.3d 1265 (3d. Cir. 1993); *see also United States v. E.I. du Pont de Nemours & Co., Inc.*, 341 F. Supp.

37

2d 215, 237 (W.D.N.Y. 2004) (finding that the EPA's use of RCRA response authority is not inconsistent with the National Contingency Plan in part because "several other courts have held that 'costs arising from RCRA compliance can be recovered in a CERCLA action.'" (quoting *Union Carbide*, 890 F. Supp. at 1044)).

The Fifth Circuit has not addressed this issue.  In its opening brief, Exxon urged this court to follow *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131 (3d Cir. 2013).  In *Trinity*, the court concluded that "§ 113(f)(3)(B) does not require resolution of CERCLA liability in particular."  735 F.3d at 136.  The court observed that § 113(f)(3)(B) "does not state that the 'response action' in question must have been initiated pursuant to CERCLA—a requirement that might have easily been written into the provision."  *Id.*

Some courts considering administrative settlements have relied on language in those settlements expressly resolving CERCLA liability.  *See, e.g.*, *Hobart*, 758 F.3d at 769 ("Not only does this paragraph explicitly state that Appellants have resolved their liability, but it also cites the specific section of CERCLA at issue here.").  But, as *Trinity* held, these statements are not necessary to "resolve" a party's liability for a "response action" or for the associated costs.  *See Trinity*, 735 F.3d at 136 ("[W]e hold that § 113(f)(3)(B) does not require resolution of CERCLA liability in particular.").  Other courts agree.  *See Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 126 n.15 (2d Cir. 2010) (noting that "there is a great deal of force to this argument given the language of the statute"); *ASARCO LLC v. Atlantic Richfield Co.*, — F. Supp. 3d —, 2014 WL 6736924, at *5-6 (D. Mont. Aug. 26, 2014) (agreeing "with the Third Circuit and the *Niagara Mohawk* panel" and holding that § 113(f)(3)(B) "does not require resolution of CERCLA liability in particular" because "that provision gives rise to a contribution claim based on a party's liability

38

for some or all of a 'response action,' as that term is defined" in the CERCLA statute).  Exxon properly acknowledged that its "administrative settlements with TCEQ that are memorialized in the Agreed Orders fall within the scope of section 113(f)(3)(B) as construed by the Third Circuit in *Trinity*."  (Docket Entry No. 51, at 41 (4:11-cv-1814)).

The two Agreed Orders fully resolved Exxon's potential civil liability for cleanup costs for the Baytown site.  Although the Orders did not specifically mention CERCLA, they reserved only one potential claim, for federal criminal liability.  The Orders resolved other types of liability.  *See* A2793-94 (March 1995 Agreed Order, "General Ordering Provisions," ¶ 24).  Exxon alleges that it spent substantial sums of money complying with its Resource Conservation and Recovery Act obligations under its Agreed Orders with the State of Texas.  (Docket Entry No. 102, at 42).  RCRA compliance costs are considered "response costs" under CERCLA's administrative-settlement provision.  *See Mardan Corp.*, 600 F. Supp. at 1053; *Union Carbide Corp.*, 890 F. Supp. at 1044.

Exxon cites this court's opinion in *Differential Development v. Harkrider Distributing Co.*, 470 F. Supp. 2d 427 (S.D. Tex. 2007), finding that an agreement was not an "administrative settlement" that "resolved" the plaintiff-PRPs' liability with the State of Texas.  That case does not support Exxon's argument.  In *Differential*, the plaintiff-PRPs sought contribution for cleanup costs incurred in responding to a "Voluntary Cleanup Agreement" with the Texas Commission on Environmental Quality.  *Id.* at 738.  The agreement in that case was voluntary.  The plaintiff-PRPs could withdraw at any time.  *Id.*  Although the agreement offered the plaintiff-PRPs an opportunity to avoid TCEQ enforcement action, the agreement "clearly state[d] that it [did] not resolve any claim by or against the participating parties."  *Id.* at 740.  The parties' agreement "'expressly reserve[d] all rights, claims, demands, and causes of action they have against each other, and against any and

39

all other persons and entities who are not parties to this Agreement.'" *Id.* (quoting Agreement at 6-7).[17] That case does not support Exxon's argument.

### C.    Exxon Must Use § 113(f) to Recover Its Baytown-Related Costs

Exxon contends that it may sue under § 107(a) to recover the cleanup costs it voluntarily incurred at Baytown before signing the 1995 Agreed Orders with the State of Texas.  Exxon also argues that it may sue to recover the cleanup costs it incurred after signing the Orders  if those costs are outside the scope of the Orders.  Exxon argues that it "undertook substantial cleanup work voluntarily at the Baytown Site beginning in 1986," none of which "was covered by any specific administrative order."  (Docket Entry No. 121, at 19 (citing Gagnon Decl. ¶ 4)).  Exxon asserts that its subsequent effort to establish a Facility Operations Area ("FOA") at the Baytown Site "was not specifically called for in these Orders and is outside the[ir] scope."  (*Id.*).  Exxon relies principally on two district court cases suggesting that a PRP may bring a cost-recovery action under § 107 for certain costs incurred in performing a consent decree.  *See LWD PRP Grp. v. ACF Indus., LLC*, No. 5:12-cv-00127, 2014 WL 901648, at *7 (W.D. Ky. Feb. 7, 2014) (refusing to dismiss a PRP's

---

[17] Although not necessary to the conclusion that the voluntary agreement in *Differential Development* was not an administrative settlement, the opinion also relied in part on the absence of any CERCLA-specific language in that agreement.  *See Differential Development*, 470 F. Supp. 2d at 739 (citing *Consolidated Edison Co. of New York, Inc. v. UGI Util.*, 423 F.3d 90, 95-96 (2d Cir. 2005)).  And the case that formed part of the basis for the result has itself since been called into question.  *See Niagara Mohawk*, 596 F.3d at 127 n.15 (observing that the EPA "understandably takes issue" with the court's holding in *Consolidated Edison* and that there was "a great deal of force" to the EPA's argument but declining to "resolve the *Consolidated Edison/W.R. Grace* problem" because it was unnecessary in that case).  *See also Trinity*, 735 F.3d at 137 ("[T]he Court of Appeals for the Second Circuit appears to have begun to retreat from its holding in *Consolidated Edison* and *W.R. Grace* that, for the purposes of CERCLA § 113(f)(3)(B), a 'response action' means a response action under CERCLA in particular."); *ASARCO*, 2014 WL 6736924, at *4 (observing that *Niagara Mohawk* "casts doubt on the continued viability of" the Second Circuit's holdings in *Consolidated Edison* and *W.R. Grace*).  While language expressly resolving "CERCLA liability" is sufficient to find that a settlement order has resolved a PRP's liability for "some or all of a response action," a settlement agreement without CERCLA-specific language may nonetheless fall within "[t]he broad sweep of what can constitute a 'response action.'" *ASARCO*, 2014 WL 6736924, at *6.

§ 107(a) claim for costs incurred before an administrative order was entered because "the courts have left open the potential for a PRP . . . to assert both a § 107(a) cost-recovery claim for its voluntary response costs and a § 113(f) contribution claim for its compelled response costs"); *United States v. Pharmacia*, 713 F. Supp. 2d 785, 789 (S.D. Ill. 2010) (observing that the plaintiffs "apparently may pursue their § 107(a) cost recovery action for any so-called 'voluntary costs'—if the potentially voluntary nature of these costs is supported, of course, by sufficient evidence").

But, as the government contends and the weight of authority demonstrates, the critical question is the PRP's procedural circumstances, not whether its response costs were voluntary or involuntary. *See Atlantic Res.*, 551 U.S. at 139 (observing that "the remedies available in §§ 107(a) and 113(f) complement each other by providing causes of action to persons in different procedural circumstances" (quotation omitted)). In *Bernstein*, 733 F.3d at 209-10, the court surveyed the cases and concluded that "not a single one . . . treated the voluntary/compelled costs dichotomy as dispositive." The court emphasized that "CERCLA does not ask whether a person incurs costs voluntarily or involuntarily. It asks whether a person incurred costs of response consistent with the national contingency plan, whether a person has previously been subjected to a civil action under § 9606 or § 9607(a), and so on."[18]  It would make little sense to have a mini-trial on whether a party

---

[18] *See also Whittaker Corp. v. United States*, No. CV 13-1741 FMO (JCx), 2014 WL 631113, at *7 (C.D. Cal. Feb. 10, 2014) ("A party's procedural circumstances, not the nature of its alleged costs, will determine whether a party may pursue a contribution action under § 113(f)(1)."); *Solutia, Inc. v. McWane, Inc.*, 726 F. Supp. 2d 1316, 1340-41 (N.D. Ala. 2010) ("[T]he distinction between 'compelled' and 'voluntary' cleanups is in some measure artificial; virtually all cleanups are performed by a party who is at least facing the specter of potential liability under CERCLA."); *Appleton Papers Inc. v. George A. Whiting Paper Co.*, 572 F. Supp. 2d 1034, 1043 (E.D. Wis. 2008) (dismissing a § 9607(a) cost- recovery claim when a § 9613(f)(1) contribution claim was available to plaintiffs by virtue of a previous EPA lawsuit, and noting that "[d]espite the courts' use of the terms 'voluntary' and 'involuntary' to distinguish between payments recoverable under § 107(a) and those recoverable under § 113(f), the operative principle appears to be that § 107(a) is available to recover payments only in cases where § 113(f) is not.").

incurred costs outside the scope of an administrative settlement—a far more fact-intensive inquiry than whether a party has "resolved" its CERCLA liability—in every CERCLA contribution action.

Exxon resolved its liability to the State of Texas in an administrative settlement. The procedural circumstances entitle Exxon to seek contribution under § 113(f), but not cost recovery under § 107(a), for the cleanup costs it incurred at that site.[19]

### D. Exxon's § 113(f) Contribution Claim for the Baytown Site is Timely

The United States argues that Exxon's § 113(f)(3)(B) claim is time-barred under § 113(g)(3)'s three-year statute of limitations. Exxon disagrees, contending that § 113(g)(3) does not apply to initial contribution actions arising out of administrative settlements with a state, as opposed to with the United States. The statutory language and Fifth Circuit case law leads the court to agree with Exxon.

Section 113(g) sets several limitations periods for CERCLA actions. *See* 42 U.S.C. § 9613(g). These periods vary depending on the underlying action. Cost-recovery actions under § 107(a) must be brought within three or six years, depending on whether the costs were incurred as part of a "removal" or a "remedial" action. *See id.* § 9613(g)(2). These time limits are specified in

---

[19] Even if Exxon could seek cost recovery under § 107(a) for costs incurred outside the scope of the administrative settlements, it has already made critical admissions on this front that would limit any potential recovery under that section. In its complaint, Exxon asserted that it had spent as little as $200,000 (out of the $45 million it seeks arising out of the Baytown site) on cleanup outside the scope of the settlement. (Docket Entry No. 1, Compl. ¶¶ 28-29 ("[I]n accordance with the Agreed Orders and a subsequent TCEQ corrective action plan . . . [Exxon] has incurred to date approximately $45,000,000 in response costs."). *See Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir. 1987) ("[F]actual assertions in pleadings are . . . judicial admissions conclusively binding on the party that made them." (quotations omitted)); *Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1315 (8th Cir. 1990) ("*Davis* stands for the proposition that even if the post-pleading evidence conflicts with the evidence in the pleadings, admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions.").

§ 113(g)(2), entitled "Actions for Recovery of Costs."  *Id.*  By contrast, § 113(g)(3), entitled "Contribution," sets out the time limits for certain contribution actions.  Section 113(g)(3) states that "[n]o action for contribution for any response costs or damages may be commenced more than 3 years after" either: the date (1) "of judgment in any action under this chapter for recovery of such costs or damages"; or (2) "of an administrative order under section 9622(g) of this title (relating to *de minimis* settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages."  *Id.* § 9613(g)(3).

The parties agree that under the statute, none of these triggering events expressly applies to an administrative settlement with a state.  Exxon argues that either no statute of limitations—or, at the very least, a six-year statute of limitations—applies to this claim because it does not fall under the CERCLA statute.

In *Geraghty & Miller v. Conoco Inc.*, 234 F.3d 917, 924-25 (5th Cir. 2000), *abrogated on other grounds by Burlington N. & Sante Fe Ry. Co. v. United States*, 556 U.S. 599 (2009), the Fifth Circuit rejected Exxon's argument that no statute of limitations applied but agreed that it was a six-year statute.  The *Geraghty* court recognized "three basic approaches to the issue"—one in which it "would find that the plain language of section 113(g)(3) establishes no statute of limitations for this case," one in which it "would use the six-year statute of limitations in section 113(g)(2)," and one in which it "would use the three-year statute of limitations in section 113(g)(3) and import another triggering event from federal common law."  *Id.* at 924.  The *Geraghty* court followed the second approach and held that the six-year "statute of limitations found in CERCLA section 113(g)(2) applies to initial contribution actions."  *Id.* at 925.

43

The government urges this court to ignore *Geraghty*'s holding in light of two subsequent Supreme Court cases, *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004), and *United States v. Atlantic Research*, 551 U.S. 128 (2007). In *Aviall*, the Supreme Court considered whether a PRP that had not been sued under § 106 or § 107 (and was not subject to an administrative settlement) could bring a contribution action under § 113(f)(1). The Court concluded that § 113(f)(1) claims could be brought only "during or following" a § 106 or 107 civil action, not only on "§ 113(f)(1) itself," but on "the whole of § 113." *Id.* at 167. CERCLA contains "two express avenues for contribution"—Sections 113(f)(1) and 113(f)(3)(B)—and "two corresponding 3-year limitations periods for contribution actions, one beginning at the date of judgment, § 1133(g)(3)(A), and one beginning at the date of settlement, § 113(g)(3)(B)." *Id.* In *Atlantic Research*, the Court stated that a PRP that "pays money to satisfy a settlement agreement or a court judgment" and thus "may pursue § 113(f) contribution," cannot, "at least in the case of reimbursement," "choose the 6-year statute of limitations for cost-recovery actions over the shorter limitations period for § 113(f) contribution claims." 551 U.S. at 139.

The government argues that these two cases and decisions applying them show that a three-year statute of limitations applies to administrative settlements such as the agreement between Exxon and the State of Texas, despite the language of § 113(g)(3). The government cites *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 773-74 (6th Cir. 2014) (holding "that § 113(g)(2) is irrelevant to resolving whether Appellants' contribution action [based on costs incurred in response to state administrative settlement] was timely filed and that § 113(g)(3) provides the statute of limitations for all contribution actions" and concluding that *Geraghty* is "no longer good law on this point" after *Aviall* and *Atlantic Research*); *Niagara Mohawk Power Corp. v. Chevron U.S.A.,*

*Inc.*, 596 F.3d 112, 128 n.19 (2d Cir. 2010) ("Claims under § 107 do enjoy a six-year statute of limitations while claims under § 113 have a three-year statute of limitations."); and *Chitayat v. Vanderbilt Assocs.*, 702 F. Supp. 2d 69, 82 (E.D.N.Y. 2010) (holding that "the decisions in [*Aviall*] and [*Atlantic Research*] eliminate the availability of the six-year statute of limitations set forth in section 113(g)(2) as an option for contribution cases" and concluding that the three-year limitations period applied to a contribution claim based on an administrative settlement with the State of New York).

In the absence of *Geraghty*, this court might agree.  But the Supreme Court cases the government cites did not hold that the § 113(g)(3) three-year limitations period applied to contribution actions seeking to recover costs incurred as a result of administrative settlements with a state.  Until the Supreme Court or the Fifth Circuit holds that § 113(g)(2)'s six-year limitations period does not apply, *Geraghty* binds this court.  Under *Geraghty*, § 113(g)(2)'s six-year limitations period governs Exxon's initial contribution action for the costs it incurred at the Baytown site.[20] *See In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 331 (5th Cir. 2013) (explaining that in order to diverge from prior Fifth Circuit precedent, a "Supreme Court decision must be more than merely illuminating with respect to the case before [the court of appeals], because a panel of this court can only overrule a prior panel decision if such overruling is unequivocally directed by controlling Supreme Court precedent"); *see also United States v. Alcantar*, 733 F.3d 143, 146 (5th

---

[20] Because of this conclusion, the court need not consider Exxon's argument (or the government's counterarguments) that no limitations period applies to § 113(f)(3)(B) contribution actions for costs incurred in response to administrative settlements.

Cir. 2013) (observing that the "change in the law must be unequivocal, not a mere 'hint' of how the [Supreme] Court might rule in the future").[21]

This conclusion raises the question of whether an interlocutory appeal is appropriate. A threshold determination involving "a controlling question of law as to which there is substantial ground for difference of opinion" may merit interlocutory review to "materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b); *R.J. Reynolds Tobacco Co. v. Hudson*, 314 F.2d 776, 777-78 (5th Cir. 1963) (considering, on interlocutory appeal, the district court's denial of a motion for summary judgment "on the ground that the undisputed facts showed that the action was barred by prescription of one year under Articles 3536 and 3537 of the Louisiana Civil Code" because the appeal "present[ed] serious questions of Louisiana law," and "[i]f the contentions of the tobacco company are correct, the case should be dismissed and judgment granted to the defendant as a matter of law."); *see also Mayo v. Hartford Life Ins. Co.*, 214 F.R.D. 458, 462 (S.D. Tex. 2002) (certifying "[a]n interlocutory appeal to obtain appellate guidance on the threshold issues of choice of law, the statute of limitations and the scope of insurable interests under Texas law" because prompt review "would materially advance the ultimate termination of this litigation, particularly if the [district court's] assessment of the law in favor of Plaintiffs on any of these issues is incorrect").

---

[21] The government argues that Exxon's § 113(f) claim for its Baytown response costs is untimely even under § 113(g)(2)'s six-year statute of limitations because Exxon's contribution claim "first accrued upon its entry of the administrative orders on consent in 1995" and "Exxon did not file suit against the United States until" 2010, "far more than six years" after 1995. (Docket Entry No. 118, at 32, 40). But § 113(g)(2)'s statute of limitations begins to run on the "completion of the removal action" or "after initiation of physical on-site construction of the remedial action," not the date of an administrative order. 42 U.S.C. § 9613(g)(2)(A), (B). And beginning in December 2003, the government entered agreements with Exxon tolling the statute of limitations. (Docket Entry No. 67, at 32 n.6 & Ex. 20 (4:11-cv-1814)). Because the inquiry under § 113(g)(2) is "highly fact-specific," *Geraghty*, 234 F.3d at 926, the court rejects the government's limitations argument at this stage of the litigation. The government may reurge this affirmative defense, if appropriate, based on a more specific showing, during Phase II.

An interlocutory appeal of the statute of limitations issue here will materially advance the ultimate termination of the litigation in only one of the two related cases (4:10-cv-2386).  Because both cases involve overlapping evidence and testimony that will be presented at the trial, the court declines to certify this issue for interlocutory appeal.

### E.    Summary

Section 113(f) is Exxon's exclusive remedy for seeking cleanup costs it incurred at the Baytown site because Exxon resolved its liability in administrative settlements with the State of Texas.  That claim is timely under prevailing Fifth Circuit law, at least on the summary judgment record.[22]   The next issue is whether the United States was an operator of the refineries and plants at the Baytown and Baton Rouge sites.

## IV.    Prior Operator Liability under CERCLA

The parties agree that Exxon is liable as a former and current owner of the refineries and as a current owner of the plants at both the Baytown and Baton Rouge sites.  They parties agree that the United States is liable as a prior owner of the plants at both sites.  (Docket Entry No. 103-1 at 11 n.3).  They now agree that Exxon is liable as a former and current operator of the refineries and the plants at both sites.[23]  The parties disagree over whether the refineries and plants at the sites are a single "facility" for CERCLA purposes.  The parties also disagree over whether the federal government was an operator of the refineries and plants during World War II and the Korean War.

---

[22]  As noted above, the government may reurge this affirmative defense during Phase II based on a more specific showing that Exxon's Baytown contribution claim is untimely under § 113(g)(2).

[23]  In its briefs, Exxon argued that it was not an operator between 1941 and 1955 of either the refineries or the plants it owned.  At oral argument, Exxon admitted that, for purposes of liability under CERCLA, it operated both its own facilities and the government's during the relevant times.  (Docket Entry No. 143, at 110-11, 123-24).  The court grants the government's motion, (Docket Entry No. 103), on these issues and denies Exxon's motion. (Docket Entry No. 102).

Exxon seeks summary judgment that the government did operate the refineries and the plants. The government seeks summary judgment that it was not an operator of the refineries. The government asks the court to deny Exxon's motion for summary judgment that the government was an operator with respect to the plants, but the government does not cross-move for summary judgment that it cannot be liable as an operator.

For the reasons explained below, the court concludes that: (1) the refineries and plants were sufficiently integrated at each site to be part of the same "facility"; (2) the government was not an "operator" of the refineries at either site; and (3) the government, with Exxon, operated the plants at both sites.

### A.   Whether the Refineries and the Plancors Are Separate "Facilities" Within Each Site

The parties agree that each of the two oil refineries is considered a "facility" under CERCLA and that the chemical plants—the plancors—at each site is also considered a "facility." The parties dispute whether the refineries and plants at each site are a single "facility." If so, liability for either the refineries or the plants would result in liability for the entire Baytown or Baton Rouge site. Because the government has admitted liability as a prior owner of the plancors at each site, concluding that the plancors and refineries at each site are one unified "facility" would subject the government to liability for the refineries regardless of whether the government actually operated them.[24]

---

[24]   This conclusion would not preclude allocating less fault to the government based on lower culpability for wastes generated at the refineries than at the plancors. *See Southern Pacific Transp. Co. v. Voluntary Purchasing Grps. Inc.*, 1997 WL 457510, at *6 (N.D. Tex. Aug. 7, 1997) (noting that the CERCLA defendants' argument that it would "be unfair to hold them liable for response costs for the entire Commerce Site based on their ownership of only one parcel" was a "fairness concern [that] may be relevant in a future apportionment or contribution phase of the case, it is not relevant to the initial determination of liability under Section 107(a)").

Exxon contends that the refineries and the plancors at each site are one "facility" for CERCLA liability purposes.  The government disagrees, cautioning the court to be "on guard to prevent clever constructions [of the CERCLA definition of "facility"] by private litigants . . . to expand the scope of liability beyond what would otherwise be provided . . . ."  (Docket Entry No. 67 at 46 (4:11-cv-01814)).  The government concedes that one Baytown plant, the Hydrocodimer Plancor, which was "located on refinery property and integrated into refinery operations," is properly included as part of the Baytown site "facility."  (Docket Entry No. 67 at 49 n.19 (4:11-cv-01814)).  The government argues that the remaining plancors at Baytown and all the plancors at Baton Rouge should be considered  separate "facilities" from the refineries at the site.  The government agrees that these plancors were located on federally owned land outside the refinery boundaries, were operated independently from the refineries, had different waste-disposal processes than the refineries, and were treated as distinct facilities by state regulatory agencies and subsequent owners or operators.[25]

The existence of a "facility" is an element of Exxon's *prima facie* case.  *Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 242 (5th Cir. 1998) (for § 107(a) claims); *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 104 (3d Cir. 1999) (for § 113 claims).  CERCLA broadly defines "facility," consistent with the statute's remedial design.  *See Uniroyal Chem.*, 160 F.3d at 242 ("[I]t is apparent that facility is defined in the broadest possible terms.").  Section 101(9) defines "facility" as:

---

[25] At the very least, the government argues, the court should defer ruling on the partial summary judgment motion and "examine the issue independently after trial."  (Docket Entry No. 67 at 50 (4:11-cv-01814)).

> (A) any building, structure, installation, equipment, pipe, or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . .

42 U.S.C. § 9601(9). Courts have generally given the definition a broad, practical construction that depends on the facts of each case. *See, e.g.*, *Clear Lake Prop. v. Rockwell Int'l Corp.*, 959 F. Supp. 763, 768 (S.D. Tex. 1997) (citing *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1573 (5th Cir. 1988)) ("[T]he Fifth Circuit has given this literal definition wide breadth in its interpretation of the statutory language."). This approach promotes CERCLA's primary objectives of "ensur[ing] prompt and efficient cleanup of hazardous wastes sites and [] plac[ing] the costs of those cleanups on the potentially responsible persons." *Cytec Indus. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 836 (S.D. Ohio 2002).

Under the broad definition of "facility," Plancor 1909—a hydrocodimer plant used to produce an avgas-blending component—at the Baytown site and the Baytown Ordnance Works are properly considered part of the same facility as the Baytown refinery. Similarly, the Baton Rouge refinery and two of the Baton Rouge Plancors easily qualify as one facility. The government admits that these three plants were located within the refinery boundaries, shared waste disposal processes with the refinery at the two sites, and are properly viewed as part of the same facility. (Docket Entry No. 67 at 49 n.19 (4:11-cv-01814)) (conceding that Plancor 1909 "was located on refinery property and integrated into refinery operations" at the Baytown site); (Docket Entry No. 67 at 48 n.17 (4:11-cv-01814)) (conceding that the two plants "located within the refinery boundary [are] logically included" in the same facility as the Baton Rouge refinery).

The government protests including the Baytown Ordnance Works in the same facility as the Baytown refinery, in part because the Works was located on federally owned land outside the refinery boundary. But "courts have consistently rejected attempts to create unnatural boundaries between different 'facilities' based on legal ownership boundaries." *Clear Lake Prop.*, 959 F. Supp. at 768; *see also Nw. Mut. Life Ins. Co. v. Atlantic Research Corp.*, 847 F. Supp. 389, 395 (E.D. Va. 1994) (rejecting the argument that parts of a 20–acre contaminated site should not be considered a single "facility" with the surrounding area because the lessee had leased only some of that area); *United States v. Stringfellow*, 661 F.Supp. 1053, 1059 (C.D. Cal. 1987) ("[N]othing in the statute or case law [indicates] that a 'facility' must be defined by or be coextensive with an owner's property lines."). Although the Works was on property located outside the refinery boundaries, the government rather than the refinery owner owned the land. The Ordnance Works had a sewer line leading to the refinery's "West Ditch" and exchanged byproducts with the refinery in an integrated fashion. (Docket Entry No. 67 at 49). The government argues that "[w]astes from the [Ordnance Works] appear to have been minimal" because the plant burned acid-sludge waste on-site and various process byproducts were returned to the refinery for its use but not as waste. (*Id.*). But the close integration between the refinery and the Ordnance Works is enough to group them as one "facility" under CERCLA. *See Uniroyal Chem.*, 160 F.3d at 245-46 (observing that the "definition of 'hazardous substances' in § 9601(14) covers far more than waste material"); 40 C.F.R. § 302.4(a) (listing a broad range of "elements," "compounds," and other substances that are "designated as hazardous substances" under CERCLA). Evidence that the Ordnance Works had less involvement in waste disposal than the refinery may be relevant in apportioning fault, but not in determining liability.

The remaining plancors present a closer question. Those plants were located outside the refinery boundaries. They were not integrated with the refinery. They generally had different waste-disposal processes from the refinery. At the Baytown site, for example, "the basic waste streams from all three Baytown rubber Plancors were routed through their own separators and down a common sewer towards Scott Bay, some distance upstream of the refinery outfalls." (Docket Entry No. 67 at 48 (4:11-cv-1814)) (citing Gravel Rep. at 62, 65, 67; Kittrell Decl. ¶ 6(a)-(b)). At the Baton Rouge site, the "rubber Plancors were similar, generally having their own waste treatment systems, and discharging to the Monte Sano Bayou well north of the refinery outfall." (*Id.* at 49) (citing Gravel Rep. at 140, 147, 150, 153; Kittrell Decl. ¶ 6(c)-(e)). But "the issue here is the release of hazardous substances which, as we all know, tend to leak to wherever they want to go, regardless of the rights and authorities of the responsible party." *Clear Lake Prop.*, 959 F. Supp. at 768. Hazardous wastes released at the Baytown site went to the Houston Shipping Channel; and the wastes released at the Baton Rouge site went to the Mississippi River. *See Cytec Indus., Inc. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 837 (S.D. Ohio 2002) (concluding "that usually, although perhaps not always, the definition of facility will be the entire site or area, including single or contiguous properties, where hazardous wastes have been deposited as part of the same operation or management" because holding otherwise "would not comport with the underlying purposes of CERCLA" and "litigation expenses might equal cleanup expenses"). This occurred regardless of whether the wastes came directly from the refineries or the plancors. And at both sites, the refineries and the plancors operated as part of the same general site with the same general purpose—supplying

the war effort with critical high-octane avgas and rubber.  The refineries and the plancors relied on each other's byproducts.

Given CERCLA's broad definition of the term "facility,"  the interrelated need for avgas and rubber production, the plants' and the refineries' proximity to each other and location on the same sites, and the shared destination for the released wastes, the court concludes that the refineries and plancors at each of the two sites are a single "facility" for CERCLA liability purposes.  *See Southern Pac. Transp. Co. v. Voluntary Purchasing Grps. Inc.*, 1997 WL 457510, at *1-3, 5 (N.D. Tex. Aug. 7, 1997) (concluding that a site was one "facility" despite the facts that different parties operated a chemical plant, a railroad facility, and a cotton gin on the site and the EPA's administrative orders had divided the site into three different cleanup areas).[26]

Exxon has admitted its prior- and current-operator liability as well as its owner liability for the plancors.  The United States has admitted its prior-owner liability.  Both parties are liable for remediation costs at the sites.  Because operator status with respect to each sub-facility is a factor in allocating fault, the court will consider the parties' arguments about prior-operator liability at both the refineries and the plants at each site.  The Phase II determination of how to equitably allocate the remediation costs incurred at each site will be informed by the following analysis, which considers the refineries and the Plancors separately.  *See Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 144-45 (D.D.C. 2014) ("[B]ecause the parties have stipulated to liability, the

---

[26] The government contends that the remaining plancors should nevertheless be considered separately because they were constructed later than the refineries and treated separately by subsequent owners and the State of Texas.  As the court in *Southern Pacific* observed in rejecting a similar argument about three separate administrative consent orders for a chemical plant, railroad line, and cotton gins at a contaminated site, the "entirety of the Commerce Site is similarly contaminated" as a "result of the long-time operation of the chemical plant, the railroad line, and the cotton gins," which "integrated their operations to varying degrees." *Southern Pacific*, 1997 WL 457510, at *5.

Court is not required to determine whether either party was an operator at the Sites. However, the Supreme Court's definition of operator liability in *Bestfoods* is helpful in delineating the *types of control* over which CERCLA extends and thus which party should be *more* responsible as an equitable matter.").

### B. Whether the Government Was a Prior "Operator" of the Refineries or the Plants

#### 1. The CERCLA "operator" standard

CERCLA defines an "operator" as "any person . . . operating" a facility. 42 U.S.C. § 9601(20)(A)(ii). In *United States v. Bestfoods*, 524 U.S. 51 (1998), the Supreme Court stated that "under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Id.* at 66. To be held liable for remediation costs, "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* "For one to be considered an operator, then, there must be some nexus between that person's or entity's control and the hazardous waste contained in the facility." *Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 928 (5th Cir. 2000) (quoting *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1341 (9th Cir. 1992)), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599 (2009). "A court must decide whether a contractor is an operator after considering the totality of the circumstances concerning its involvement at the site." *Id.*[27]

---

[27] In *Geraghty & Miller*, the court went on to say that "operator liability only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment." 234 F.3d at 928 (quotations omitted). That language is inconsistent with *Bestfoods*, which requires the operator to "manage, direct, or conduct operations specifically related to

Exxon argues that the "indicia of control" test from *FMC Corp. v. U.S. Dep't of Commerce*, 29 F.3d 833, 843 (3d Cir. 1994), governs.  In *FMC*, the Third Circuit concluded that the government exercised "substantial control" over the plaintiff's World War II production facility by determining "what product the facility would produce, the level of production, the price of the product, and to whom the product would be sold."  29 F.3d at 843.  Under this standard, Exxon contends, the United States exercised "substantial control" over the refineries and plants at the Baytown and Baton Rouge sites.  Although Exxon acknowledges that *FMC* was decided before *Bestfoods*, it argues that "numerous courts" have applied *FMC* since *Bestfoods* was decided.  (Docket Entry No. 102 at 24 (4:10-cv-2386)).  Exxon cites *United States v. Twp. of Brighton*, 153 F.3d 307, 315 (6th Cir. 1998) (finding the *FMC* decision "instructive"); *City of Waukegan v. Nat'l Gypsum Co.*, 560 F. Supp. 2d 636, 641 (N.D. Ill. 2008) (finding the *FMC* decision "to be consistent with *Bestfoods* and thus still viable as legal authority"); *United States v. Wash. State Dep't of Transp.*, No. 3:08-cv-05722 (RJB), 2010 WL 5071277, at *5 (W.D. Wash. Dec. 7, 2010) (finding the *FMC* decision "illuminating" and that the *FMC* criteria "provide an example of the type of 'control' that an entity must exert before operator liability may attach").

The government argues that *FMC*'s continuing relevance is dubious.  The *FMC* court based its operator-liability test on *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209 (3d Cir. 1993), which "adopted the 'actual control' test in determining whether operator liability should be imposed on one corporation for the acts of a related corporation."  *FMC*, 29 F.3d at 843

---

pollution."  524 U.S. at 66-67; *see also City of Wichita, Kansas v. Trs. of APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1055 (D. Kan. 2003) ("*Bestfoods* rejected authority to control as a basis for operator liability.  Instead, an operator must be actively involved in decisions regarding disposal of hazardous substances or environmental compliance." (citation to *Bestfoods* omitted)).

55

(describing *Lansford-Coaldale*, 4 F.3d at 1221).  In *Bestfoods*, the Supreme Court described the "actual control" test as too broad and stated a narrower standard for operator liability.  Under *Bestfoods*, "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  *See Bestfoods*, 524 U.S. at 66; *see also id.* at 67 ("The well-taken objection to the actual control test, however, is its fusion of direct and indirect liability; the test is administered by asking a question about the relationship between the two corporations (an issue going to indirect liability) instead of a question about the parent's interaction with the subsidiary's facility (the source of any direct liability).").

Many lower courts have recognized that *FMC*'s test is not helpful after *Bestfoods*.  *See Miami-Dade Cnty., Fla. v. United States*, 345 F. Supp. 2d 1319, 1342 (S.D. Fla. 2004) ("[T]he Third Circuit's reasoning in *FMC* does not assist this Court, because *FMC* is with inconsistent *Bestfoods*."); *see also Lockheed Martin Corp.*, 35 F. Supp. 3d at 147 n.77 (observing that *FMC*'s "'substantial control' test is in tension with *Bestfoods*'s focus on a party's particularized control over hazardous waste disposal processes," but finding it unnecessary to reach the issue (citing *Miami-Dade Cnty.*, 345 F. Supp. 2d at 1342)); *Steadfast Ins. Co. v. United States*, No. CV 06-4686 AHM, 2009 WL 3785565, at *1, *8 (C.D. Cal. 2009) (discussing *FMC* but finding that the United States was not liable as an operator "because the undisputed facts reveal[ed] that [the United States] ha[d] neither 'manage[d], direct[ed], [n]or conduct[ed] operations specifically related to pollution,'" (quoting *Bestfoods*, 524 U.S. at 67)).

### 2. Analysis

#### a. The Refineries

Under the *Bestfoods* standard, the government did not operate either the Baytown or Baton Rouge refineries.  Although the government had regulatory authority over the industry and contracted with the oil companies to ensure adequate avgas production during World War II and the Korean War, the government did not "manage, direct, or conduct . . . operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 61.

Exxon argues that the government's pervasive wartime regulation of the petroleum industry shows that it directed the Baytown and Baton Rouge refinery operations, including waste disposal. Exxon relies on *Brighton*, 153 F.3d 307 (6th Cir. 1998), which held that a government entity could be liable as an operator when its "'regulations' are just the government's method of macromanaging the facility." *Id.* at 315.  In *Brighton*, a Michigan township had contracted with a local landowner in 1960 to use his 15-acre plot of land "as a dump for town residents.'" *Id.* at 310.  "The township agreed to pay [the landowner] $60 a month in rent and $10 a month for maintenance," and "[t]ownship residents were admitted to the dump free of charge." *Id.*  In 1965, the township "decided to let local commercial waste into its dump along with residential waste." *Id.*  When "the Michigan state government began regulating dumps more carefully" in the late 1960s, "[f]or Brighton Township, part of this scrutiny included visits by the county sanitarian, who was sometimes accompanied by township officials." *Id.* at 311.  The township "was told in May 1971 by the Michigan Department of Public Health to take 'drastic measures' to improve the dump" or "legal action would be taken to close it." *Id.*  The dump was closed in 1973, and the township's "board wrote an official letter to the state health officer stating that the township had fulfilled its clean-up duties." *Id.*  In 1994, after the Environmental Protection Agency incurred nearly $500,000

cleaning up hazardous materials from the dump, the United States sued both the township and the landowner under CERCLA.  *Id.* at 312.  The district court found the township liable as an operator and the landowner liable as an owner.

The township appealed, arguing that "it did not exercise sufficient control over the site to qualify as a liable 'operator' under CERCLA."  *Id.*        The Sixth Circuit acknowledged that "the Supreme Court ha[d] recently addressed the issue of defining 'operator' status" in *Bestfoods*. *Id.* at 313.  But because the panel thought "corporate-form cases [were] not applicable to the present case," in which the federal government's rather than a private corporation's role was at issue, the panel sought to define "operator liability outside of the corporate context." *Id*. at 314.  The panel viewed its "task" as distinguishing  (1) "situations in which a governing authority uses its conventional police power to ensure that a dump does not pose a threat to public health and safety; from (2) situations in which the 'regulations' are just the government's method of macromanaging the facility,"  because  "mere regulation does not suffice to render a government entity liable, but actual operation (or 'macromanagement') does."  *Id.* at 315-316. Applying this test to the record, the panel could not "conclude that Brighton Township was or was not an operator of the facility." The panel vacated the district court's "ruling that the township was an operator of the facility" and remanded for further proceedings.   *Id.*

*Brighton* does not support Exxon's argument.  The distinction that opinion drew between the government-entity and private-entity cases, applying the "regulation" versus "macromanagement" test only when a government entity is involved is not consistent with *Bestfoods.  See Brighton*, 153 F.3d at 333 (Dowd, J., dissenting) ("I note my disagreement with my colleagues that a governmental entity should be held to a lower threshold level of control which would give rise to liability" because

"the *Bestfoods* standard should be applied to both the corporate form and the governmental entity situations" and "[w]hen this standard is applied to the instant case, . . . the Township's actions were insufficient to render it liable as an 'operator'"). *Bestfoods* clearly requires more than general influence over the economy or over a plant's operations, even if the result could increase waste production.   Under *Bestfoods*, operator liability requires the defendant to "manage, direct, or conduct" affairs leading to waste leakage, waste disposal operations, or environmental compliance decisions.  *See Bestfoods*, 524 U.S. at 66-67; *N. States Power Co. v. City of Ashland, Wis.*, — F. Supp. 3d. —, 2015 WL 1243597, at *12 (W.D. Wis. Mar. 18, 2015); *Steadfast*, 2009 WL 3785565, at *8; *Schiavone v. Pearce*, 77 F. Supp. 2d 284, 290 (D. Conn. 1999).

In addition, the governmental entity in *Brighton* "made repeated and substantial ad hoc appropriations, and it made arrangements . . . for bulldozing and other maintenance when [the landowner it contracted with] himself proved unequal to the task.  *It also took responsibility for ameliorating the unacceptable condition of the dump*, before and after scrutiny from the state government, at least as early as 1965." *Brighton*, 153 F.3d at 315-16 (emphasis added).  The present record does not disclose facts showing that the federal government assumed similar responsibilities over the sites.

The federal government's wartime influence over these refineries stemmed from its voluntary contractual relationships with Exxon's predecessors.  Courts have repeatedly rejected arguments that similar procurement activities during wartime to fill national defense needs are enough for operator liability.   Direct and specific federal government involvement in the waste-disposal matters at issue is required.  *See, e.g.*, *E. Bay Mun. Util. Dist. v. U.S. Dep't of Commerce*, 142 F.3d 479, 486 (D.C. Cir. 1998) ("[E]ntering into an output contract does not make the

government an operator."); *Litgo N.J., Inc. v. Martin*, Civ. No. 06-2891 (AET), 2010 WL 2400388,

*24-25 (D.N.J. June 10, 2010), *aff'd in part & vacated in part on other grounds sub nom Litgo N.J.*

*Inc. v. Comm'r N.J. Dep't of Envtl. Protection*, 725 F.3d 369 (3d Cir. 2013) (the government was

not liable as an operator from its World War II contracts to purchase aircraft parts because it did not

"manage, direct, or conduct any of the day-to-day operations," even though it regulated the

distribution of the raw material that contaminated the groundwater and did quality-control

inspections of the facility).[28]

The government "played the role of a very interested consumer" in its wartime contracts with

suppliers, including Exxon's predecessors. *See United States v. Iron Mountain Mines, Inc.*, 987 F.

Supp. 1277, 1284 n.14 (E.D. Cal. 1997).  But the contracts gave Exxon's predecessors bargaining

power.  Standard LA and Humble had virtually identical contracts.  They included provisions stating

that "[t]he prices, specifications and quantities of [100-octane avgas of specifications other than

those originally attached to the contract] shall be *determined by negotiation* between the parties, and

[Standard] shall not be required to deliver such products unless and until an agreement has been

reached."  (Docket Entry No. 66-4, ¶ 61 at MIS-00022189-90 (emphasis added) (4:11-cv-1814)).

Humble negotiated a provision in its Baytown Avgas Contract that allowed it to continue selling

---

[28] *See also, Miami-Dade Cnty. v. United States*, 345 F. Supp. 2d 1319, 1342-43 (S.D. Fla. 2004) (the United States had no operator liability from its wartime contracts with aircraft manufacturers because there was no evidence that the contractor "consulted federal personnel on waste disposal matters or that federal inspectors had any duties or responsibilities for waste disposal matters"); *Rospatch Jessco Corp. v. Chrysler Corp.*, 962 F. Supp. 998, 1005-06 (W.D. Mich. 1995) (concluding that the "Air Force did not exercise substantial control over, or actively involve itself in, the activities of KMC," which "owned the plant and manufactured airplane engines pursuant to contracts with the United States"); *Steadfast Ins. Co. v. United States*, No. CV 06-4686 AHM, 2009 WL 3785565, at *1, *8 (C.D. Cal. 2009) (the government was not liable as an operator from its manufacturing contracts with a plant producing "powder charges for commercial use and rocket motors for the military").

avgas to its existing customers: "[T]he Army and the Navy and certain commercial airports where supplies [were] delivered to Army and Navy airplanes."   (Docket Entry No. 66-4, ¶ 73 & MAA_EM-000728 (4:11-cv-1814)).   Although the contracts capped profits at 6%, both Standard and Humble consistently made profits under them. The maximum profit figure was not significantly lower than the average profits in the industry in the decade before the war.  (Docket Entry No. 123, at 17 n.5 (describing a study finding that the average rate of return on capital in the oil industry between 1934 and 1941 was 6.4%); *see also* Docket Entry No. 66-4, ¶ 86 (4:11-cv-1814)).   Standard and Humble were able to pay their investors dividends during both World War II and the Korean War, and both companies applied for and received tax-amortization certificates worth a total of more than $120 million without adjusting for present-day inflation.  (Docket Entry No. 66-4, ¶¶ 82-85 (4:11-cv-1814)).

Exxon argues that the specter of having the refineries seized and cutting crude-oil supplies coerced its predecessors into taking orders from the federal government.  (Docket Entry No. 102 at 26-27).   While the government had seizure authority, it did not seize, or threaten to seize, either the Baytown or Baton Rouge refineries.  Indeed, there was no need; Exxon's predecessors appeared to be willing partners enthusiastic to support the nation's defense needs.  (Docket Entry No. 66-4, ¶ 184 (4:11-cv-1814)).  *See Coeur d'Alene Tribe v. Asarco, Inc.*, 280 F. Supp. 2d 1094, 1129 (D. Idaho 2003) ("[T]he threat of seizure does not support a finding of liability where such a threat was never triggered."); *E. Bay Mun. Util. Dist.*, 142 F.3d at 487 ("[O]ne can imagine a party so threatened by the War Production Board's seizure power as to have been driven to produce against its will.  But no such threat seems ever to have loomed here.").  Exxon's conclusory assertion that the "threat of seizure was no idle threat to Humble or Standard Oil" does create a genuine factual

dispute as to any issue material to determining liability.  *See Brown v. City of Hous., Tex.*, 337 F.3d 539, 541 (5th Cir. 2003) ("[U]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

Exxon cites evidence about the oil companies' dissatisfaction with the renegotiation clauses. This evidence does not turn what was otherwise a consensual relationship into a coercive one. Exxon cites a 1943 letter that George Parkhurst, Standard's national assistant director of refining, sent to George H. Hill, Jr., the Defense Supplies Corporation's executive vice-president and general counsel.  (Docket Entry No. 159).  The letter discussed the "unwillingness" of certain oil companies "to execute a contract containing a clause having the effect of waiving the right to contest the validity or applicability of the renegotiation statute." (*Id.*).  The statute allowed the government to renegotiate wartime profits if they were too high.  *See Lichter v. United States*, 334 U.S. 742, 768 (1948).  The letter did not discuss either Standard LA or Humble,[29] spoke in general terms, and did not identify either of the refineries in this case.  (Docket Entry No. 159).  The companies' "unwillingness" was limited; the letter merely stated that, "[i]n general these companies [were] willing to execute contracts containing statutory negotiation clauses if such clauses [could] be made to provide that they fall if the statute [was] held unconstitutional or inapplicable. . . ." (Docket Entry No. 157).

The federal government's "authority to control" the private entities that were necessary to meet wartime supply needs is not the *Bestfoods* standard.  *Bestfoods* requires a direct nexus between the government's activities and the decisions in the refineries' waste leakage, disposal, or

--------

[29] The letter mentions only the following companies as examples of those "which have most strongly objected" to the statutory renegotiation clauses: "Texas, Phillips, Socony-Vacuum, Pan American, Mohawk, and Tide Water."  (Docket Entry No. 159, at 1).

environmental compliance.  *See Bestfoods*, 524 U.S. at 60 & n.8, 66-67 (rejecting the "authority to control" test and requiring that "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations"); *see also Coeur d'Alene Tribe v. Asarco, Inc.*, 280 F. Supp. 2d 1094, 1128-29 (D. Idaho 2003) (mining and milling companies that voluntarily entered into government contracts did not prevail on the argument that the imposition of price and labor restrictions, the requirement of government approval for capital improvements, and other regulatory controls made the government liable as an operator); *Litgo*, 2010 WL 2400388 at *24 ("The mere existence of a contract between the government and a private business . . . does not make the United States Defendants an 'operator' of [the site].").

Nothing in the record indicates that the contracting parties negotiated or specified how the oil companies would manage waste disposal at the refineries.  The contracts are silent on this issue. (Docket Entry No. 66-4, ¶¶ 198-99 (4:11-cv-1814)).  The evidence does not show that government officials or employees worked at the Baytown and Baton Rouge refineries.  Instead, the record shows that Humble and Standard LA personnel ran the refineries' day-to-day operations.  (Docket Entry No. 66-4, ¶¶ 2, 6, 169 (4:11-cv-1814)).  The avgas contracts referred to the personnel operating the refineries as governed by the companies' existing labor contracts.  No federal government employees operated any refinery equipment, supervised operations, or directed operations.  (Docket Entry No. 66-4, ¶¶ 81, 174, 177).  *See Miami-Dade Cnty.*, 345 F. Supp. 2d at 1342 (holding that the government was not liable as an operator in part because "federal personnel did not operate the engine work assembly line or direct [the contractor's] employees in their daily work"); *Iron Mountain Mines*, 987 F. Supp. at 1285 (finding no operator liability in part because the

"United States did not participate in 'day-to-day' management nor did it have the right to do so");
*Litgo N.J., Inc.*, 2010 WL 2400388 at *24 (finding no operator liability because "[t]he United States defendants did not manage, direct, or conduct any of the day-to-day operations" at an aircraft-manufacturing plant).

Exxon argues that the inspections by government employees at the refineries—including by one employee stationed at Baton Rouge—supports a conclusion that the government "operated" these entities.  (Docket Entry No. 102 at 26-27).  Courts have consistently rejected similar arguments.  In *Miami-Dade County*, for example, the court determined the United States was not liable as a past operator, noting that "[f]ederal government employees . . . *including those actually stationed at the . . . plant*, had no objective, duty, or responsibility other than to enforce the price, schedule, and other contract provisions by ensuring delivery of quality products in accordance with the terms of the contract . . . ."  345 F. Supp. 2d at 1343 (emphasis added); *see also United States v. Vertac Chem. Corp.*, 46 F.3d 803, 809 (8th Cir. 1995) (federal inspections to ensure compliance with worker-safety requirements at a facility manufacturing Agent Orange were "insufficient bases for imposing CERCLA liability on the United States as an operator"); *Litgo*, 2010 WL 2400388, at *24 (finding no operator liability when the United States "conduct[ed] periodic inspections to ensure that the site was maintained in compliance with industry standards"); *Steadfast Ins. Co. v. United States*, No. CV 06-4686 AHM, 2009 WL 3785565, at *8 (C.D. Cal. 2009) ("[I]nspectors were only at the Site to monitor . . . contractual performance and to ensure that the products . . . manufactured met USA's specifications."); *Maxus Energy*, 898 F. Supp. at 402 (granting summary judgment to the United States despite federal inspections at contractor's facility to determine compliance with contract specifications).

64

The evidence shows that a government employee was stationed at the Baton Rouge refinery to "inspect C-S," a blending agent for avgas, to ensure product quality, and to coordinate shipping for the finished product.  Exxon's predecessors contractually agreed to these inspections.  Nothing in the record suggests that this inspector's duties involved day-to-day management of the refinery or related to waste disposal or environmental compliance.  (Docket Entry No. 66-4, ¶ 172 (4:11-cv-1814)).  As in *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92 (D.D.C. 2014), "[a]lthough the government had a significant presence and role at the Sites, there is no evidence that the government used its influence to manage or control the day-to-day disposal of hazardous wastes there."  *Id.* at 145.

The evidence also shows that the government did not hire, fire, or otherwise manage the refineries' employees.  No contract provision allowed the government to make personnel or labor-related decisions.  Nothing in the record suggests the government had or played a role in these decisions.  (Docket Entry No. 66-4, ¶¶ 170-71, 179 (4:11-cv-1814)).  When, as here, "[n]o one from the federal government was involved with the hiring or firing of [the] employees" running the facility, *Miami-Dade County*, 345 F. Supp. 2d at 1342, the basis for operator liability diminishes.

Exxon argues that the government's control over the national labor market during wartime subjects it to operator liability.  The case law is clear, however, that this broad or general authority over industry-wide labor allocation is not enough.  *See, e.g.*, *Coeur d'Alene Tribe*, 280 F. Supp. 2d at 1127, 1129 (the United States was not the facility's operator based on its regulation of wages, the length of the workweek, and other labor conditions, or based on its labor-allocation authority); *East*

65

*Bay*, 142 F.3d at 485 (federal regulation of labor mobility and hours was not "direct managerial or supervisory authority" over a particular facility's workforce).

Third, there is no evidence that the government designed, specified, or provided equipment to the refineries. Exxon's predecessors designed and constructed their own processes and equipment. (Docket Entry No. 66-4, ¶¶ 50-53, 55, and 59 (4:11-cv-1814)). Both the Baytown and Baton Rouge refineries had an existing infrastructure that provided the capacity to make war products. Both refineries were valuable to the war effort "as is." (Docket Entry No. 66-4, ¶ 60 (4:11-cv-1814)).

Exxon urges this court to follow "cases in which the courts have recognized that wartime conditions presented a unique set of factors when considering CERCLA liabilities." (Docket Entry No. 102 at 29) (citing *Cadillac Fairview*, 299 F.3d at 1029; *Shell*, 294 F.3d 1060; *FMC*, 29 F.3d at 846); *cf. Lockheed*, 2014 WL 1647147, at *43 ("Even assuming that *FMC* remains good law in the wake of *Bestfoods*, this case does not present the pervasive levels of control exhibited in *FMC* and other World War II cases."). But those cases do not support the result Exxon seeks. *Shell* addressed arranger rather than operator liability. The Ninth Circuit concluded that the government was not liable as an arranger for disposing of non-benzol hazardous waste from World War II avgas production, despite the evidence showing that the government allocated crude oil and scarce materials during the war and provided the market for the 100-octane avgas produced. *See* 294 F.3d at 1054-59.

*Cadillac Fairview* did not address operator liability under *Bestfoods* in the refinery context. Instead, it concerned equitable allocation of costs required to remediate waste from rubber-production operations. 299 F.3d at 1022-23. In *Cadillac Fairview*, the evidence as to the

66

government's role was far different than the evidence here.  In that case, the government "had unrestricted control over its contractor's operations of the site" and "required monthly reports regarding hazardous waste disposal."  *Lockheed Martin*, 2014 WL 1647147, at *43 n.78 (citing *Cadillac Fairview*, 299 F.3d at 1022, 1026); *see also Steadfast*, 2009 WL 3785565, at *7 ("The Government's involvement in *Cadillac/Fairview* was pervasive: it directly participated in decisions about the disposal of waste by studying the manufacturer's waste pits and approving them." (citing *Cadillac/Fairview*, 299 F.3d at 1024)).

Finally, as discussed above, *Bestfoods*, not *FMC*, controls.  The observation that "environmental cleanup costs [a]re a cost to society that the Government should *rightly pay* as a result of wartime conditions," 29 F.3d at 846, bears on other equitable allocation issues, not whether the government was an operator.[30]

_____

[30] To the extent that *FMC* remains good law after *Bestfoods*, the court agrees with the government that it is not liable as a prior "operator" under that standard.  In *FMC*, unlike the present case, the government "supplied equipment for use in the manufacturing process, acted to ensure that the facility retained an adequate labor force, participated in the management and supervision of the labor force, had the authority to remove workers who were incompetent or guilty of misconduct, controlled the price of the facility's product, and controlled who could purchase the product."  *Id.* at 843.

Decisions applying *FMC*'s "substantial control" test have held that federal involvement at an industrial plant will make the government liable under CERCLA only if that involvement exceeds general regulation of or oversight over a contractor's operations.  *See, e.g.*, *Twp. of Brighton*, 153 F.3d at 316 n.11 ("In both of these cases, then, the dispositive question, as here, was whether the government entity was running the facility or merely regulating it.  In the present case, Brighton Township took hands-on, non-regulatory action distinct from that of the entities in *Dart* and *New Castle*."); *Vertac Chem. Corp.*, 46 F.3d at 809 (the United States was not liable as an operator for wastes generated by Agent Orange manufacturing during Vietnam War despite government directives and specifications requiring prioritization because the United States "was not sufficiently involved, directly or indirectly, in the activities that took place at" the facility); *E. Bay Mun. Util. Dist.*, 948 F. Supp. at 78 (the United States was not liable as an operator for wastes generated during WWII despite pervasive regulatory involvement at a mine because of a lack of managerial control over the mine); *Rospatch Jessco Corp. v. Chrysler Corp.*, 962 F. Supp. 998 (W.D. Mich. 1995) (holding that the United States was not liable as an operator even though it provided specifications and on-site quality control inspectors at aircraft engine manufacturing plant); *Maxus Energy Corp. v. United States*, 898 F. Supp. 399, 402 (N.D. Tex. 1995) (no United States operator liability despite the evidence showing that the government stationed federal inspectors at the facility to monitor compliance with contract specifications and issued directives to accelerate production).

Exxon argues that federal rationing of materials critical for the war effort controlled and limited the oil refineries' ability to dispose of the increased waste. Exxon identifies two requests to allocate materials toward waste-disposal projects. The government rejected both requests.

At the Baytown refinery, Exxon's predecessors requested PAW's approval in 1944 to use scarce material to build a new acid-sludge burning facility that would serve as back-up until a new acid-concentration facility was built and the existing facility overhauled. The government had already approved the new construction and overhauling projects. The PAW denied the request for the acid-sludge burning facility, concluding that it would "only serve to tide [Humble] over" while the new facility was being built and that delaying the modifications to the existing acid-concentration facility would eliminate the need for the acid-sludge burning facility. (Docket Entry No. 66-4, ¶ 221 (4:11-cv-1814); Docket Entry No. 118-1 ¶ 107).

At the Baton Rouge refinery, Standard LA first considered building a new master separator in 1931, but did not. Standard LA reviewed the adequacy of its waste-disposal facilities in two studies that showed the "escape of oil to the river." This led Standard LA to plan changes in the existing separators in 1939. But Standard LA did not take meaningful action until 1944, after a high-profile oil spill from a barge at the Baton Rouge refinery.[31] After that spill, the United States Army Corps of Engineers found that the refinery's waste disposal into the Mississippi River violated the River and Harbor Act, informing Standard LA that "it . . . expected [ ] the next [Corps]

---

[31] Exxon contends that its predecessor "originally requested PAW's approval to construct" the master separator "during the 'early part' of the war" (Docket Entry No. 117 at 45), but it acknowledges "historical documentation of Standard Oil's initial attempt to obtain PAW approval" is "very limited," (*Id.* n.16). The government points out that there is "no record of a 1943 request made by Standard regarding a master separator at Baton Rouge" apart from a "1946 company memorandum" and a "1953 company newspaper." (Docket Entry No. 123, at 23 n.7).

investigation will show that proper action has been taken" or else the Corps would refer the matter to the U.S. District Attorney.  (Docket Entry No. 66-4, ¶ 248 (4:11-cv-1814)).

In July 1944, Standard LA applied to the PAW for permission to use steel, copper, and labor to build a master separator and a silt-treating system.  (Docket Entry No. 66-4, ¶ 260 (4:11-cv-1814)).  Standard LA acknowledged that the wartime need for the scarce materials might prevent it from completing both projects and told the PAW that it put a higher priority on the silt-treating system:

> We believe that you are fully aware that our two projects covering the master separator and the mud washing and emulsion treating facilities can be handled separately.  Although we think the installation of both projects is very desirable, if in the interest of conservation of materials and manpower it is necessary to postpone at least part of those projects, we believe that the installation of mud washing and emulsion treating facilities should be given preference, since they could be installed more quickly and more could be accomplished in correcting pollution problems with a smaller investment.

(Docket Entry No. 66-4, ¶ 272 (quoting Standard LA's internal correspondence) (4:11-cv-1814)).

The PAW concluded that constructing the master separator would divert too much steel and labor from higher priority war projects.  The PAW approved the silt-treatment unit, consistent with Standard LA's preference.  Standard LA completed the unit in September 1945.  Although the government lifted the restriction on the materials necessary to build the master separator in 1945, Standard LA did not begin operating the separator until October 1952, seven years later.  (Docket Entry No. 66-4, ¶¶ 292-93 (4:11-cv-1814)).

In both instances, the government's role focused on allocating scarce materials, not on deciding whether, when, or how Exxon's predecessors should dispose of wastes at either facility. The government exercised its regulatory authority to refuse to allocate steel or other scarce materials

69

to the two proposed waste-disposal projects.  The government's decisions allocating or refusing to allocate certain resources did not direct the refineries' waste-disposal operations or manage their day-to-day waste-disposal decisions.  *See Steadfast*, 2009 WL 3785565, at *7 (finding no operator liability "[e]ven accepting [the plaintiff's] contention that the DOD Safety Manual did direct [certain] employees as to how to perform their waste disposal duties" because that was "insufficient to show 'direction' or 'control' over waste disposal for purposes of establishing operator liability"); *United States v. Wash. State Dep't of Transp.*, No. 08-cv-5723, 2010 WL 5071277, at *7 (W.D. Wash. Dec. 7, 2010) (holding that the issuance of permits by the Corps did "not give rise to operator liability" absent evidence that the Corps "managed, directed, or controlled" the waste producing operations or "had hands-on, day-to-day control of the management of the [facility]").

The evidence that the Corps knew the potential for pollution at the Baton Rouge refinery does not support holding the United States liable for that pollution as an operator.  *See Coeur D'Alene Tribe*, 280 F. Supp. 2d at 1128 (the standard for operator liability was not satisfied even when the United States "knew how the waste material was disposed of"); *Lockheed Martin*, 35 F. Supp. 3d at 150 ("[E]vidence that a party knew of another's disposal practices is insufficient to impose either operator or arranger liability. . . ." (citing *Coeur D'Alene Tribe*, 280 F. Supp. 2d at 1127-30)).  If the government's decisions in this case gave rise to operator liability, then any resource-allocation decisions the government made under the World War II contracts, impacting waste disposal or environmental compliance, would subject it to CERCLA liability.  The cases clearly forbid this result.

Exxon fails to justify, and neither the record nor law supports, using these two examples to make the United States liable.  Given the undisputed and extensive evidence of the general and

limited nature of federal control over the refineries' operation, these neglected requests are insufficient for operator liability.  There is no evidence that the United States was otherwise involved in environmental-compliance decisions at either facility.[32]  *See Coeur D'Alene Tribe*, 280 F. Supp. 2d at 1128 ("any one single action taken by the federal government would arguably not be sufficient to make the federal government an operator under CERCLA"); *Iron Mountain Mines*, 987 F. Supp. at 1287 (same).  Even "courts applying the actual control test[, which *Bestfoods* rejected,] have consistently required more than casual or occasional involvement in such decisions.  Instead, an operator under CERCLA must make the relevant decisions on a frequent, typically day-to-day, basis." *City of Wichita, Kansas v. Trs. of APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1055 (D. Kan. 2003) (citing cases).

Exxon relies on similar arguments in arguing that the United States' involvement in the refineries during the Korean War subjects it to operator liability.  The same analysis and result apply.  Exxon does not allege or identify evidence that the United States had played a role—as required by *Bestfoods*—in either site's waste-disposal operations during the Korean War.

---

[32] Exxon asserts that "the available evidence shows that the government made at least five, unilateral waste disposal decisions about waste processing improvements at the Baytown and Baton Rouge refineries." (Docket Entry No. 121, at 16).  Three of these examples were entwined with the government's resource-allocation decisions about the acid-waste burner at Baytown and the master separator at Baton Rouge: (1) the government's first denial of Standard LA's request to construct a master separator in the "early part" of World War II; (2) the government's approval of Standard LA's silt-treating unit; and (3) the government's approval of Humble's request to build acid reconstruction facilities.  (Docket Entry No. 117, at 47).  Whether framed as approving the use of certain materials or denying the use of others, these decisions were part of the decisions to deny materials to build a back-up acid-sludge burner at Baytown and build a master separator at Baton Rouge.  (Docket Entry No. 123, at 22 ("[I]n fact, those two projects—through subdivision—make up the five instances that Exxon now refers to in its brief.")).

The court rules that the United States did not operate either the Baytown or Baton Rouge refineries during either World War II or the Korean War.[33]

### b.    The Plancors and the Ordnance Works

Exxon also moved for summary judgment that the United States is liable as operator for the chemical plants (including the Ordnance Works) at both the Baytown and Baton Rouge sites.  The government opposes Exxon's motion but does not seek a declaratory judgment that the United States did not operate the plants.  Because the government admits ownership of the plants, the United States is liable as a "covered person" for an equitable share of the qualifying cleanup costs.  The

---

[33] The government argues that Exxon's expert witness, A.J. Gravel, is not "qualified as an expert [historian] by knowledge, skill, experience, training, or education" and will not "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; (Docket Entry No. 118, at 80).  The government specifically challenges Mr. Gravel's ability "to assist the Court in understanding the context of the WWII and Korean War time periods" because he "lacks training and education in history."  (Docket Entry No. 118, at 81).  The government has not, however, challenged his qualifications to provide an opinion on non-historical issues.  Considering Gravel's testimony and report does not alter the conclusion that the United States did not operate the refineries.  Nor is Gravel's testimony necessary to find and conclude that the United States did operate the plants.

The government also argues that "Exxon's expert reports—all unsworn—would constitute inadmissible hearsay at trial and thus do not constitute competent summary judgment evidence."  (Docket Entry No. 67, at 83 n.31 (4:11-cv-1814)).  Each of Exxon's experts subsequently filed sworn rebuttal declarations incorporating their reports by reference under penalty of perjury.  (*See* Docket Entry Nos. 121-1, ¶ 3; 121-2, ¶ 5; 121-3, ¶ 4); *see also Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 634 (S.D. Tex. 2007) (refusing to exclude a party's "unsworn expert report" because "that deficiency was cured by filing [a subsequent] sworn declaration").

issue is whether, for the purpose of this court's later equitable allocation, the United States also

operated the plancors and the Baytown Ordnance Works.[34]

The government's direction of certain aspects of the synthetic-rubber plant operations and

the waste disposal activities make it liable as a prior operator under *Bestfoods*. The government

approved the designs Humble and Standard LA submitted for the new plants. The Rubber Reserve

Corporation's ("RuR") "Manual of Administrative Procedures" required Exxon's predecessors at

both sites to obtain government approval for, among other things, any plant-related expenditure

exceeding $1,000; the disposal of waste, scrap, byproducts, and surplus materials and equipment;

additions or alterations to the plants; and increasing employee salaries and benefits. (Docket Entry

No. 118-1 ¶ 226). A government official was also permanently stationed at one of the Baytown

plants. (Docket Entry No. 118-1, ¶ 232). One communication to Humble from that government

official, expressing frustration with plant employees, shows the level of control he exerted:

> On numerous occasions I sit in my office looking out of the window
> along about a quarter to five and can see the men gathering up
> through the aisles of the boiler house section and lining up to make
> a rush for the time clocks at five o'clock. Since this matter has not
> just occasionally happened, but has been constant for weeks, it is

---

[34] Exxon also moved for summary judgment that the government is liable as an "arranger" for the disposal of waste at the Hydrocodimer Plancor (Plancor 1909) at the Baytown site. Exxon argues that the government "arranged for and paid" it to process "various hazardous raw materials" into hydrocodimer at the plant, and that the government "retained title to these raw materials throughout the production process." (Docket Entry No. 102, at 42-43 n.14); *see also Sea Lion, Inc. v. Wall Chem. Corp.*, 974 F. Supp. 589, 595 (S.D. Tex. 1995) (defendant may be liable as an arranger when it supplied the raw materials to produce "a dinitrobenzene mixture" to be sold back to the defendant). The government has not responded to the substance of these arguments. Instead, the government argued that, because it "concedes that it is a 'covered person' as a prior owner," the court "need not decide whether the United States was an arranger at Plancor 1909 at Baytown." (Docket Entry No. 118, at 65 n.21). The government is correct that the court need not determine whether the United States is an arranger to decide liability. The court must decide whether the United States is an arranger for purposes of apportioning fault, but neither party has had an opportunity to address the Fifth Circuit's recent decision on arranger status in *Vine Street LLC v. Borg Warner Corp.*, 776 F.3d 312 (5th Cir. 2015), which requires "an intentional act directed toward the disposal of hazardous waste," *id.* at 317. The court will rule on this issue until Phase II.

> running into a considerable loss of time. . . .  Please take steps with
> the general contractor to see that the condition is eliminated or the
> matter will have to be taken up with Washington, where I am sure we
> can get results.

(Docket Entry No. 117, at 58 (quoting PPF ¶ 233)).  Unlike the CS inspector at the Baton Rouge

refinery, the official at the plant played a substantial role in overseeing day-to-day operations.

In addition to playing a much larger role in directing plant operations than refinery

operations, the United States also made specific decisions about waste disposal and environmental

compliance at the plants.  During World War II, the Army's Ordnance Department knew that some,

if not most, of the spent alumna-catalyst waste generated at the hydroformer reactor processing unit

at the Ordnance Works was disposed of in open dumps at, or in the vicinity of, the Ordnance Works.

(Docket Entry No. 118-1 ¶ 221).  The government acknowledged that during the War, it delayed

improving the waste-processing facilities at the plants:

> During this period, it was recognized that some raw and partially
> processed materials were lost into waste waters leaving the plants,
> and that some of these substances were causing a stream pollution
> problem.  However, personnel could not be diverted from more
> pressing objectives to study the complex problems related to waste
> prevention or treatment—nor could construction materials be secured
> for such purposes.

(Docket Entry No. 118-1 ¶ 219).  In the same 1946 report, the government observed that "[m]any

of these facilities were designed to meet only the minimum requirements because the more

comprehensive programs in many instances could not be justified in the war emergency and the

scarcity of critical materials."  (Docket Entry No. 118-1 ¶ 217).

The RuR eventually recognized the "increasing importance of active attention to problems

concerned with air and water pollution in our operating plants" and deemed it "advisable to

centralize the contacts and work on such projects under Reserve's direction in a single office."

(Docket Entry No. 117-3, ¶ 64).  In 1946, the RuR hired an industrial waste-management expert, Sheppard Powell, to inspect and make recommendations to address pollution from the synthetic-rubber plants.  (Docket Entry No. 118-1 ¶¶ 150, 157, 179, 220.  (Docket Entry No. 118-1 ¶ 220).  In the late 1940s, Humble had to obtain the government's approval to install an effluent-treating system for the condensate oil emulsion wastewater generated at the Butadiene Plancor at the Baytown site.  (Docket Entry No. 118-1 ¶ 222).  Around that same time, RuR officials met with Texas environmental officials to discuss wastes from the chemical plants at the Baytown site polluting nearby surface waters.  The RuR informed company employees about the outcome of these meetings.  (Docket Entry No. 118-1 ¶ 224).

The government's organization of, and direction over, the operations at the Ordnance Works and its disposal mechanisms also satisfy the *Bestfoods* operator standard.  The Ordnance Works featured military barracks, a mess hall, air raid shelters, high-security perimeter fencing, and four guard watchtowers.  It resembled a United States Army base more than a chemical plant.   Army personnel, including a commanding officer, a permanent Army staff, a detachment, and an infantry company, were stationed full-time at the Ordnance Works.  (Docket Entry No. 118-1 ¶¶ 227-28, 230).  The Army personnel played an important role in the plant's toluene production.  As one Humble employee wrote in a memo:

> [w]e are subjected to a steady stream of orders from this [Ordnance Department] office stating how various phases of the business should be conducted and specifying numerous reports to be submitted daily, weekly, and monthly to St. Louis covering personnel, absenteeism, average hourly rates, overtime payments, production quotas, maintenance costs, warehouse inventories on a dollar basis. . . . [I]nspectors from the Eighth Service Command regularly check our sanitary facilities and require a monthly report from us as to the adequacy of our water supply and sewage facilities.

75

(Docket Entry No. 102-1, ¶ 231).

### C.    Findings and Conclusions as to CERCLA Operator Liability

The court makes the following rulings on the parties' CERCLA operator liability under the parties' wartime contracts:

- Exxon operated the refineries;

- Both Exxon and the United States operated the Plancors at the Baytown and Baton Rouge sites; and

- Both Exxon and the United States operated the Baytown Ordinance Works.[35]

Accordingly, both parties operated the Baytown and Baton Rouge "facilities" during the time in question.  Each party's culpability and extent of liability, which depend in part on whether that party operated particular parts of those facilities, will be decided in the equitable allocation phase.

### D.    The Forms of Relief Available to Exxon

Even though the United States did not operate the refineries, it did operate the Plancors and the Baytown Ordnance Works and has admitted it owned the Plancors at each site.  Exxon argues that the United States is jointly and severally liable for past, present, and future costs under § 107(a).  In the alternative, Exxon seeks a declaratory judgment that the United States is responsible for an equitable share of its past, present, and future costs.  The United States argues that joint and several

---

[35] Exxon initially argued that it did not operate the Plancors or the Ordnance Works because it served as the government's agent and its actions were therefore attributable to the government.  (Docket Entry No. 117, at 10, 63).  At oral argument, however, Exxon appeared to retreat from this theory, conceding that for liability purposes, it did operate the plants under its contracts with the government.  In any event, the court rejects Exxon's agency arguments, in part because CERCLA expressly exempts from liability "an act or omission of a third party *other than an employee or agent of the defendant*. . . ."  42 U.S.C. § 9607(b)(3) (emphasis added); *see also Bestfoods*, 524 U.S. at 65 ("Under the plain language of the statute, *any* person who operates a polluting facility is directly liable for the costs of cleaning up the pollution.") (emphasis added)); *see also* (Docket Entry No. 102, at 30 n.10 ("Several parties may be subject to 'operator' liability at a particular Site under CERCLA.")).

liability is inappropriate when, as here, one liable party sues another under CERCLA.   The government also argues that this court should decline to enter a declaratory judgment at any point allocating Exxon's "speculative future costs" to remediate certain nearby areas, offshore water bodies, and sediments.[36]   (Docket Entry No. 103, at 11).

### 1.        Joint and Several Liability

Exxon argues that joint and several liability is the "default" standard in § 107(a) actions.  *See PCS Nitrogen Inc. v. Ashley II of Charleston*, 714 F.3d 161, 168 (4th Cir. 2013) (observing that joint-and-several liability is the "default" standard for private-party actions under § 107(a)); *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 289 (5th Cir. 2010) ("Joint and several liability may be imposed, unless a party can prove that the harm it caused is divisible from the harm others caused.").   In response, the government points to *Elementis Chromium L.P. v. Coastal States Petroleum Co.*, 450 F.3d 607 (5th Cir. 2006), which held that "[w]hen one liable party sues another liable party under CERCLA, the action is not a cost recovery action under § 107(a), and the imposition of joint and several liability is inappropriate."  *Id.* at 613 (quotations omitted).  *Elementis* was a postsettlement contribution action under § 113(f), not § 107(a).  *See id.* at 612 (identifying the issue as "whether liability is joint and several, or several only, in *§ 113(f) contribution actions*" (emphasis added)); *id.* at 613 ("As liability is several only in CERCLA contribution actions, the district court erred in imposing joint and several liability upon Hess and Magellan.").   Although *Elementis* prohibits imposing joint and several liability for Exxon's Baytown

---

[36] These water bodies include the Houston Ship Channel, Black Duck Bay, Scott's Bay, and Mitchell Bay at the Baytown site.  At the Baton Rouge site, they include the Mississippi River and the Monte Sano Bayou.  (Docket Entry No. 117 at 68 n.28).

site costs, which this court has already held cannot be recovered under § 107(a), *Elementis* says nothing about Exxon's Baton Rouge site costs.

Section 107(a) does not mandate joint and several liability.  *See In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 901 (5th Cir. 1993) (specifying that "joint and several liability is not mandated under CERCLA").  In *Atlantic Research*, the Supreme Court "assum[ed] without deciding that § 107(a) provides for joint and several liability."  551 U.S. at 140 n.7.[37]  But the Court has made clear that the scope of liability under § 107 is to "be determined from traditional and evolving principles of common law[.]"  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 613 (2009) (quotation omitted); *see also* 126 Cong. Rec. 30,932 (1980) (explaining that "the liability of joint tort feasors will be determined under common or previous statutory law").

The government argues that common-law principles preclude liable parties like Exxon from imposing joint and several liability on other liable parties.  *See* RESTATEMENT (SECOND) OF TORTS § 433B cmt. *d* at 444 (1965) ("As between the proved tortfeasor who has clearly caused some harm, and *the entirely innocent plaintiff*, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former." (emphasis added)).  This court need not decide the issue.  Even if joint and several liability applies here, the government has "blunt[ed] any inequitable distribution" through its counterclaim for contribution under § 113(f).  *Atlantic Research*, 551 U.S. at 141.[38]  The

---

[37] Several courts since *Atlantic Research* have concluded that § 107(a) allows for joint and several liability.  *See PCS Nitrogen* 714 F.3d at 168;  *Tronox Worldwide LLC v. Atlantic Richfield Co.*, No. Civ.-07-1017-HE, 2012 WL 1493733, at *3 n.9 (W.D. Okla. Apr. 27, 2012) ("In order to conclude that liability under § 107(a) is joint and several when the plaintiff is an 'innocent party' but several only when the plaintiff is a PRP, the court would have to read into the statute a distinction that is not there.").

[38] Exxon argues that this does not apply when liability is disputed.  But the Court found that most aspects of liability are not in dispute.  For example, the United States admitted that it was a prior owner of the plants.

court will not impose joint and several liability and instead will allocate fault based on equitable principles. *See Halliburton Energy Servs. v. NL Indus.*, 648 F. Supp. 2d 840 (S.D. Tex. 2009) (analyzing the parties' comparative fault without deciding whether joint and several liability applied because the defendant's counterclaim had "blunted" the plaintiff's claim for cost recovery).

### 2.     The Equitable Allocation Methodology

After liability is established, a court allocates fault "using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). "This language gives district courts discretion to decide what factors ought to be considered, as well as the duty to allocate costs according to those factors." *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000). Section 113 does not require the court to consider any particular list of factors. Rather, courts often "use what are called the 'Gore factors,' named after a failed attempt to amend CERCLA." *Id.* These factors include:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (ii) the amount of the hazardous waste involved; (iii) the degree of toxicity of the hazardous waste involved; (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (vi) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment.

*Carson Harbor Vill., Ltd. v. Unocal Grp.*, 270 F.3d 863, 893–94 (9th Cir. 2001) (citation and quotation omitted). In addition, courts also consider the "Torres Factors," including (1) "[t]he extent to which cleanup costs are attributable to wastes for which a party is responsible"; (2) "[t]he party's level of culpability"; (3) "[t] he degree to which the party benefitted from disposal of the waste";

and (4) "[t]he party's ability to pay its share of the cost." *Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 123 (D.D.C. 2014).

"Given the broad discretion granted in CERCLA § 113(f)(1), courts also look beyond the Gore and Torres factors when equitably allocating response costs." *Id.* (citing *Am. Int'l Specialty Lines Ins. Co. v. United States (AISLIC II)*, 2013 WL 135405, at *9 (C.D. Cal. Jan. 9, 2013)). "[C]ourts have also considered the following factors under CERCLA § 113(f)(1)":

1.      The "knowledge and/or acquiescence of the parties in the contaminating activities." *Weyerhaeuser Co. v. Koppers Co.*, 771 F.Supp. 1420, 1426 (D. Md. 1991).

2.      The value of the contamination-causing activities to furthering the government's national defense efforts. *Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.*, 299 F.3d 1019, 1026 (9th Cir. 2002); *Shell Oil*, 294 F.3d at 1060.

3.      The existence of an indemnification agreement demonstrating "the parties' intent to allocate liability among themselves." *Halliburton Energy Servs., Inc. v. NL Indus.*, 648 F. Supp. 2d 840, 863 (S.D. Tex. 2009); *see also Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 447 (3d Cir .2005).

4.      "The financial benefit that a party may gain from remediation of a site." *Litgo New Jersey, Inc. v. Martin*, 2011 WL 65933, at *9 (D. N.J. Jan. 7, 2011); *see also City of Wichita*, 306 F. Supp. 2d at 1101.

5.      The potential for windfall "double recoveries" by a plaintiff. *See, e.g.*, *Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*, 725 F.3d 369, 391 (3d Cir. 2013); *Friedland v. TIC–The Indus. Co.*, 566 F.3d 1203, 1207 (10th Cir. 2009).

6.      The potential that a plaintiff might "make a profit on the contamination" at the expense of another PRP. *See Vine St., LLC v. Keeling ex rel. Estate of Keeling*, 460 F. Supp. 2d 728, 765 (E.D. Tex. 2006).

7.      CERCLA's intent that "'responsible parties, rather than taxpayers, bear the costs'" of cleanup. *Yankee Gas*, 852 F. Supp. 2d

> at 256 (quoting *Marsh v. Rosenbloom*, 499 F.3d 165, 182 (2d Cir.
> 2007) (emphasis added)).

*Lockeed Martin*, 35 F. Supp. 3d at 123-24.

Exxon asks the court to adopt its expert witness's proposed "production-based approach" to allocate fault in Phase II.  This approach uses  "throughputs"—the amounts of oil and rubber each facility produced—to approximate the hazardous waste generated during a given period.  The proposed model places more weight on the period during the war, before better waste-management technology was installed at either site.  The model also assigns more blame to operators than to owners.

The United States opposes this methodology on several grounds.  The United States argues that the court should defer deciding equitable allocation, including methodology, until it receives more evidence during Phase II of this case, including "the opinion of the United States' expert on CERCLA allocation, Matt Low."  (Docket Entry No. 118, at 83).  The court agrees with the United States that deciding on the method for allocating fault is premature.  The court will resolve that issue during Phase II of the litigation.  Exxon is free to reurge its allocation arguments at that time.

### 3.    A Declaratory Judgment as to Future Costs

Exxon seeks a declaratory judgment that the United States is liable for the future cleanup costs Exxon will incur at both sites and specifying the United States' equitable share of these future costs.   The United States argues that the "court should enter the declaratory judgment as to liability only for unknown future costs, and defer any equitable allocation of those costs until they are actually incurred and sufficient facts are established to determine what allocation would be equitable."  (Docket Entry No. 67 at 38 (4:11-cv-01814)).

Based on the court's holding that the United States owned and operated the Plancors at the Baton Rouge site, the court enters declaratory judgment that the United States is liable for its share of past and future costs.  Section 113(g)(2) provides that "[i]n any such action described in this subsection [cost-recovery actions brought under § 107], the court *shall* enter a declaratory judgment on *liability* for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2) (emphasis added).   A declaratory judgment as to Exxon's § 107(a) past and future cleanup costs at the Baton Rouge site is required.

Section 113(f) is different.  A declaratory judgment is not required in Exxon's § 113(f) action to recover its Baytown site cleanup costs.   "The statute does not explicitly provide for declaratory relief for a contribution action for future *or* past response costs."  *United States v. Davis*, 261 F.3d 1, 46 (1st Cir. 2001).   "However, nothing in the statute precludes an interpretation that declaratory relief is available in both instances."  *Id.*; *see, e.g.*, *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1191 (9th Cir. 2000) ("The statute is silent on whether declaratory judgments are authorized in contribution actions.  It does not prohibit them.  It is hard to see why it would.  CERCLA was intended to encourage quick response and to place the costs on those responsible.  Declaratory relief serves these purposes because all parties, like those in this case, will know their share of costs before they are incurred." (footnote omitted)); *Tosco Corp.*, 216 F.3d at 897 ("[W]here, as here, a responsible party chooses to go to trial and future response costs are likely to be incurred, but the exact amount remains unknown, a judgment on proportional liability is an appropriate remedy."); *Solvent*, 664 F.3d at 26; *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 450-51 (6th Cir. 2004) (holding that "declaratory judgments concerning future costs in § 107 and § 113(f) suits must be treated

alike" so long as a case or controversy exists); *Vine St., LLC v. Keeling*, 460 F. Supp. 2d 728, 766-67 (E.D. Tex. 2006) (holding that § 113(g)(2) requires declaratory relief as to "any action described in this subsection, including § 113 contribution claims").

Exxon's claim for a declaratory judgment that the United States is liable for its share of the cleanup costs is ripe as to both its § 107(a) and § 113(f) claims.  Courts have held that "some funds must be spent on response costs prior to a [CERCLA] declaratory judgment action being considered ripe." *A Shapiro & Sons, Inc. v. Rutland Waste & Metal Co.*, 76 F. Supp. 2d 82, 87 (D. Mass. 1999) (collecting cases).  Exxon alleges and presents evidence that it has already incurred substantial cleanup costs at each site, roughly $41 million at Baytown and $31 million at Baton Rouge.  (Docket Entry No. 117, at 70 n.30).  Exxon has adequately demonstrated that it will continue to incur costs. This controversy is "sufficiently real to permit the court to issue a declaratory judgment on defendant's liability."  *Jones v. Inmont Corp.*, 584 F. Supp. 1425, 1430 (S.D. Ohio 1984).  The United States does not dispute this claim.

The issue is whether the record similarly supports a declaratory judgment for fault allocation as to Exxon's future costs, including costs incurred in cleaning up "offshore" water bodies near the two sites.  For the same reasons that allocating fault at this time would be premature, the court declines to enter a summary declaratory judgment that the United States is equitably held to a certain share of for future costs.  During Phase II, the court may issue a declaratory judgment equitably assigning the parties' shares of future costs if the evidence is not unduly speculative or otherwise subject to challenge. *See New York*, 664 F.3d at 26-27; *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 449 (3d Cir. 2005); *Davis*, 261 F.3d at 45 n.41; *Basic Mgmt.*, 569 F. Supp. 2d at 1126; *F.P. Woll & Co.*, 2006 WL 2381778, *8-9.

## V.      Conclusion

The court grants in part and denies in part Exxon's motions for partial summary judgment as to Phase I liability and allocation, (Docket Entry No. 102 (4:10-cv-2386); Docket Entry No. 51 (4:11-cv-1814)).  The court grants in part and denies in part the government's motions for partial summary judgment.  (Docket Entry No. 103 (4:10-2386); Docket Entry No. 52 (4:11-cv-1814).  The court enters declaratory judgment that the United States is liable for its equitable share of the past and future cleanup costs incurred at the Baytown and Baton Rouge sites.  The equitable allocation of fault and costs will be determined in Phase II.

SIGNED on June 4, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge


## GLOSSARY APPENDIX

| | |
|---|---|
| AGRP | Aviation Gas Reimbursement Plan |
| Avgas | Aviation Gasoline |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| DPC | Defense Plant Corporation |
| DPA | Defense Production Act |
| EPA | Environmental Protection Agency |
| FOA | Facility Operations Area |
| NCP | National Contingency Plan |
| NPA | National Production Authority |
| PAD | Petroleum Administration for Defense |
| PAW | Petroleum Administration for War |
| PRP | Potentially Responsible Party |
| RCRA | Resource Conservation and Recovery Act |
| RuR | Rubber Reserve Company |
| SARA | Superfund Amendments and Reauthorization Act of 1986 |
| TCEQ | Texas Commission on Environmental Quality |
| WPB | War Production Board |